UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| In re | ) | Case No. 06-20152 |
| | ) | |
| DAVIS PETROLEUM CORPORATION | ) | Case No. 06-20153 |
| | ) | |
| DAVIS OFFSHORE, L.P. and | ) | Case No. 06-20154 |
| | ) | |
| DAVIS PETROLEUM PIPELINE, LLC, | ) | Jointly Administered under Case No. 06-20152 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |
| THE NANCY SUE DAVIS TRUST, | ) | Adv. No. P. No. 06-_____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | COMPLAINT OF THE NANCY SUE DAVIS TRUST TO REVOKE AN ORDER OF CONFIRMATION |
| | ) | (11 U.S.C. § 1144) |
| DAVIS PETROLEUM CORPORATION, DAVIS OFFSHORE, L.P., DAVIS PETROLEUM PIPELINE, LLC, DAVIS PETROLEUM ACQUISITION CORP., DAVIS PETROLEUM HOLDINGS CORP., DAVIS OFFSHORE PARTNERS, LLC, AND ALBERT S. CONLY, LIQUIDATING TRUSTEE UNDER LIQUIDATING TRUST AGREEMENT OF DAVIS PETROLEUM CORPORATION, DAVIS OFFSHORE, L.P. AND DAVIS PETROLEUM PIPELINE, LLC, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

The Nancy Sue Davis Trust ("ND Trust") brings this complaint to revoke the order of confirmation entered in these jointly administered cases on March 10, 2006, on the grounds that the order was procured by fraud. The ND Trust alleges as follows:

JURISDICTION AND VENUE

1. The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

2.	This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (L), and (O).

3.	Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

SUMMARY OF THE ACTION

4.	In March 2006, the Court, in a whirlwind process, confirmed a plan that provided for a fire sale of the debtors.  The Court sought and obtained assurances that the buyer was disinterested, that the negotiations were arm's length, and that the buyer had no prior relationship with the seller and its equityholders.  None of these statements were true.  In fact, months before, an individual whom the equityholders believed to be an advisor to the debtors, trusted to seek a disinterested acquirer who would pay top price, had entered into a secret agreement with the President of the debtors to structure a deal for their self interests, engineered a loan to the debtors secured by the debtors' most valuable assets to a lender whose affiliate was part of the buying group, and then, along with the President of the debtors, joined the investment group that acquired the debtors' shares in a fire sale. The plan was confirmed when these blatant and egregious conflicts of interest were concealed, and this complaint seeks to revoke the confirmation order that was procured by this fraud.

THE PARTIES

5.	Plaintiff, The Nancy Sue Davis Trust ("ND Trust") is a trust established under the laws of the State of Colorado.  As of March 7, 2006, the date these cases were commenced (the "Petition Date"), the ND Trust owned, among other things, 8.8% of Davis Petroleum Corp.; 8.8% of Davis Pipeline, LLC; and held an indirect ownership interest in Davis Offshore, L.P.

6.	Defendant Davis Petroleum Corporation ("DPC") is one of the debtors in these administratively consolidated proceedings and is a corporation organized under the laws of the State of Delaware, with its principal place of business in Houston, Texas.

7. Defendant Davis Offshore, L.P. is one of the debtors in these administratively consolidated proceedings and is a limited partnership organized under the laws of the State of Texas, with its principal place of business in Houston, Texas.

8. Defendant Davis Petroleum Pipeline, LLC is one of the debtors in these administratively consolidated proceedings and is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Houston, Texas.

9. Defendant Davis Petroleum Acquisition Corp. ("DPAC") is one of the acquiring entities in these administratively consolidated proceedings and is a corporation organized under the laws of the State of Delaware.

10. Defendant Davis Petroleum Holding Corp. is one of the acquiring entities in these administratively consolidated proceedings and is a corporation organized under the laws of the State of Delaware.

11. Defendant Davis Offshore Partners, LLC is one of the acquiring entities in these administratively consolidated proceedings and is a limited liability company organized under the laws of the State of Delaware.

12. Defendant Albert S. Conly is sued in his capacity as Liquidating Trustee under the Liquidating Trust Agreement for the debtors. The Liquidating Trustee is named because the Liquidating Trust holds proceeds from the sale of the debtors.

MESDAG'S RELATIONSHIP WITH THE DAVIS ENTITIES AND DAVIS FAMILY

13. DPC and its predecessor, Davis Oil Company, was family owned for more than 60 years until the recent sale. For many years, DPC was run by Marvin Davis ("Mr. Davis"). Mr. Davis died in September 2004. Prior to his death, he appointed his son, Gregg Davis (the "President"), president of DPC, Davis Offshore, L.P., and Davis Petroleum Pipeline, LLC (collectively "the Davis Entities"). The equityholders of the Davis Entities were all members of the Davis family. The equityholders of the Davis Entities, exclusive of the President, are referred to herein as the "Davis Family". During

all times relevant hereto, the President was the sole equityholder of the Davis Entities serving as an officer of the Davis Entities.

14. During the 1990s, Willem Mesdag ("Mesdag"), who served as head of Goldman Sach's Los Angeles office, worked on a number of deals for Mr. Davis and his companies. Prior to becoming an investment banker, Mesdag was an attorney in a firm noted for its expertise in corporate transactions.

15. In or about March 2002, Mesdag joined Davis Companies as a senior advisor to "pursue and evaluate new investment opportunities in Davis' primary areas of interest, including gas and oil exploration off the Gulf of Mexico." A copy of the press release announcing his retention is attached hereto as Exhibit "A" and incorporated herein by this reference.

16. From that point forward, through and including the filing date of these cases, Mesdag maintained an office at DPC in Los Angeles, California, was on its payroll, received medical benefits, had an assistant working under his direction who was employed by DPC, and had access to the Davis Entities' confidential records. Mesdag held himself out to the Davis Family as their companies' investment banker and adviser.

17. In or about January of 2005, the Davis Entities were in need of capital to further develop offshore wells in which they had an interest. The Davis Family agreed that the Davis Entities, through the President and Mesdag, should explore the following alternatives:

      (a) Additional financing;

      (b) An equity investor in the Davis Entities;

      (c) A sale of a portion of the Davis Entities' assets;

      (d) A sale of the Davis Entities.

THE SECRET DEAL BETWEEN MESDAG AND THE PRESIDENT

18. On or about January 31, 2005, Mesdag, through his company, Red Mountain Capital Partners LLC ("Red Mountain"), entered into an agreement (the "Secret Agreement") with the President pursuant to which, among other things:

(a) Red Mountain agreed to be retained by Davis Acquisition Corp. ("DAC") (not to be confused with DPAC, one of the entities which acquired the Davis Entities in the bankruptcy proceedings) and the President to act as an "advisor" "in connection with a possible management led buyout of DPC." DAC was a company formed by the President for the purpose of acquiring the Davis Entities.

(b) DAC was to pay Red Mountain a fee of $10,000 per month.

(c) Red Mountain was to provide services to the President and DAC, not DPC.

(d) Additional fees were to be paid by DAC if Red Mountain raised new capital.

(e) Additional fees were to be paid by DAC if an outstanding loan from Sankaty Advisor, LLC to DPC was amended or if new financing for DPC was obtained.

(f) All of these fees were guaranteed by DPC.

(g) DPC agreed to indemnify Red Mountain in the event any claims were asserted against it in connection with duties it performed under the Secret Agreement.

19. The President signed the agreement on behalf of himself, DAC, <u>and DPC. No corporate resolution was ever passed by DPC authorizing him to enter into this transaction, and the Davis Family was never provided with a copy of the agreement or told of its terms</u>. The notion that the target of an acquisition would pay the fees of an advisor for an insider who was seeking to acquire the target is, if not unheard of, at the very least extraordinary and required independent board approval which was never obtained.

20. Based upon his past experiences, both as a lawyer and investment banker, Mesdag knew that the President was not disinterested and that an agreement of this nature required approval by disinterested directors of DPC. Despite this knowledge, ND Trust is informed and believes, and based upon such information and belief alleges that

Mesdag persuaded the President to enter into the transaction without proper authorization and to keep the terms of the agreement a secret from the Davis Family.

21. DAC never paid any fees to Red Mountain. Rather, all of the fees were paid by DPC per the President's instructions even though no claims were ever made on DPC to pay as a guarantor. Mesdag continued to remain on the DPC payroll and remained on its premises.

## MESDAG AND THE PRESIDENT CONTROL THE SEARCH FOR CAPITAL

22. According to the Disclosure Statement filed March 7, 2006 (the "Disclosure Statement"), commencing in approximately February 2005 (immediately following the execution of the Secret Agreement), the Davis Entities "sought a transaction by which a third party would infuse substantial capital into the Debtors to create a liquidity event for current equity owners." This effort was led and controlled by the President and Mesdag, although the Davis Family believed that the President and Mesdag were acting on behalf of the Davis Entities, not in their own self interests.

23. From February through May 2005, no investment banker was hired to shop the Davis Entities nor was a book put together for prospective financiers, investors or acquirers. During this time period, the Davis Family believed that the President and Mesdag were acting on behalf of the Davis Entities in a search for financing or a potential acquirer. Had the Davis Family known that Mesdag was not acting as an investment banker on their behalf, an independent investment banker would have been hired. During this time period, Mesdag located Evercore Capital Partners, L.P. ("Evercore") and identified it as a prospective purchaser. Mesdag reached an understanding with Evercore that he and the President would be allowed to obtain an equity ownership in the entity Evercore would form to acquire the Davis Entities. At the time this understanding was reached, it was kept secret from the Davis Family.

## THE INDEPENDENT DIRECTOR AND INVESTMENT BANKER

24. In May 2005, Dan Armel ("Armel") was hired by the Davis Entities as an independent director for the principal purpose of overseeing a potential sale to

Evercore. Jeffries & Co. was hired by the Davis Entities as an investment banker for the principal purpose of reviewing the Evercore transaction. Jeffries & Co. was never asked nor did it prepare a book for prospective investors or acquirers, and it did not shop the Davis Entities.

### THE SANKATY GROUP FINANCING

25. In or about June 2005, Mesdag arranged for the Davis Entities to obtain a loan from Sankaty High Yield Partners II, L.P.; Sankaty High Yield Partners, III, L.P.; Sankaty Credit Opportunities, L.P.; Sankaty Credit Opportunities, III, L.P.; and Prospect Credit Harbor Partners, L.P. (collectively, the "Sankaty Group"). This loan was secured by a lien on the most valuable assets of the Davis Entities, its offshore wells. There was an existing lien on these assets in an amount far below their value. Unbeknownst to the Davis Family, a scheme had or was in the process of being hatched by Mesdag pursuant to which Evercore and the Sankaty Group, through an affiliate, Sankaty Davis, LLC ("Sankaty"), would team up with Mesdag to acquire the Davis Entities. This lien placed a stranglehold on the Davis Entities and precluded them from having flexibility to raise capital. This financing increased the prospects that Evercore, Mesdag, and the President could acquire the Davis Entities under "fire sale" conditions.

### THE EXCLUSIVITY AGREEMENT

26. On or about October 26, 2005, the Davis Entities entered into an agreement to negotiate exclusively with Evercore and agreed that they would not shop the deal with any third parties (the "Exclusivity Agreement"). A copy of the Exclusivity Agreement is attached hereto as Exhibit "B" and incorporated herein by this reference. The President supported the Davis Entities entering into this agreement. Among other things, the Exclusivity Agreement prohibited the Davis Entities from entering into any discussions, negotiations, or agreements with any third parties which would have the effect of limiting Evercore's ability to acquire the Davis Entities. It further provided that in the event the Davis Family did not approve the sale of the Davis Entities to Evercore on terms that were not materially less advantageous than those set forth in a proposal that Evercore

had made, that the Davis Entities would be required to reimburse Evercore for its out of pocket expenses up to $1.5 million. It further provided that if, within one year after the date of the Exclusivity Agreement the Davis Entities were sold to another party, a breakup fee of $5 million would be owing unless Evercore withdrew its proposal prior to the end of the nonsolicitation period in the agreement.

### THE RESIGNATION OF THE INVESTMENT BANKER

27. In or about late December 2005, Jeffries & Co. resigned as investment banker to the Davis Entities. ND Trust is informed and believes, and based upon such information and belief alleges that Jeffries & Co. resigned because it believed that if the deal with Evercore went forward and Jeffries & Co. provided a fairness opinion or other documentation to support the deal, it would be sued.

### THE FAILED AGREEMENT

28. In or about December 2005, several members of the Davis Family utilized their personal counsel for the purpose of representing their respective interests in connection with the potential acquisition by Evercore. ND Trust is informed and believes, and based upon such information and belief alleges that a draft of a stock acquisition agreement ("Failed Agreement") was circulated to the Davis Family's counsel on January 6, 2006. The only purchaser identified in the Failed Agreement was Evercore. The Failed Agreement provided, among other things, for a payment of approximately $77 million to the Davis Family, with the debts of the Davis Entities to be assumed by the buyers.

29. The Failed Agreement required the consent of the Davis Family. One member of the Davis Family, Patricia Davis Raynes, had been embroiled in contentious litigation with other members of the Davis Family, contending, among other things, that she had been denied a portion of her inheritance.

30. In or about January 2006, the Davis Family's counsel were advised that the entities that would be buying the Davis Entities would be owned by Evercore, Sankaty, Red Mountain, and the President, but were not advised of the terms of the Secret Agreement and the other untoward acts that had been engaged in for the prior year. Under

the deal the President struck with Evercore, the President was also to be given an employment contract, royalties, and a right to acquire an additional interest in the buyers.

31. On or about January 31, 2006, the Davis Family's counsel were provided with schedules for the Failed Agreement (the "Schedules"). The Schedules refer to hundreds of contracts. Buried in Schedules is a reference to the Secret Agreement. The reference refers to DAC, not DPAC, one of the buyers. The names are on their face, very similar, so they would not draw attention to the Secret Agreement. Further, the description refers to Red Mountain being engaged by DPC. The fact that an entity owned by Mesdag would be engaged by DPC would not draw suspicion since that is what was understood to be the relationship by the Davis Family.

32. In an effort to go forward with the favorable deal it sought to consummate, Evercore offered the Patty Davis Raynes Trust an additional $5 million to consent to the Failed Agreement.

33. On or about February 13, 2006, Evercore announced it was terminating the Failed Agreement. As a justification for said termination, Evercore stated that it was doing so because of the failure to obtain the consent of the Patricia Davis Raynes Trust to the sale. Said trust held an ownership interest in the Davis Entities that mirrored that of the ND Trust.

34. At the time that Evercore terminated negotiations pertaining to the Failed Agreement, Armel, the independent director, resigned.

THE PRESIDENT ASSUMES CONTROL OF THE SALES PROCESS

35. Both before and after the failed Evercore deal, the Davis Family was told by the President, who was being advised by Mesdag, that there were no acceptable suitors for the Davis Entities, no ability for the Davis Entities to raise a meaningful amount of cash, and that a "free fall" bankruptcy was likely which would wipe out their equity interests and result in a scenario where they could have personal liability for certain obligations.

36. Following Armel's resignation, the President advised the Davis Family that a deal with Evercore was the only way in which they would realize anything for their equity interests. The President recommended to them that Evercore be asked to submit a new proposal.

37. On or about February 8, 2006, the Sankaty Group declared a default with respect to its outstanding loan. At the time this default was declared, the Sankaty Group understood that this would have the effect of further pressuring the Davis Family to enter into an agreement to sell their ownership interest in the Davis Entities to the buyers, Davis Petroleum Acquisition Corp., Davis Offshore Partners, LLC, and Davis Petroleum Holdings Corp. (collectively, the "Evercore Group").

38. The Davis Entities retained bankruptcy counsel on February 14, 2006.

39. At the President's urging, Evercore was asked to submit a new proposal. Notwithstanding the fact that Evercore had been dealing with the Davis Entities since at least May 2005, Evercore advised the Davis Family that it needed to do additional due diligence and that if it made a new offer, it would be lower than its previous offer. The ND Trust is informed and believes, and based upon such information and belief alleges that Evercore spent less than a day doing additional due diligence.

40. On or about February 27, 2006, Evercore, on behalf of itself, Mesdag's entity, Red Mountain, Sankaty, and the President, made an offer to purchase the Davis Entities for a price that provided at least $50 million less to the Davis Family than what they would have received had the Failed Agreement been consummated. The proposal was presented to the Davis Family on or about March 2, 2006, and they were given a deadline of 48 hours, which was later extended to 72 hours, to approve the new deal. The Davis Family was advised that it was a take it or leave it deal, would have to be done through a prepackaged bankruptcy to avoid the need to obtain Patricia Davis Raynes' approval, that overbidding or an auction process would not be allowed, that a plan of reorganization had to be confirmed by March 15, 2006, and that the deal would have to

close by March 30, 2006. If the deal did not close by March 30, 2006, the Davis Entities would owe Evercore a breakup fee of approximately $4 million, plus transaction costs.

41. The lone holdout of the Davis Family to the Failed Agreement, the Patricia Davis Raynes Trust, agreed to sign the Failed Agreement and forego the additional $5 million that had been offered to her trust by Evercore if it would agree to go forward with that agreement. The Evercore Group refused to accept this proposal.

42. The ND Trust is informed and believes, and based upon such information and belief alleges that during the course of the negotiations between the Davis Family and Evercore over the terms of the sale agreement, information pertaining to the confidential negotiations being held by the Davis Family was conveyed to Mesdag, who then conveyed this information to Evercore.

43. Between February 6, 2006 and February 27, 2006, the President did not have the Davis Entities hire an investment banker to seek financing or another acquisition partner.

44. At or about the time the new Evercore proposal was presented to the Davis Family, the President told them that absent acceptance of the Evercore deal, the Davis Entities would have to file bankruptcy and their equity interests would be wiped out. Mesdag made a similar statement to Barbara Davis, the widow of Mr. Davis, whose trust held a majority interest in the Davis Entities, and told her she was lucky to be getting this amount. A lower price for the Davis Entities was beneficial for Mesdag and the President since it lowered their cost to acquire an equity interest in the Evercore Group.

45. With the exception of the ND Trust, the Davis Family agreed to accept the revised Evercore proposal. An acquisition agreement was prepared and the Secret Agreement was again buried in the schedules. The terms of the Secret Agreement were not known at that time by the Davis Family or their counsel. However, the terms of the Secret Agreement were known by the Evercore Group at that time.

## THE BANKRUPTCY FILING AND CONFIRMATION PROCESS

46.	The Davis Entities filed voluntary petitions in this Court under chapter 11 of title 11 of the United States Bankruptcy Code, the Disclosure Statement, and Plan (the "Plan") on March 7, 2006.  Parties in interest were given one day to file objections to the Disclosure Statement and Plan.

47.	A hearing to approve the Disclosure Statement and Plan was held on March 9, 2006, and the Court approved the Disclosure Statement and entered an order confirming the Plan (the "Confirmation Order") on March 10, 2006.

48.	The only entity identified in the body of the Plan and Disclosure Statement as having an interest in the Evercore Group is Evercore.  There is an exhibit among the hundreds of pages attached to the Disclosure Statement which references a Red Mountain affiliate and Sankaty as additional equityholders in the Evercore Group.  There is no mention of the terms of the Secret Agreement in the Disclosure Statement or Plan.  At the time these documents were prepared, the Davis Entities' bankruptcy counsel was not aware of the existence of the Secret Agreement.

49.	A proffer filed in support of the Plan by the President says the Evercore Group deal was an arm's length transaction.

50.	At the Plan confirmation hearing, when describing the benefits the President would receive as part of the sale to the Evercore Group, the Davis Entities' counsel represented that "it's completely above board."  The Court inquired whether there was any relationship with Evercore – obviously referring to the Evercore Group – and DPC or the Davis Family. The Court was assured by the Davis Entities' counsel that the contracts "have all been disclosed" and that there were no contracts prior to the proposed deal.  The Court inquired whether the first and second deals with the Evercore Group "have all been an arm's length transaction" and was assured that that had been the case.  The Davis Entities' counsel described the one year process where "management has been trying to recapitalize the company with additional capital" which resulted in the selection of Evercore and stated "My understanding is that was an arm's length process as well."

51. The Evercore Group was given the opportunity to address the lack of any relationship between the Davis Family and the Evercore Group, and represented that there were "no current ties or other relationship with the company, other than pursuing it as an investment," and failed to apprise the Court of the Secret Agreement notwithstanding their knowledge of its terms.

52. The President stated on his direct examination that the Davis Family had no relationship with Evercore prior to the negotiation or consummation of the deal.

53. The Disclosure Statement provides, among other things, that it is proposed in good faith and contains adequate information for purposes of § 1125. It also states that: "The transaction between Davis Acquisition and the Debtors is an arms-length transaction between unrelated parties."

### THE RED MOUNTAIN PROOF OF CLAIM

54. On April 20, 2006, nearly six weeks after entry of the Confirmation Order, Red Mountain filed a proof of claim for $500,000, a copy of which is attached hereto as Exhibit "C" and incorporated herein by this reference. The Secret Agreement is attached to the proof of claim, which is how the ND Trust learned of its existence. Had Red Mountain not had the audacity to profiteer further from its untoward acts, this agreement would never have come to the Davis Family's attention. Under the formula in the Secret Agreement, Red Mountain claimed that it was entitled to $800,000 from DAC.

55. In the proof of claim, Red Mountain acknowledges that there were oral agreements with DPC with respect to payment obligations, none of which are disclosed in the Disclosure Statement and Plan. Neither the Court nor the Davis Family were advised of the existence of these oral agreements at the time of the confirmation hearing.

56. The proof of claim indicates that Evercore paid Red Mountain $300,000. The ND Trust is informed and believes, and based upon such information and belief alleges, that Red Mountain has acknowledged that the Evercore Group was the successor to DAC under the Secret Agreement.

57. In email correspondence between Evercore and Red Mountain dated March 28, 2006, Evercore acknowledges that "Nevertheless, if the Transactions are consummated, Red Mountain will have been a significant contributor to this result. In light of the cooperative relationship among our firms, it is important to Evercore that Red Mountain's contribution be recognized."

58. In seeking fees from DPC, Red Mountain states in its proof of claim that "it was the clear intent and understanding of the parties that the services were for the benefit of Davis Petroleum and its shareholders."

59. Red Mountain was providing services for the buyers; the sellers; and the sellers' president, the President. The underlying agreements, which included the Secret Agreement and oral agreements, were not disclosed to the Davis Family or to the Court. The rampant conflicts of interests were certainly something about which parties in interest and the Court should have been apprised.

60. There is no mention in the Plan or Disclosure Statement of the Secret Agreement or the fact that Red Mountain would seek or was owed compensation from DPC and the Evercore Group for a $800,000 success fee, nor was there any reference to subrogation claims that DPC has against the President or DAC and/or the Evercore Group as a consequence of having both paid and guaranteed Red Mountain's fees. There is no mention of the fact that DPC had been paying $10,000 monthly fees to Red Mountain that were an obligation of DAC and the President under the Secret Agreement. These facts were likewise not disclosed to the Court at the confirmation hearing. There is a reference to a $300,000 obligation of the Davis Entities to Red Mountain in a line item in a schedule to the Disclosure Statement, yet no mention of the fact that this is an obligation of DAC and the President under the Secret Agreement. While there is an oblique reference in a line item in a schedule attached to the Disclosure Statement of an obligation of DPC to pay a $250,000 fee to Red Mountain for arranging financing, the Court and parties in interest were not apprised of the fact that under the Secret Agreement, this was an obligation of DAC and the President.

61.  As noted, in January 2005, the Davis Entities recognized that there would be a need to locate a source of capital, a potential equity partner, or potential acquirer for the companies. No investment banker was hired by the Davis Entities for this purpose because the Davis Family believed that their interests were being represented by Mesdag and the President. By the time disclosures were made to the Davis Family in January 2006 concerning the fact that Mesdag, through Red Mountain, and the President would have significant equity holdings in the Evercore Group, nearly a year had passed. As a consequence of the passage of this significant amount of time, the Davis Family was then advised that the Davis Entities had insufficient working capital, no time to procure additional capital, no time to market the companies, and that if they did not agree to sell the Davis Entities, their equity interests would be worthless.

62.  Red Mountain acted as agent for the Evercore Group in connection with the dealings described herein.

63.  The acts described herein give rise to claims against the Evercore Group, Evercore, Red Mountain, the President, and Sankaty. The existence of these facts and claims were not set forth in the Disclosure Statement and Plan, nor was any information pertaining to same provided to the Court or the Davis Family at the confirmation hearing.

<u>COUNT ONE (REVOCATION OF PLAN – 11 U.S.C. § 1144)</u>

64.  The ND Trust alleges and incorporates by reference paragraphs 1 through 63 as if fully set forth herein.

65.  The Confirmation Order was procured by fraud.

66.  Parties seeking confirmation of a plan have an affirmative duty of disclosure in good faith. As heretofore described, these duties were breached and such breaches amounted to a fraud on the Court and parties in interest. There were intentional misstatements of material facts and an intentional failure to disclose materials facts in the Disclosure Statement and Plan and at the confirmation hearing. The false statements include, but are not limited to the representation to the Court in writing and orally that the

proposed sale was the product of an arm's length negotiation. Given the existence of the Secret Agreement, the undisclosed oral agreements, and the fact that confidential negotiations concerning the terms of the sale agreement held by the Davis Family and their counsel were conveyed by Mesdag to the Evercore Group, this was anything but an arm's length deal.  This was blatant self-dealing.  The President of the Davis Entities had a fiduciary obligation to make full disclosures.  Mesdag's company was acting as and charging a fee for serving as an investment advisor for the sellers, the Davis Entities; the buyers; and the President of the sellers.  These conflicts of interest were not disclosed to the Davis Family or the Court.

67.	At the time of the confirmation hearing, the Davis Entities and the Evercore Group made representations concerning disinterestedness that were materially false and which they knew were materially false.

68.	A party seeking to revoke a plan need not demonstrate reasonable reliance.  Nonetheless, the Davis Family and the Court reasonably relied upon the representations that were made to them.

69.	A party seeking to revoke confirmation need not establish damages. Nonetheless, the ND Trust and the Davis Family have been damaged as a consequence of the acts complained of herein in a multimillion dollar sum, which amount is subject to proof.

70.	Mesdag, the President, Evercore, Sankaty and the Evercore Group were intent on creating, and did create, a situation in which the Davis Entities were not exposed to the market, and foreclosed the possibility of obtaining equity financing, an auction, overbidding, or an arms length sale in connection with the bankruptcy process.

71.	There was a failure to fully disclose the Davis Entities' relationship with Red Mountain.  Under the Secret Agreement, DAC and the President, not the Davis Entities, were liable for Red Mountain's fees.  If there were oral agreements between Red Mountain and the Davis Entities, they were certainly not disclosed.  Further, the amount being sought by Red Mountain as a success fee, $800,000, was underreported in the

Disclosure Statement.  Following confirmation, the Davis Entities made a payment of $250,000 to Red Mountain even though this was an obligation of the President and DAC under the Secret Agreement.  These intentional failures to disclose resulted in payments made, or to be made for services in a manner that violated 11 U.S.C. § 1129(a)(4).  Compliance with this Code section is mandatory in order for a plan to be confirmed, and the Court would not have entered the Confirmation Order but for being misled into believing that the section's dictates had been satisfied.

72. The Court should revoke the Confirmation Order.  In addressing the disclosure of material facts in bankruptcy court transactions, numerous courts have noted that "the importance of full disclosure cannot be overstated."  The filing and confirmation process, which lasted all of two days, required full and complete disclosure.  This never occurred and the confirmation process was subverted.

73. In an attempt to eviscerate any means for the Davis Family to obtain a remedy for the acts described herein, the Evercore Group insisted upon broad release provisions in the Plan.  Revocation of the Confirmation Order is also necessary to undo the releases to the Evercore Group and its constituents so that damage claims can be asserted by parties in interest.

PRAYER FOR RELIEF

WHEREFORE, the ND Trust respectfully requests that the Court enter an order:

1. Revoking the Confirmation Order, thereby unwinding the sale of the Davis Entities and undoing the releases.

    2.    Granting such other and further relief as may be just and proper.

DATED:  September 5, 2006

    IRELL & MANELLA LLP
Howard J. Steinberg (Cal. SBN 89291)
1800 Avenue of the Star, Suite 900
Los Angeles, California 90067
Telephone: (310) 277-1010
Facsimile:   (310) 203-7199
hsteinberg@irell.com

HAYNES AND BOONE, LLP


By: /s/   Trey A. Monsour
Trey A. Monsour
State Bar No. 14277200

Robin E. Phelan
State Bar No. 15903000
Trey A. Monsour
State Bar No. 14277200
901 Main Streuet, Suite 3100
Dallas, Texas 75202
Telephone: (214) 651-5612
Facsimile:  (214) 651-5940
robin.phelan@haynesboone.com
trey.monsour@haynesboone.com

Attorneys for Plaintiff
The Nancy Sue Davis Trust