# EXHIBIT   1
# Part 1

Page 1

1               UNITED STATES BANKRUPTCY COURT

2                SOUTHERN DISTRICT OF TEXAS

3                 CORPUS CHRISTI DIVISION

4
   In re                          ) Case No. 06-20152
5                                 )
   DAVIS PETROLEUM CORPORATION,   )
6  DAVIS OFFSHORE, L.P., and      ) Case No. 06-20153
   DAVIS PETROLEUM PIPELINE, LLC, )
7                                 )
              Debtors.            ) Case No. 06-20154
8  _____)
                                  )
9  THE NANCY SUE DAVIS TRUST,     ) Jointly Administered
                                  ) under
10            Plaintiff,          ) Case No. 06-20152
                                  )
11       vs.                      )
                                  ) Adv. No.
12 DAVIS PETROLEUM CORPORATION,   ) P. No. 06-02062
   et al.                         )
13                                )
              Defendants.         )
14 _____)

15      CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

16        (Exhibits Bound Under Separate Cover)

17         VIDEOTAPED DEPOSITION OF MICHAEL

18         DIAMOND, taken on behalf of Debtors

19         at 555 South Flower Street,

20         50th Floor, Los Angeles, California,

21         commencing at 9:18 a.m., on

22         Wednesday, October 17, 2007, before

23         Paula A. Pyburn, RPR, CLR, CSR

24         No. 7304.

25  Pages 1 - 320

Page 2

```
1              UNITED STATES BANKRUPTCY COURT

2               SOUTHERN DISTRICT OF TEXAS

3                 CORPUS CHRISTI DIVISION

4
     In re                        ) Case No. 06-20152
5                                 )
     DAVIS PETROLEUM CORPORATION, )
6    DAVIS OFFSHORE, L.P., and    ) Case No. 06-20153
     DAVIS PETROLEUM PIPELINE, LLC,)
7                                 )
              Debtors.            ) Case No. 06-20154
8    ─────────────────────────────)
                                  )
9    THE NANCY SUE DAVIS TRUST,   ) Jointly Administered
                                  ) under
10              Plaintiff,        ) Case No. 06-20152
                                  )
11         vs.                    )
                                  ) Adv. No.
12   DAVIS PETROLEUM CORPORATION, ) P. No. 06-02062
     DAVIS OFFSHORE, L.P., DAVIS  )
13   PETROLEUM PIPELINE, LLC, DAVIS)
     PETROLEUM ACQUISITION CORP., )
14   DAVIS PETROLEUM HOLDINGS CORP.,)
     DAVIS OFFSHORE PARTNERS, LLC, )
15   AND ALBERT S. CONLY,         )
     LIQUIDATING TRUSTEE UNDER    )
16   LIQUIDATING TRUST AGREEMENT OF)
     DAVIS PETROLEUM CORPORATION, )
17   DAVIS OFFSHORE, L.P. AND DAVIS)
     PETROLEUM PIPELINE, LLC,     )
18                                )
              Defendants.         )
19   ─────────────────────────────)

20

21

22

23

24

25
```

CONFIDENTIAL

Page 30

1     A.    I think the next time I saw Gregg Davis was

2   at a mediation conference that we had where all the

3   family members were present.  Gosh, it was after --

4   certainly after the bankruptcy filing.  I don't

5   remember exactly when it was.  Sometime I think in          09:42

6   late 2006 would be my guess.

7     Q.    Let me show you what we'll mark as D-3.

8           (Exhibit D-3 marked.)

9   BY MR. BENNETT:

10    Q.    You see this one looks to be an email at         09:43

11  the top there from someone named Rosenfeld at Bryan

12  Cave to various folks, including yourself, April 8,

13  2005.

14          Could you just take a look at D-3, sir,

15  tell us whether, to the best of your knowledge, that       09:43

16  is an email chain that you did receive?

17    A.    I -- I have no reason to doubt that I

18  received it.

19    Q.    Okay.  And this one at the top of that

20  first page, D-3, the email from Rosenfeld, Item 1          09:44

21  there says (reading):

22          We look forward to working with

23          O'Melveny & Meyers, if that firm is

24          hired to serve as the independent

25          counsel for DPCorp.                               09:44

CONFIDENTIAL

Page 31

1    A.    Yes.

2    Q.    Do you see all that?

3    A.    Yes.

4    Q.    Do you know what that refers to, sir?

5    A.    Yes.  I guess by this point it was decided    09:44

6  that there was at least going to be exploration of a

7  transaction involving Davis Petroleum and Davis

8  Petroleum needed counsel.  And there was discussion

9  among counsel for the family members, at least, as

10  to who that counsel should be.                         09:44

11          I recall that O'Melveny was one of the

12  firms that was suggested and -- and eventually it

13  was agreed O'Melveny should be hired.

14    Q.    The reference in this one, D-3, is to

15  independent counsel.                                   09:45

16          Do you know what that refers to?

17    A.    Well, independent -- yes.  We wanted

18  counsel who was not, as I recall, involved in

19  representing any of the shareholders or the company.

20    Q.    That would include Gregg Davis; correct?    09:45

21    A.    Yes.

22    Q.    Was any part of the purpose of hiring an

23  independent counsel review of any management buyout

24  proposal that might be made?

25    A.    Well, eventually, yes.  I mean, it would be   09:45

Page 32

1    to advise whoever was reviewing that as -- as

2    counsel.

3        Q.   Well, maybe I need a second cup of coffee.

4            My -- my point is just -- it's April 2005.

5    The shareholders and their counsel are talking about          09:46

6    hiring independent counsel.

7            At that point was it contemplated that a

8    management buyout proposal was going to come in and

9    independent counsel would review it?

10       A.   I think it was contemplated that that might          09:46

11   happen.  I'm not sure we knew it would definitely

12   happen.

13       Q.   Okay.  D-4.

14           (Exhibit D-4 marked.)

15   BY MR. BENNETT:                                               09:46

16       Q.   You'll see this one at the top, D-4, looks

17   to be an email from somebody named Kaddo, K-a-d-d-o,

18   to various folks, including you, April 12, 2005.

19           Could you take a look at D-4 and just tell

20   us whether, to the best of your knowledge, that is          09:47

21   an email that you did receive?

22       A.   Yes.

23       Q.   And this one says, D-4 (reading):

24               On behalf of Mrs. Davis, I am

25               requesting that counsel for the five          09:47

Page 61

1      Q.   And at that point, May 12, 2005, as far as

2   you know, had approval of the arrangement for

3   Mr. Armel to serve as the special committee been

4   received from the shareholders?

5      A.   I don't know.                                    10:35

6      Q.   Looking at the charter on the next page of

7   D-11 --

8      A.   Right.

9      Q.   -- do you have any knowledge as to whether

10  any changes were made in this form of charter?         10:35

11     A.   I have no recollection one way or the

12  other.

13     Q.   Okay.  As far as you know, this is the

14  charter that was adopted?

15     A.   I don't know.                                    10:35

16     Q.   Okay.  The reference here to "Specific

17  Responsibilities and Duties," that's broken down

18  into "Equity Transactions," "Financing

19  Transactions," and "Interim Operations," plus "Other

20  Actions."                                                10:36

21          Do you see all of that?

22     A.   I do.

23     Q.   Was it your understanding that all of those

24  things were within the scope of Mr. Armel's

25  responsibilities?                                        10:36

Page 62

1    A.    Yeah.   I'm not sure how much I was -- I

2  understood about his operational responsibilities as

3  opposed to his responsibilities for finding the best

4  transaction for the company.

5          MR. BENNETT:  Off the record.                    10:37

6          THE VIDEO TECHNICIAN:  Off the record at

7  10:37.

8          (A discussion was held off the record.)

9          THE VIDEO TECHNICIAN:  Back on the record

10  at 10:38.                                                10:38

11         MR. BENNETT:  D-12.

12         (Exhibit D-12 marked.)

13         THE VIDEO TECHNICIAN:  Counsel, could we go

14  off the record for a moment.  I'm having a problem

15  with my mixer.                                           10:39

16         MR. BENNETT:  Okay.

17         THE VIDEO TECHNICIAN:  Off the record at

18  10:38.

19         (A discussion was held off the record.)

20         THE VIDEO TECHNICIAN:  Back on the record     10:44

21  at 10:44.

22  BY MR. BENNETT:

23    Q.    We're looking at D-12, which looks to be an

24  email from Jack Hardy to various folks, including

25  you, Mr. Diamond, May 19, 2005.                          10:44

Page 70

1          proposal on behalf of the Company,

2          but we thought it would be useful to

3          get it in front of the shareholders

4          prior to our meeting tomorrow.

5          Do you see all of that?                    10:55

6     A.   Yes.

7     Q.   Do you have a recollection of a meeting in

8    which there was a discussion about a proposal from

9    Evercore in or about May 2005?

10    A.   I don't have a specific recollection of a      10:56

11   meeting.  I know we were discussing another core

12   proposal in or about that time, yes.

13    Q.   Okay.  And if you could skip in, starting

14   on 47135, the Summary of Proposed Terms.

15    A.   Right.                                       10:56

16    Q.   You'll see there under "general" it says

17   (reading):

18          Acquiring shareholder:  Davis

19          Petroleum Acquisition Corp., an

20          entity formed by Gregg Davis to        10:56

21          raise new equity...

22          And it goes on.

23          You see all of that?

24    A.   Yes.

25    Q.   Did you have an understanding that this      10:56

Page 71

1    proposal from Evercore was being made in conjunction

2    with a management-led buyout?

3        A.   Yes.

4        Q.   And this proposal we see in D-16, was it

5    your understanding that this proposal would be          10:57

6    evaluated by the other shareholders and by Mr. Armel

7    and his advisors?

8        A.   Yes.

9        Q.   And was it your understanding that this

10   proposal from Evercore, what we see in D-16, was        10:57

11   subject to consideration against alternative

12   transactions?

13       A.   My assumption was that that's what

14   Mr. Armel would do, yes.

15       Q.   Okay.  Let me get you into the PowerPoint.     10:57

16   Starts on page 47148 of D-16.

17            Are you there?

18       A.   Right.

19       Q.   Second page there talks about the

20   advantages of private equity.                           10:58

21       A.   Right.

22       Q.   By the way, this PowerPoint, as far as you

23   know, was prepared by Evercore; is that right?

24       A.   Certainly looks like that.  I -- I don't

25   recall --                                               10:58

Page 74

1    that meeting I remember that Gregg was at.  And I

2    also recall Sankaty being a possible source of

3    bridge financing, because there was a need for money

4    to -- to keep the company going, and that Sankaty

5    might -- whether they actually did or not, that they          11:00

6    were a possible source for that kind of financing.

7        Q.    Okay.  And the reference there to RMCP, to

8    your knowledge, is that Red Mountain Capital

9    Partners?

10       A.    I have no idea.                                       11:01

11       Q.    Had you heard of Red Mountain Capital

12   Partners at some point?

13       A.    No.

14       Q.    Does that name mean anything to you today?

15       A.    No.                                                   11:01

16       Q.    Did you have an understanding that anyone

17   other than Evercore and Sankaty might have some

18   involvement in this equity financing?

19       A.    Nope.  I always thought of it as the

20   Evercore deal.                                                 11:01

21       Q.    Well, you did have an understanding that

22   Gregg Davis proposed to roll over his equity

23   position in Davis Petroleum; correct?

24       A.    Yes.  Yes, I did.

25       Q.    And after this proposal from Evercore came          11:02

Page 75

1    in, could you tell us what steps were taken on

2    behalf of the shareholders to evaluate the proposal?

3         A.   Well, Mr. Armel and Jefferies -- I -- let

4    me answer that question several ways.

5              First of all, on behalf of the                    11:03

6    shareholders, Mr. Armel and Jefferies were acting on

7    their behalf to evaluate it.  Whether or not any of

8    the other individual shareholders undertook their

9    own evaluation, I do not know.  But we did not,

10   other than to just look at what it was in terms of   11:03

11   the numbers.

12        Q.   By "we," you mean Nancy Davis and her --

13        A.   Yes.

14        Q.   -- representatives?

15        A.   I would -- by that I mean myself and       11:03

16   Milbank.  We reported what the proposal was, but

17   not -- we didn't undertake any evaluation of it

18   other than that.  Other shareholders may have done

19   something different; I don't know.

20        Q.   There was nothing to stop you from hiring a  11:03

21   financial advisor to evaluate the proposal; correct?

22        A.   No.  But we already had Dan Armel.  We

23   already had Jefferies.  There were at least two

24   corporate lawyers involved representing other

25   shareholders who were looking at this, and we didn't  11:04

Page 76

1    need to hire -- to get every lawyer in town working

2    on this thing.

3        Q.   Okay.  D-17.

4            (Exhibit D-17 marked.)

5    BY MR. BENNETT:                                           11:05

6        Q.   Take a look at this one.  You'll see it

7    looks to be an email from someone named Festa at

8    O'Melveny, June 8th, 2005, to various folks,

9    including you, Mr. Diamond.

10           Could you take a look at D-17.  Just tell     11:05

11   us whether, to the best of your knowledge, that is

12   an email and attachment that you did receive?

13       A.   I assume so.

14       Q.   Second page there on D-17 starts a list of

15   "Davis Petroleum Corp. Contact List."                  11:05

16           Do you see that?

17       A.   I do.

18       Q.   And just running through the list of names

19   there, are these all folks that, to the best of your

20   knowledge, had some involvement in this transaction?   11:05

21       A.   If whoever created this list put them on

22   those -- this list, I assume they did, but I -- I

23   don't know if I ever looked at the list.  I --

24   certainly would not have been my practice to look at

25   a contact list except to make sure my name was on     11:06

Page 77

1    it.

2        Q.    Okay.  If there was any question as to who

3    needed to receive distributions of information from

4    your firm, Milbank, what was the process for putting

5    together that distribution list?                    11:06

6        A.    If I wanted to communicate?

7        Q.    Yes, sir.

8        A.    I already knew who I was communicating

9    with, who was -- which were the lawyers for the

10   other shareholders and O'Melveny.  I didn't -- I --   11:06

11   I mean, the purpose of a contact list is if you need

12   to find somebody's phone number -- at least in my

13   view, if I need to find somebody's phone number, I

14   have now someplace to look for it.

15        But I didn't look at a contact list just       11:06

16   telling me who I needed to communicate with.  I

17   already knew who that group was.

18        Q.    Okay.  Well, on --

19        A.    I don't know when this was.

20        Q.    On --                                     11:07

21        A.    June.

22        Q.    -- the third page, 6573 of D-17 --

23        A.    Right.

24        Q.    -- you will see there a name, Willem

25   Mesdag.                                              11:07

CONFIDENTIAL

Page 78

1      A.    I see that.

2      Q.    Do you know who that person is?

3      A.    I know the name.  I've heard the name

4  before.

5      Q.    When did you first hear the name?          11:07

6      A.    The only time I heard the name was in a

7  conversation I recall with a lawyer for one of the

8  other shareholders.

9      Q.    When was that?

10     A.    I can't tell you.  I think it was at --    11:07

11  in -- it was after the first deal didn't go and when

12  we were either thinking about -- I think it was when

13  we were thinking about a -- a prepack bankruptcy.

14          THE REPORTER:  Pre what?

15          THE WITNESS:  Prepack, prepackaged          11:08

16  bankruptcy proposal.  So that would have been, I

17  guess, in early 2006.

18  BY MR. BENNETT:

19     Q.    What was discussed about Mr. Mesdag?

20     A.    I just recall a conversation in -- in which  11:08

21  Jerry Coben said that Mr. Mesdag had come to see

22  him, and he raised the question, who is this guy?

23          And it was on a shareholder lawyer

24  conference call and nobody seemed to have a very

25  good idea about who he was and the -- you know,      11:08

Page 79

1   there was really no further discussion.  It was

2   just -- you know, was somebody who was trying to

3   figure out what was going on with the deal.  That

4   was the sense that I got.

5       Q.   And what steps, if any, were taken to          11:09

6   determine what Mr. Mesdag's role was?

7       A.   I don't know.  I didn't take it.

8       Q.   There's reference on that page, 6573 of

9   D-17, again, under Mr. Mesdag's heading there, it

10  says (reading):                                           11:09

11           Financial Advisor re:

12           Management Recap.

13           Do you see that?

14      A.   I do.

15      Q.   Did you have some understanding that Gregg       11:09

16  Davis had a financial advisor regarding a management

17  recap proposal?

18      A.   I -- I don't think I had an understanding

19  one way or the other whether he did or he didn't.

20      Q.   Did you have some reason to think that          11:09

21  Gregg Davis was proceeding to make a proposal to buy

22  out the equity of the company without a financial

23  advisor?

24      A.   I don't think I ever really thought about

25  it one way or the other.                                  11:10

Page 91

1    A.    I don't even think we thought about it in

2  terms of claims.   It was just a question of we would

3  sit down at some point and figure out a fair

4  allocation of the family assets and how they would

5  be distributed to family members, and in that                    11:35

6  discussion there might be some issues that might be

7  raised.   We never got that specific.

8    Q.    Okay.   Item 4, if you go to page 2 of D-19,

9  Mr. Shapiro writes in particular (reading):

10                 Beginning in November 2004,                      11:36

11            Gregg Davis represented that he

12            would undertake to "monetize" DPC,

13            which Ms. Raynes understood to mean

14            that he would seek a buyer for the

15            company.   In fact, it appears that                   11:36

16            Mr. Davis has investigated only

17            financing for a management buyout,

18            which would permit him to retain his

19            management position, inflated

20            salary, and other perquisites, and                   11:36

21            equity stake.   In failing to seek

22            out a buyer for the entire company,

23            or one that would replace current

24            officers with more effective

25            management, Gregg Davis has placed                   11:36

CONFIDENTIAL

Page 92

1          his personal interests ahead of the

2          interests of the company and the

3          other shareholders.

4          Do you see all of that?

5     A.    Yes.                                          11:36

6     Q.    And did you take any steps to look into

7     that specific allegation?

8     A.    No.  Because at this point in time, that

9     is, the time of this letter, we had somebody in

10    place who's -- who I understand was going to seek    11:37

11    out other ways to maximize value.  So that whether

12    or not this was accurate, it was irrelevant at this

13    time.

14    Q.    Irrelevant in the sense that there was then

15    a process in place to test the management buyout     11:37

16    proposal against other possibilities?

17    A.    Yeah.  And seek out other buyers and find

18    other -- other possible transactions, yes.

19    Q.    Did you have any discussion with any of the

20    other shareholder representatives at any time about  11:37

21    the allegations that were made in this letter from

22    Mr. Shapiro, D-19?

23    A.    I don't recall any discussions, no.

24    Q.    Do you have any knowledge of any

25    investigation that was undertaken by any of the      11:38

Page 121

1    A.    They had raised issues like this, yes, in

2    that letter that you showed me earlier, that's

3    correct.

4    Q.    Okay.  Get you to the next page there,

5    7- -- well, sorry.  Not the next page -- 72.  We're          13:18

6    looking at D-26, paragraph 122q, and it says

7    (reading):

8              Since Marvin's death, Gregg has

9              pursued a partial sale of Davis

10             Petroleum that would sell equity in          13:18

11             the company for less than its actual

12             value, while preserving his

13             positions as President and Director,

14             contrary to the best interests of

15             Patricia, her trust, and the          13:18

16             company, actions that he knows to be

17             a breach of his fiduciary duties to

18             Patricia and her trust.

19             Do you see all of that?

20   A.    Yes.          13:19

21   Q.    Do you know of any investigation that was

22   done on behalf of any of the shareholders with

23   regard to that allegation?

24   A.    Well, yeah.  I mean, that's what we had

25   Armel and First Boston to do, was to make sure that          13:19

CONFIDENTIAL

Page 122

1    we weren't selling the company for less than its

2    value.

3         Q.   You mean Jefferies?

4         A.   Jefferies.  I'm sorry.  What did I say?

5         Q.   First Boston.                                    13:19

6         A.   I'm sorry.  Investment bankers all look

7    alike.

8         Q.   Well, what steps do you know of that were

9    taken to investigate that allegation?

10        A.   I don't -- I don't know that anybody took    13:19

11   any steps to investigate this allegation because --

12   and -- I'm sorry.

13             What I meant to say -- what I meant to say

14   was that we were -- we were at the time pursuing the

15   transaction to maximize value, and so we were         13:19

16   looking for a deal that was getting -- getting full

17   value for the company.

18             So whether Gregg had pursued a partial sale

19   to sell the company at less than its value was not

20   something we looked at.  We were trying to -- we       13:20

21   were hopefully pursuing a sale that would get us

22   full value or more for the company.

23        Q.   Let me get you to page 134 on D-26, the

24   Complaint.

25        A.   Isn't it wonderful how the federal courts    13:20

Page 162

1    interest, but she wanted to retain an interest in

2    the company.

3        Q.   Ultimately did that position change?

4        A.   I don't believe so.

5        Q.   Okay.  Next page, 37 on D-35, the letter                 14:19

6    from Mr. Hiltz to Mr. Armel.

7             Are you there?

8        A.   Yes.

9        Q.   Top of the page, first paragraph at the end

10   there says (reading):                                             14:19

11            We intend to partner in this

12            transaction with Sankaty Advisors,

13            LLC and Red Mountain Capital

14            Partners, although our offer is not

15            contingent on their participation.                       14:20

16            Do you see all of that?

17       A.   I do.

18       Q.   And was there some discussion among the

19   shareholder representatives about this partnering

20   between Evercore and other investors?                             14:20

21       A.   I don't recall any, no.

22       Q.   Was there ever, to your knowledge, any

23   inquiry by any of the shareholder representatives as

24   to who would be the participants in the Evercore

25   investment?                                                       14:20

Page 173

1    the ability to leave in or roll over some of their

2    equity interest if they -- in -- in the Evercore

3    proposal.

4        Q.    Okay.   Second item on that list from

5    Mr. Hardy, D-37 (reading):                          14:48

6              Does any shareholder find the

7              Evercore proposal to be unacceptable

8              and know now that he or she will not

9              voluntarily participate in a

10             transaction on substantially the        14:48

11             terms set forth in that proposal?

12             You see that?

13       A.    Yes.

14       Q.    Was there some discussion with the

15   shareholder representatives on that subject?        14:48

16       A.    I -- I think -- my recollection is they

17   just wanted to know before we entered into an

18   exclusivity arrangement whether anybody was already

19   of the view that there was no way they were going to

20   do the deal.                                         14:48

21       Q.    Did anybody express that view?

22       A.    No.   I don't believe so.

23       Q.    And then the -- the third item there, D-37,

24   Mr. Hardy's email, October 28, 2005 (reading):

25             If Dan Armel determines to             14:48

Page 174

```
 1              proceed with the Evercore

 2              transaction without obtaining a

 3              "fairness opinion" from an

 4              investment bank or valuation expert,

 5              is there any shareholder who would          14:49

 6              not execute an appropriate release

 7              of Armel with respect to his

 8              activities as the sole member of a

 9              Special Committee?

10              You see that?                                14:49

11      A.   Yes.

12      Q.   Do you know what that refers to?

13      A.   I recall a discussion -- Jefferies, for --

14   for reasons I don't remember, was no longer in the

15   deal.  And so the question was, would we -- should   14:49

16   we invest whatever it would take to get a fairness

17   opinion?  Because Dan was reluctant to go forward

18   and approve the deal without that unless the

19   shareholders would release him.

20           And I do recall we talked about it, and my   14:49

21   recollection is that at the end of the day we

22   decided that we would do so.  I don't recall the

23   specifics.  I'm trying to remember the specifics of

24   the discussion.

25           I think -- I think we felt that at this      14:50
```

Page 175

1    point, once again, Armel and -- and Jefferies had

2    been at it for several months, and this was, we were

3    told, the best deal on the table.  So it -- it

4    was -- the fairness opinion to the shareholders was

5    not that critical.  I think that's sort of our        14:50

6    reasoning here.  And we figured it wasn't worth the

7    money to go out and find somebody else to give a

8    fairness opinion at this point.

9        Q.   Did you express that view?

10       A.   I -- my rec- -- my recollection is that I     14:50

11   followed the lead of the corporate lawyers who were

12   involved in this deal since we were not expending

13   corporate resources in -- in -- in dealing with the

14   transaction --

15       Q.   When you're talking about --                  14:51

16       A.   -- with Milbank Tweed.

17       Q.   Okay.  When you're talking about corporate

18   lawyers, you're talking about the lawyers for some

19   of the other shareholders?

20       A.   And O'Melveny, yes.                           14:51

21       Q.   Did you form a view as to the competence of

22   those other lawyers?

23       A.   Well, I -- I felt Jack Hardy was a

24   competent corporate lawyer.  Jerry Coben is one of

25   the most competent corporate lawyers I know.  And I   14:51

CONFIDENTIAL

Page 203

1        Q.    Which meant --

2              THE REPORTER:  Our what?

3              THE WITNESS:  Bank agreements.  Sorry.

4   BY MR. BENNETT:

5        Q.    Which meant that the bank could declare        15:45

6   default at any point; correct?

7        A.    I guess.

8              MR. STEINBERG:  Objection to form.

9              THE WITNESS:  Depending on what the

10  agreement said, I guess they could declare a        15:45

11  default.  What the result of that would be, I don't

12  remember if I ever knew.

13  BY MR. BENNETT:

14       Q.    Okay.  Next item under III(B) is "Cash

15  Flow," and it says (reading):        15:45

16              Have enough cash to last until

17              approximately January 20.

18        Do you know what that refers to?

19              MR. STEINBERG:  Objection as to form.

20              THE WITNESS:  What I would have taken from        15:45

21  that is exactly what it says.  We were running out

22  of cash, but we had enough to go through

23  January 20th.

24  BY MR. BENNETT:

25       Q.    Did you have an understanding that, in        15:45

Page 204

1    fact, the company in January 2006 was in a serious

2    cash flow problem situation?

3            MR. STEINBERG:  Objection as to form.

4            THE WITNESS:  Yes, I did.

5    BY MR. BENNETT:                                          15:46

6        Q.   Okay.  Let me show you D-48.

7            (Exhibit D-48 marked.)

8    BY MR. BENNETT:

9        Q.   You'll see this one appears to be a letter

10   from Daniel Armel to Ciara Burnham at Evercore,          15:48

11   January 9, 2006.  And you'll see it's got an

12   attachment which says, "Annex, Response to Modified

13   Proposal."

14           Could you take a look this one and just

15   tell us whether, to the best of your knowledge, this     15:48

16   is a letter and attachment that you did receive?

17       A.   I don't know whether I received this or

18   received some report of it.  I -- I don't know -- I

19   don't know the answer to that.

20       Q.   Okay.  This one on the front of the first       15:48

21   page, D-48, Mr. Armel's letter, January 9, 2006, to

22   Evercore says (reading):

23               This letter responds to your

24               modified proposal of January 5,

25               2006...                                       15:48

Page 244

1        Q.   And do you recall that there was such a

2   discussion among the shareholder representatives?

3        A.   I -- I don't recall whether there was or

4   there wasn't, but --

5        Q.   January 31, 2006, was the tentative date        16:48

6   for closing of the --

7        A.   Yes --

8        Q.   -- transaction?

9        A.   -- it was.

10       Q.   And there was recognition, at least, as of       16:48

11  this point, January 26, that the transaction might,

12  in fact, not close; correct?

13       A.   That's correct.

14       Q.   And was there some discussion among the

15  shareholders about what the ramifications of that        16:49

16  would be?

17       A.   Yes.  I'm sure there was.  I just don't

18  remember what it was.

19       Q.   Was there any discussion about the

20  possibility that failure to close a transaction         16:49

21  would actually harm the company, Davis Petroleum?

22       A.   Yes.

23       Q.   And in what way?

24       A.   Well, the company was out of money and was

25  in default on its loan.  So it was in a very serious      16:49

Page 245

1    condition if we couldn't do a deal that would, you

2    know, create some -- share some value.   I don't

3    think there was any mystery about that.

4              (Exhibit D-64 marked.)

5    BY MR. BENNETT:                                    16:50

6        Q.   Showing you what we've marked as D-64,

7    you'll see there an email from Jack Hardy to Dan

8    Armel, January 25, 2006, and there's an attachment

9    there from AIG, "Non-Binding Indication Letter."

10             Do you see all that?                     16:50

11       A.   Yes.

12       Q.   You can tell us whether you've seen any of

13   this before.

14       A.   I don't recall seeing this.

15       Q.   Okay.  You'll see the -- the email from    16:51

16   Jack Hardy to Dan Armel, January 25, 2006, reads in

17   part (reading):

18             Dan --

19             Jerry Coben told me today that

20             the family wants to proceed to           16:51

21             get -- looks like rep and --

22             representation and warranty

23             insurance coverage for the Evercore

24             transaction.

25             Do you see that?                         16:51

Page 298

1      Q.   And in the course of that voting, Nancy

2   Davis voted no?

3      A.   I believe so.

4      Q.   And that was based on your view that it was

5   possible to get a better deal than the one that was          18:30

6   being proposed with Evercore?

7      A.   Correct.

8      Q.   Was there any other basis for that vote?

9      A.   No.  We just felt the value was -- the

10   value was not what it should have been.                      18:30

11      Q.   Okay.  D-85.

12           (Exhibit D-85 marked.)

13   BY MR. BENNETT:

14      Q.   Take a look at this one quickly and just

15   confirm for me that this is a transcript of the              18:30

16   confirmation hearing on the reorganization plan for

17   Davis Petroleum.

18      A.   It -- it appears to be.

19      Q.   March 9, 2006, do you see that?

20      A.   Yeah.  I mean, I have no reason to doubt             18:30

21   that it's a tran- -- an accurate transcript.

22      Q.   Okay.  And you --

23      A.   I don't think I've ever read the transcript

24   of that hearing, but --

25      Q.   You participated in that hearing by               18:31

Page 319

1          DECLARATION UNDER PENALTY OF PERJURY

2

3          I, MICHAEL DIAMOND, do hereby certify under

4   penalty of perjury that I have read the foregoing

5   transcript of my deposition taken on October 17,

6   2007; that I have made such corrections as appear

7   noted herein; that my testimony as contained herein,

8   as corrected, is true and correct.

9

10         Dated this _____ day of _____,

11   200___, at _____, California.

12

13

14                  _____

15                      MICHAEL DIAMOND

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 320

1     I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby

3   certify:

4     That the foregoing proceedings were taken before

5   me at the time and place herein set forth; that any

6   witnesses in the foregoing proceedings, prior to

7   testifying, were duly sworn; that a record of the

8   proceedings was made by me using machine shorthand

9   which was thereafter transcribed under my direction;

10  that the foregoing transcript is a true record of

11  the testimony given.

12     Further, that if the foregoing pertains to the

13  original transcript of a deposition in a Federal

14  Case, before completion of the proceedings, review

15  of the transcript [x] was [ ] was not requested.

16     I further certify that I am neither financially

17  interested in the action nor a relative or employee

18  of any attorney or party to this action.

19     IN WITNESS WHEREOF, I have this date subscribed

20  my name.

21

22  Dated: _____

23

24        _____

               Paula A. Pyburn

25            CSR No. 7304/RPR