# EXHIBIT 12

**ANNEXED TO THE DECLARATION OF HOWARD J. STEINBERG IN SUPPORT OF OPPOSITION OF PLAINTIFF THE NANCY SUE DAVIS TRUST TO MOTIONS OF NEW DAVIS DEFENDANTS AND ALBERT S. CONLY, LIQUIDATING TRUSTEE, FOR SUMMARY JUDGMENT**

CONFIDENTIAL

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

CERTIFIED COPY

| | | |
|---|---|---|
| In re | ) | Case No. 06-20152 |
| | ) | |
| DAVIS PETROLEUM CORPORATION, | ) | |
| DAVIS OFFSHORE, L.P., and | ) | Case No. 06-20153 |
| DAVIS PETROLEUM PIPELINE, LLC, | ) | |
| | ) | |
| Debtors. | ) | Case No. 06-20154 |
| _____ | ) | |
| | ) | |
| THE NANCY SUE DAVIS TRUST, | ) | Jointly Administered |
| | ) | under |
| Plaintiff, | ) | Case No. 06-20152 |
| | ) | |
| vs. | ) | |
| | ) | Adv. No. |
| DAVIS PETROLEUM CORPORATION, | ) | P. No. 06-02062 |
| et al. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

(Exhibits Bound Under Separate Cover)

VIDEOTAPED DEPOSITION OF NANCY

DAVIS, taken on behalf of Debtors at

555 South Flower Street, 50th Floor,

Los Angeles, California, commencing

at 9:09 a.m., on Friday, October 19,

2007, before Paula A. Pyburn, RPR,

CLR, CSR No. 7304.

Pages 1 - 277

CONFIDENTIAL

```
 1      A.    That's correct.

 2      Q.    And just the one at the very top of D-86,

 3  first -- first page there, Mr. Diamond writes to

 4  Mr. Keating, March 10, 2006 (reading):

 5              That is correct.  The main point          15:41

 6              is that, contrary to the headline on

 7              your story (at least as it appears

 8              on the web edition) it was not Nancy

 9              Davis who "forced the bankruptcy."

10              Nancy was supportive of the original      15:41

11              sale, but it could not close because

12              of the objections of another

13              shareholder.

14              Do you see that?

15      A.    I see that.                                 15:41

16      Q.    Is that a true statement to the best of

17  your knowledge?

18      A.    I believe they -- he was clearing up that

19  Patty Davis Raynes was the one who objected to the

20  original deal.  And he was trying to clear up the     15:41

21  writer's interpretation.  I did vote against the

22  prepack, but it, I guess, doesn't matter because

23  you -- you don't -- you just have to have a

24  majority, not everybody.

25      Q.    Okay.  When Mr. Diamond writes, the         15:41
```

1   original sale could not close because of the

2   objections of another shareholder, is that a true

3   statement?

4       A.   He's referring to Patty Davis Raynes, my

5   sister.                                                    15:42

6       Q.   Is that a true statement?

7       A.   The original sale didn't close because

8   Patty wouldn't agree to Evercore's terms.

9       Q.   Okay.  Did you ever see this exchange

10  between Mr. Diamond and the "Denver Post" folks          15:42

11  before today?

12      A.   I might have.

13      Q.   Okay.

14      A.   I'm not sure, but I might have.

15      Q.   Did you ever tell Mr. Diamond that anything     15:42

16  that he had written to the "Denver Post" was

17  incorrect?

18           MR. STEINBERG:   Objection; attorney-client

19  privilege.

20           Instruct you not to answer.                      15:42

21  BY MR. BENNETT:

22      Q.   Let me show you what we marked as D-87.

23           You see this one refers to Notice of Rule

24  2004 Examination Regarding Undisclosed Material

25  Facts Relating to Debtors' Joint Plan of                  15:43

DepoPro                              213-244-9668
Deposition Concierge Professionals

CONFIDENTIAL

1    I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4    That the foregoing proceedings were taken before

5    me at the time and place herein set forth; that any

6    witnesses in the foregoing proceedings, prior to

7    testifying, were duly sworn; that a record of the

8    proceedings was made by me using machine shorthand

9    which was thereafter transcribed under my direction;

10   that the foregoing transcript is a true record of

11   the testimony given.

12   Further, that if the foregoing pertains to the

13   original transcript of a deposition in a Federal

14   Case, before completion of the proceedings, review

15   of the transcript [x] was [ ] was not requested.

16   I further certify that I am neither financially

17   interested in the action nor a relative or employee

18   of any attorney or party to this action.

19   IN WITNESS WHEREOF, I have this date subscribed

20   my name.

21

22   Dated: 10/22/2007

23

24   Paula A. Pyburn, RPR
     CSR No. 7304
     Certified Shorthand
     Reporter for the
25   State of California

DepoPro                              213-244-9668
       Deposition Concierge Professionals

# EXHIBIT 13

**ANNEXED TO THE DECLARATION OF HOWARD J. STEINBERG IN
SUPPORT OF OPPOSITION OF PLAINTIFF THE NANCY SUE
DAVIS TRUST TO MOTIONS OF NEW DAVIS DEFENDANTS AND
ALBERT S. CONLY, LIQUIDATING TRUSTEE, FOR SUMMARY
JUDGMENT**

# CONFIDENTIAL MEMORANDUM

**TO:**      ECP

**CC:**      WOH

**FROM:**   BAJ, DGR

**DATE:**    January 21, 2005

**RE:**      Davis Petroleum Corp. ("DPC" or the "Company")

---

| | |
|---|---|
| Sponsor: | WOH |
| Deal Concept: | Acquire a majority interest in an oil and gas exploration and production company with proven reserves in the onshore Gulf of Mexico, and provide $50 million of growth capital to the Company to fund offshore Gulf of Mexico and other exploration opportunities |
| Industry: | Oil & Gas |
| Size: | To be negotiated, but pre-money enterprise value of $100-135 million; 2004 and 2005 EBITDAX of $13 million and $38 million, respectively |
| Valuation: | Approximately 9.2x 2004 EBITDAX and 3.2x 2005 EBITDAX at mid-point |
| Source | WOH's relationship with Will Mesdag and Gregg Davis |

Background/Situation

After declining to pursue a minority investment in DPC in January 2004 due primarily to governance-related reasons, we have been given the opportunity to evaluate a majority investment in the Company on potentially substantially improved governance terms. This opportunity comes in the aftermath of the passing of Marvin Davis, whose son Gregg Davis is DPC's CEO and whose family owns 100% of the business today. It was Marvin's wish that Gregg (who is an 8% owner) continue as CEO, and Gregg is seeking a financial sponsor to take a controlling interest in DPC by investing new capital and by purchasing some or all of the rest of the family's interests in the Company. Gregg would roll 100% of his equity in the business into the transaction.

The opportunity has come through Will Mesdag, a senior partner in the family office of the Marvin Davis family in charge of managing the family's private equity investments. Prior to joining the Davis operations, Mesdag was a senior partner at Goldman Sachs. Mesdag has been involved with DPC for some time and sees it as an attractive place for him to focus now that Marvin has passed; Mesdag intends to invest $5-$10 million on the same financial terms as the sponsor (but without governance rights).

Confidential                                                                    NEWD00078860

Timing

WOH, BAJ and DGR have met twice with the management team of DPC over the last two weeks at their Houston headquarters and in Denver (where they have a new team of geologists who focus on the Rockies region) to understand the progress of the business since last January and to discuss the framework of a potential transaction. We understand DPC has met with a few other sponsors as well (Carlyle-Riverstone had put a valuation on the table last year before discussions collapsed over governance and is likely taking another look), but we are likely among a small group of sponsors looking at the deal. The ultimate partner is more likely to be selected based on fit with Gregg as opposed to strictly valuation, and we believe we are well-positioned, provided we want to pursue the deal.

DPC would like to conclude the process quickly, and has asked for an indication of our general level of interest for next week (although the timing is likely to slip, as the Company is not able to produce a detailed model until early-mid next week). This memo is primarily intended to provide an early update to ECP, as the team's view on the opportunity will depend on information that is yet to come. This would include: (i) a detailed model that allows us to understand on a more granular basis the historical and projected performance of the Company's individual prospects; (ii) a follow-up meeting or conversation with management to discuss open questions; and (iii) feedback from Bruce Sidner (formerly a key geologist with EPL), who is meeting with the management team and BAJ in Houston today.

Overview of the Company

DPC has been an active oil & gas exploration company for 60 years. Gregg Davis, the current CEO, has been involved with the company for 20 years. Gregg is not involved with other aspects of the family business.

*Business Model*

DPC's business model is a relatively low-risk model for the oil and gas exploration business. The Company's team of engineers review seismic data and well logs for a particular region in order to find potential new drilling opportunities. DPC will also commission new seismic studies, if necessary, to further evaluate possible prospects. Once the Company has developed a potential drilling location, it will acquire or lease the land necessary to drill the hole and begin to seek partners to drill the well. Typically, the partner will agree to drill the well, take all the "dry hole" risk associated with the well and provide DPC with a 25% working interest. In this fashion, DPC might spend $300K to $500K for seismic and land to get a 25% interest in a well that has $3 million to $5 million of drilling costs. Essentially, DPC gets $750K to $1,250K of exploration value for $300K to $500K. If the well is successful, DPC would contribute its share of necessary capital for well development (i.e., bringing pipeline to the well and other costs necessary to bring it to production). Once the well is producing, DPC receives its share of profits while the well continues to be operated by the farm-out company or a third

Confidential

party. If the well is not successful, DPC is not out any money beyond the initial $300K to $500K. In many cases, the partner will also cover the $300K to $500K of overhead incurred by Davis when it agrees to drill a prospect, leaving them with essentially no capital at risk.

This approach allows DPC to focus exclusively on developing prospects and avoid the need to employ a drilling and production staff. Obviously, the strategy works if prospects can be sold and prospects ultimately achieve a high success rate.

*Areas of Focus*

DPC explores in four different areas: the onshore Gulf of Mexico, Oklahoma, the Rockies, and the offshore Gulf of Mexico. Historically, the Company has been most active in the onshore Gulf and all of its proven reserves are from this region. In the last two years, the Company has expanded its geographical focus to include the other three areas.

*Deepwater Opportunity is Key to Future Growth*

The Company's most important growth driver going forward is DPC's play in the offshore Gulf of Mexico. Similar to historical developments in the shallow water Gulf of Mexico, DPC believes deepwater exploration in the Gulf has started to reach its second phase. DPC believes it is uniquely well positioned to take advantage of this second wave.

In the initial phase, started in the early 1990s, the major oil & gas companies found several large 1 Tcf+ sized oil & gas fields in the deepwater Gulf. As a general rule, the majors didn't bother with the mid-size fields they came across (100Bcf – 500 Bcf) because the economics of smaller fields were not sufficiently attractive to pursue. Specifically, employing the expensive, exotic drilling technology required for deepwater exploration combined with the high cost and long lead times necessary for developing infrastructure (i.e., laying pipeline from the shore to the field might take 2+ years) made anything but the largest fields uneconomic to the majors.

Now, however, the circumstances have changed. A number of large oil and gas fields have been discovered in the deepwater Gulf and the geography of the region is more clearly understood, making it easier, and less costly, to identify new fields. Additionally, drilling technology has matured and it is cheaper to drill for a new prospect. Finally, the existing infrastructure put in place by the majors can be used to hook up new fields to onshore processing facilities for a fraction of the initial cost and in a relatively short time period of time (typically in 12-18 months). Each of these factors has made it less risky and less costly to drill in the deepwater Gulf of Mexico. With the majors still ignoring the mid-size fields in the deepwater Gulf because they need to pursue larger discoveries to materially increase their audited reserves, the opportunity is left open to independents like DPC. Given DPC's experience to date and the experience of a highly successful team of engineers the Company hired out of the former Vastar four years ago, it is well-positioned to take advantage of this opportunity in the Gulf of Mexico.

Confidential

NEWD00078862

## Business Update

The Company missed its 2004 plan and reduced its 2005 projections substantially. DPC produced 6.1 Bcfe in 2004 versus expectations of 12.3 Bcfe (a decline of more than 50%), and EBITDAX was $13 million versus a budget of $40 million. Nearly 100% of the shortfall relates to the Company's onshore prospects, as there was not any meaningful production budgeted in 2004 from DPC's other regions.

|  | Plan | Actual | Better/(Worse) | |
| --- | --- | --- | --- | --- |
|  | 2004 | 2004 | $ | % |
| Production (mmcfe) | 12,313 | 6,064 | (6,249) | (51%) |
| Revenue | $58.4 | $26.0 | ($32.4) | (55%) |
| EBITDAX | 39.8 | 13.0 | (26.8) | (67%) |

The substantial majority of the Company's production in 2004 (or 5.8 Bcfe of the 6.1 Bcfe produced) related to prospects that had been identified last year as proven and producing, "Tier I" wells. DPC had expected an incremental ~5 Bcfe to be generated from other, non-proven onshore prospects – most of this production was not realized in 2004 due to drilling delays, although there were three dry holes that were drilled in 2004 that contributed to ~25% of the production shortfall.

DPC had more success with its offshore prospects in 2004, although there was no offshore production that had been budgeted last year. Development at the Company's two key prospects (expected to collectively produce ~10 Bcfe annually (DPC's share) once online) remains broadly on track..

The Company's 2005 projections have been reduced substantially, primarily reflecting much softer production results from onshore prospects (down 80% from last year's budget and down 20% from 2004 levels) and offshore prospects (down 60% from last year's budget):

|  | Old Plan | New Plan | Better/(Worse) | |
| --- | --- | --- | --- | --- |
|  | 2005 | 2005 | $ | % |
| Production (mmcfe) | 23,944 | 9,060 | (14,884) | (62%) |
| Revenue | $110.2 | $56.1 | ($54.1) | (49%) |
| EBITDAX | 96.2 | 36.4 | (59.8) | (62%) |

While we are clearly concerned with the performance shortfall at the Company's onshore operations, we will need to work to understand the true potential of the onshore wells which are yet to produce. There is certainly value in the onshore wells that are proven and producing, and we are inclined to believe there is some additional value in the prospects. The offshore prospects appear – subject to due diligence – to hold promise, as the 2005 shortfall seems to be the result of only a couple of months of slippage. Our goal would be to evaluate both the onshore and offshore prospects in significantly greater detail to determine a view on value for the overall business.

Confidential

NEWD00078863

We would note that the Company recently hired a new team of geologists in the Rockies region out of Prema, which was a highly successful independent in Denver that was acquired by PetroCanada. We were impressed with the Rockies team, who appear to have identified a number of drilling opportunities that offer attractive risk-adjusted returns, although we would note that there are currently no meaningful prospects that are proven, producing properties. For now, we believe this business would provide attractive upside opportunity, although we would not necessarily ascribe value to it.

Pros

- *Experienced, High-Quality Team:* DPC has been a successful oil & gas player for 60 years. Gregg Davis is the current CEO, who has been with the company for 20 years. Four years ago, DPC hired Vastar's deepwater exploration team and it now fields one of the top independent deepwater oil & gas exploration teams in the Gulf of Mexico; last year the Company hired a team from Prema who have similarly had great success in the Rockies.

- *Potentially Attractive Offshore Exploration Portfolio:* As a result of the major oil & gas players developing several large (i.e., 1 Tcf+) gas fields in the offshore Gulf of Mexico, there is now sufficient infrastructure, seismic data and reservoir knowledge available to make a second wave of exploration, targeted at 100 Bcf to 500 Bcf fields, economically attractive. DPC's experience places it in a unique position to gain first mover advantage in this second wave of exploration.

- *Lower Risk Business Model:* DPC finds new oil & gas prospects by reviewing existing seismic data and well logs in search of opportunities that may have been overlooked by prior developers. Once it identifies a prospect, DPC farms-out the drilling to another E&P operator in exchange for retaining a carried interest in the prospect. Specifically, the "farm-out" operator pays the drilling costs for the well (and takes the risk on a dry hole) and allows DPC to retain a working interest in the well as compensation for identifying the prospect (typically 25%). This allows DPC to avoid "dry-hole" costs, the largest part of any exploration failure, and only exposes the company to the smaller cost of buying seismic data and leasing land.

- *Substantial Cash Flow:* Under management's forecasts, the business generates substantial free cash flow beginning in 2006. This cash could likely be distributed to shareholders shortly thereafter (depending on the repayment of an existing mezzanine facility from Bain Capital's mezzanine arm).

- *Preliminary Returns are Attractive:* While our modeling is clearly preliminary, it appears based on the expected results of the Tier I and Tier II prospects alone (which primarily include the proven and producing wells, in addition to two offshore wells that appear to be one step better than "probable"), even under a more benign commodity price environment, we could expect to recover our capital and earn a modest return at a valuation that might be acceptable to the family. (See attached exhibit for a summary of preliminary case outcomes.) In the event we determine the

Page 5 of 6

NEWD00078864

Company's numbers might be more challenging, there is the possibility of structuring our investment as a preferred instrument, at a higher valuation, in order to protect our capital.

## Concerns

- *Recent Budget Miss:* The Company has significantly under-performed expectations from a year ago. We will need to get comfortable that we are paying for prospects that have a very high likelihood of producing.

- *High Oil Price Environment:* Any investment would need to be evaluated in the context of more normalized oil and gas prices.

- *Valuation:* An independent valuation of DPC was conducted last year, valuing the enterprise at $90-$120 million. It is not clear the family would do a deal at a lower valuation. Based on 2004 metrics, using comparable company valuations (see attached exhibit), the Company's valuation is not likely to appeal to the family. Based on 2005 metrics (or giving the Company full credit for offshore reserves), valuations become challenging for ECP – although, as mentioned above, the situation may be made more palatable for ECP if the investment is structured as a preferred.

## Next Steps

We will report back to the group with feedback from Bruce Sidner following his meeting with the management team. In addition, we intend to do more detailed analysis of the Company's financial performance and prospects once DPC provides a detailed model. Finally, AMB will be in touch with Mesdag to understand the art of the possible on structure and to determine if the Company will be receptive to a preferred investment by ECP.

## Attachments

- Valuation summary (including trading and M&A comps)
- Preliminary model summary

Confidential

NEWD00078865

# EXHIBIT 14

**ANNEXED TO THE DECLARATION OF HOWARD J. STEINBERG IN
SUPPORT OF OPPOSITION OF PLAINTIFF THE NANCY SUE
DAVIS TRUST TO MOTIONS OF NEW DAVIS DEFENDANTS AND
ALBERT S. CONLY, LIQUIDATING TRUSTEE, FOR SUMMARY
JUDGMENT**

**From:** Mesdag, Will
**Sent:** Saturday, January 08, 2005 04:31 PM
**To:** Davis, Gregg
**Subject:** RE: Gregg Davis

Gregg,

As we have just discussed by telephone, I would be pleased to consider a role as some combination of advisor/investor/partner/board member in Davis Petroleum. While there is a lot of water under the bridge, none of it is foul and, with the benefit of perfect hindsight, I think that things have worked out for the best. You made some tough but good judgment calls along the way. I have the highest regard for you and your team and would like to help you build your career and your own legacy.

Let's talk about how you should position my role with your family and with your potential private equity partners.

Call me over the weekend.

Best,

Will

---

**From:** Davis, Gregg
**Sent:** Fri 1/7/2005 8:50 PM
**To:** Mesdag, Will
**Subject:** Gregg Davis

Will, thank you for your continued support today with Sankaty while I was tied-up. And again I wish we had time to meet face to face while I was in town. Great weather by the way.

Will, I want fill you in on some new developments which is why I was busy today. I met with the family today to discuss in part Davis Petroleum, its current operations and my intentions as is relates to the future and a possible financing/buyout. The picture is clearer in that I have their blessing to pursue a deal which would finance the business and give some the opportunity to sell. It is clear now that some will stay and some will go. Bottomline is I am going full steam ahead to try to get an offer and a subsequent deal.

Will, I want to ask you to consider this and tell me if it could be still in the cards. Aside from your role today, I want you to know I would like to have you as a partner/advisor/boardmember with me as I grow this business beyond the family. This means I'm asking you to consider being an investor again. I know you want to keep this issue separate from your work with me as an advisor but I am asking you only that if the conditions were right would you consider this again. I realize we have stopped and started several times for reasons that I believe were appropriate at those times and you have been more than patient. And if there is water under the bridge so be it. I do however want you to know that I think it would be very good for the business and my career to have you on board. I only ask if you would consider this. Of course many conditions would have to be met for this to happen and to be attractive for you as we have spoken in the past. Let me know your thoughts.

In the meantime I look forward to our meetings on the 12th, 20th and the 25th. I am leaving for Houston saturday and am arround all weekend.
Gregg

--------------------------
Sent from my BlackBerry Wireless Handheld

CONFIDENTIAL

RM00018325

# EXHIBIT 15

**ANNEXED TO THE DECLARATION OF HOWARD J. STEINBERG IN SUPPORT OF OPPOSITION OF PLAINTIFF THE NANCY SUE DAVIS TRUST TO MOTIONS OF NEW DAVIS DEFENDANTS AND ALBERT S. CONLY, LIQUIDATING TRUSTEE, FOR SUMMARY JUDGMENT**

## RED MOUNTAIN CAPITAL PARTNERS LLC

**PERSONAL AND CONFIDENTIAL**

January 31, 2005

Mr. Gregg J. Davis
President
Davis Petroleum Corp.
1360 Post Oak Blvd., Suite 2400
Houston, TX 77056

Dear Gregg:

This letter confirms the understanding and agreement among Gregg J. Davis ('you"),
Davis Acquisition Corp., a company to be formed by you (the "Company"), Davis
Petroleum Corp. ("DPC"), and Red Mountain Capital Partners LLC ("Red Mountain")
as follows:

Red Mountain has been retained on behalf of and will report solely to you and the
Company, notwithstanding that certain agreements in support of Red Mountain's
retention are made by DPC herein.  As such, Red Mountain's client is, and Red
Mountain will provide its services solely to you and the Company (rather than DPC).
Red Mountain will serve as your and the Company's advisor in connection with the
possible management led buyout of DPC (the "Transaction").  Immediately upon
consummation of the Transaction, you shall cause the Company to assume the
obligations of DPC hereunder pursuant to a written agreement.

In connection with this engagement, the Company will pay Red Mountain a fee of
$10,000 per month, payable on the last day of each month.  In addition, upon
consummation of the Transaction, the Company agrees to pay Red Mountain at
closing a cash fee equal to the greater of $250,000 or 0.5% of the new capital raised
to complete the Transaction (but not to include capital that is used to purchase shares
from the Davis family).

We also understand that, in order to fund DPC prior to the Transaction, the Company
may require DPC and Sankaty Advisors, LLC ("Sankaty") to amend the Sankaty
Senior Subordinated Secured Note Agreement and/or to obtain an additional
financing commitment from Sankaty (collectively, the "Sankaty Bridge").  Red
Mountain will advise the Company and DPC in negotiating the Sankaty Bridge and, if
the Sankaty Bridge is successfully negotiated, the Company will cause DPC to pay Red
Mountain an additional fee of $250,000 at the closing of the Sankaty Bridge.  If the
Company and DPC are not able to obtain the Sankaty Bridge, Red Mountain will use
its best efforts to propose to DPC a bridge financing facility with net proceeds of up to
$17,000,000.



EXHIBIT
Davis
4

NEWD00006617

The Company also agrees to reimburse Red Mountain periodically, upon request, for reasonable out-of-pocket expenses incurred in connection with this engagement. In support of Red Mountain's retention by you and the Company, DPC will guarantee payment of Red Mountain's fees hereunder and you and DPC will cause Davis Companies to continue to provide Red Mountain with its current offices and related services unless such offices are subleased by Davis Companies to a third party.

Any written or oral advice provided by Red Mountain in connection with this engagement is exclusively for the information of you and the Company and may not be disclosed to any third party or circulated or referred to publicly without Red Mountain's prior written consent.

This engagement may be terminated by you and the Company or by Red Mountain at any time with or without cause and effective upon receipt of written notice. If this engagement is terminated by you and the Company on or prior to a fee payment date as described above, the Company will pay Red Mountain all fee amounts due through and including such fee payment date and the Company will not owe Red Mountain any amounts with respect to subsequent fee payment dates. If this engagement is terminated by Red Mountain, the Company will pay Red Mountain all fee amounts due through and including the fee payment date prior to the date of termination and will not owe Red Mountain any amount with respect to subsequent fee payment dates. In the event of a termination of this engagement, the Company will continue to be responsible for reasonable out-of-pocket expenses as described above.

It is Red Mountain's policy to receive indemnification in connection with the provision of strategic advisory services. In that regard and in support of Red Mountain's retention by you and the Company, DPC agrees to the provisions with respect to indemnification and other matters set forth in Annex A which is incorporated by reference into this engagement letter. DPC recognizes that, in providing services under this engagement, Red Mountain will rely upon and assume the accuracy and completeness of all financial and other information discussed with or reviewed by Red Mountain for such purposes, and Red Mountain will not assume responsibility for the accuracy or completeness thereof. Red Mountain will not have an obligation to conduct an independent evaluation or appraisal of the assets or liabilities of DPC or any other party.

It is understood and agreed that Red Mountain will act under this engagement as an independent contractor with duties solely to you and the Company. Nothing in this letter or the nature of Red Mountain's services shall be deemed to create an employment, fiduciary or agency relationship between Red Mountain and its employees and the Company, DPC, their shareholders, their directors or their officers. Except as set forth in Annex A hereto, nothing in this letter is intended to confer upon any other person (including shareholders, employees or creditors of the Company or DPC) any rights or remedies hereunder or by reason hereof. Neither Red Mountain nor its employees will have any liability to you, the Company or DPC in connection with or as a result of this engagement or any matter referred to in this letter except to the extent that any losses, claims, damages, liabilities or expenses incurred by you, the Company or DPC result from Red Mountain's or its employees'

NEWD00006618

gross negligence or bad faith in performing the services that are the subject of this letter.

Please confirm that the foregoing is in accordance with your understanding by signing and returning to me the enclosed copy of this letter, which will become a binding agreement upon receipt. We are delighted to accept this engagement and look forward to working with you on this important strategic advisory assignment.

Sincerely yours,

RED MOUNTAIN CAPITAL PARTNERS LLC
By: _____
Willem Mesdag, Managing Partner


Confirmed:
GREGG J. DAVIS


DAVIS PETROLEUM CORP.
By: _____

Gregg J. Davis, President

NEWD00006619

### Annex A

*In the event that Red Mountain Capital Partners LLC ("Red Mountain") or its employees, become involved in any capacity in any action, proceeding or investigation brought by or against any person, including Gregg J. Davis ("you"), Davis Acquisition Corp. (the "Company"), Davis Petroleum Corp. ("DPC"), or their shareholders or creditors, in connection with or as a result of either this engagement or any matter referred to in this letter, DPC periodically will reimburse Red Mountain and its employees for their legal and other expenses (including the cost of any investigation and preparation) incurred in connection therewith. DPC also will indemnify and hold Red Mountain and its employees harmless against any and all losses, claims, damages or liabilities to any such person in connection with or as a result of either this engagement or any matter referred to in this letter, except to the extent that any such loss, claim, damage or liability results from the gross negligence or bad faith of Red Mountain or its employees in performing the services that are the subject of this letter. If for any reason the foregoing indemnification is unavailable to Red Mountain or its employees or insufficient to hold them harmless, then DPC shall contribute to the amount paid or payable by Red Mountain or its employees as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect the relative economic interests of DPC and its shareholders or creditors on the one hand and Red Mountain and its employees on the other hand in the matters contemplated by this letter as well as the relative fault of you, the Company, DPC and Red Mountain and its employees with respect to such loss, claim, damage or liability and any other relevant equitable considerations. The reimbursement, indemnity and contribution obligations of DPC under this paragraph shall be in addition to any liability which DPC may otherwise have. You, the Company and DPC also agree that Red Mountain and its employees shall not have any liability to you, the Company and DPC or any person asserting claims on behalf of or in right of you, the Company or DPC in connection with or as a result of either his engagement or any matter referred to in this letter except to the extent that any losses, claims, damages, liabilities or expenses incurred by you, the Company or DPC result from the gross negligence or bad faith of Red Mountain or its employees in performing the services that are the subject of this letter. **Any right to trial by jury with respect to any action or proceeding arising in connection with or as a result of either this engagement or any matter referred to in this letter is hereby waived by the parties hereto. The provisions of this Annex A shall survive any termination or completion of the engagement provided by this letter, and this letter shall be governed by and construed in accordance with the laws of the State of California without regard to principles of conflicts of laws.**

NEWD00006620

# EXHIBIT 16

**ANNEXED TO THE DECLARATION OF HOWARD J. STEINBERG IN
SUPPORT OF OPPOSITION OF PLAINTIFF THE NANCY SUE
DAVIS TRUST TO MOTIONS OF NEW DAVIS DEFENDANTS AND
ALBERT S. CONLY, LIQUIDATING TRUSTEE, FOR SUMMARY
JUDGMENT**

**From:** Mesdag, Will
**Sent:** Monday, January 03, 2005 08:02 PM
**To:** Davis, Gregg
**Subject:** RE: Davis Petroleum Corp.

Good message.

---

**From:** Davis, Gregg
**Sent:** Mon 1/3/2005 7:20 AM
**To:** 'William Hiltz (hiltz@evercore.com)'
**Cc:** Mesdag, Will
**Subject:** Davis Petroleum Corp.

Will, as we spoke briefly before the holidays, I look forward to hearing from you soon. As mentioned and to give you a heads-up before we speak, I am in the process of executing a management buyout of my family's interest in the business. I will do this in combination with an equity partner who will provide capital for both an infusion to grow the business and to buyout a majority or all of the family's interests (less my interest which I am not selling....I am looking to increase my ownership through the deal).

As far as the amount of capital that stays in for growth, it is in the $40 to $60 million range. We have re-calibrated our projections based on new developments since we last spoke and can quickly get you up to speed. The amount of capital needed to buyout the family interests is subject to valuation and based on how much the family chooses to sell. What's important is "Majority" interest is available for the financial partner (say 50.1%).

What I am looking for is a "partner" to buy the business so "personality" is key to the team and I. We will be on the same side of the table here and I am not conducting an "auction".  I am talking with only a few firms in this exercise to determine the best partner to "marry". Issues of most concern for me in the buyout are valuation, management compensation and a mutual agreement on my team and I's vision for the growth of the business. As you can understand, I must be careful in this exercise as I am both a fiduciary to the family (so getting a fair "market" price is essential), and an interested party on the other side as I am also a buyer. I have a good sense of what I think is a deal that will get their attention. So we would need to jointly work towards a price that is fair, compelling and a good deal for all. The family then can do its own analysis to test the fairness

So total investment is $40-60 million for working capital plus capital to buy up to at minimum a 50.1% interest and perhaps all.

I hope this helps. This will move quickly so if Evercore has interest please let me know as soon as possible so we can get you re-acquainted with the business. My regards, Gregg Davis

CONFIDENTIAL

RM00018137

# EXHIBIT 17

**ANNEXED TO THE DECLARATION OF HOWARD J. STEINBERG IN SUPPORT OF OPPOSITION OF PLAINTIFF THE NANCY SUE DAVIS TRUST TO MOTIONS OF NEW DAVIS DEFENDANTS AND ALBERT S. CONLY, LIQUIDATING TRUSTEE, FOR SUMMARY JUDGMENT**

**From:** Mesdag, Will
**Sent:** Tuesday, January 04, 2005 05:32 PM
**To:** Davis, Gregg
**Subject:** RE: Davis Petroleum- Meeting with Evercore Jan. 12th in Houston

Gregg,

An investment bank could be helpful, but in the role of representing the family in its negotiations with the private equity investor. Richardson Barr could expand its role beyond valuation and advise the family in the negotiation. It would take them long to get up to speed. There are alternatives to Richardson Barr, but a top name investment bank such as Goldman or Morgan Stanley would probably not take on the assignment for less than a $2-3 million fee. I do not see my role as a substitute for an investment bank advising the family -- I see my role as strategic advisor to you and your management team and to help you pick the right partner and to close a successful management buyout.

I think that you have in effect communicated to Sankaty that they have the inside track, but the presence of others will keep them on their toes. Keep in mind that it's not really a competitive process because it's not an auction. Once you have selected a partner, you will all be working to close a deal on a mutually agreeable negotiated valuation. It will be important for John to be comfortable with the process and your partner, so I would give his suggestions a lot weight.

Will

---

**From:** Davis, Gregg
**Sent:** Tue 1/4/2005 7:16 AM
**To:** Mesdag, Will
**Subject:** RE: Davis Petroleum- Meeting with Evercore Jan. 12th in Houston

Will, please give me your thoughts on this. I spoke to John last night. He thinks we should hire an investment banking firm to help handle this process to ensure we get the best price and best deal. I responded by saying I've retained you to help me. I told him that it would be expensive to do this. Also on further thought it would slow down the process as we would spend much time getting the IB up to speed. He said we should inform Sankaty that they are getting a first shot at this and that they could preempt any competitive process by moving quickly. Your thoughts? Gregg

---

**From:** Mesdag, Will
**Sent:** Monday, January 03, 2005 9:03 PM
**To:** Davis, Gregg
**Cc:** Stedman, Sherry
**Subject:** RE: Davis Petroleum- Meeting with Evercore Jan. 12th in Houston

That should work.

I talked to Grace today and made the necessary officing arrangements. She's on board.

Will

---

**From:** Davis, Gregg
**Sent:** Mon 1/3/2005 4:41 PM
**To:** Mesdag, Will
**Subject:** RE: Davis Petroleum- Meeting with Evercore Jan. 12th in Houston

Will, I just spoke to Stuart Davies. He can meet in Denver on the 20th of January(he needs a Rockies update as well). Can you do that too? He says he could be ready with a loose proposal by then. Let's talk Tuesday AM. Gregg

---

**From:** Mesdag, Will
**Sent:** Monday, January 03, 2005 4:48 PM
**To:** Davis, Gregg
**Subject:** RE: Davis Petroleum- Meeting with Evercore Jan. 12th in Houston

I will be there. I am arriving the night before and leaving on a 3.55pm flight.

RM00018056

Will

-----Original Message-----
**From:** Davis, Gregg
**Sent:** Monday, January 03, 2005 2:04 PM
**To:** Mesdag, Will
**Subject:** RE: Davis Petroleum- Meeting with Evercore Jan. 12th in Houston

Will, Evercore is on for 9am Jan. 12th. Its Will Hiltz, Brain Jansen and Dan Ross. See you there? Gregg

---

**From:** Mesdag, Will
**Sent:** Monday, January 03, 2005 1:57 PM
**To:** Davis, Gregg
**Cc:** Stedman, Sherry
**Subject:** RE: Davis Petroleum- Meeting with Evercore Jan. 12th in Houston

Yes, but for potential jury duty. I'll see what I can do about defering it.

---

**From:** Davis, Gregg
**Sent:** Mon 1/3/2005 11:34 AM
**To:** Mesdag, Will
**Subject:** Davis Petroleum- Meeting with Evercore Jan. 12th in Houston

Will, Wil Hiltz is enquiring about coming to Houston on the 12th of January. Are you available? Gregg

CONFIDENTIAL

RM00018057

# EXHIBIT 18

**ANNEXED TO THE DECLARATION OF HOWARD J. STEINBERG IN SUPPORT OF OPPOSITION OF PLAINTIFF THE NANCY SUE DAVIS TRUST TO MOTIONS OF NEW DAVIS DEFENDANTS AND ALBERT S. CONLY, LIQUIDATING TRUSTEE, FOR SUMMARY JUDGMENT**

**From:** Mesdag, Will
**Sent:** Wednesday, February 02, 2005 04:12 PM
**To:** Davis, Gregg
**Cc:** dvoyticky@yahoo.com
**Subject:** RE: Potential Additional DAVIS PETROLEUM CORP. Investor

Gregg,

As we discussed briefly, the most important criteria for a private equity partner are (1) the style of their investment philosophy, (2) the chemistry they have with you and your management team, and (3) their strategic vision for the business. Keep in mind that you are not selling the company and walking away -- you are picking a partner who you will spend the next five to ten years with.

I have no objection to having discussions with additional partners -- and Encap and JPMorgan are good ideas. They both have a lot of experience in the industry. We should be able to get a good read on Encap and their style from Michael Pierce. JPMorgan participated (as a junior partner) in Bill Barrett.

But don't underestimate the value of the one year of due diligence that all of the other potential partners have done. It will be very difficult for anyone else to get up to speed quickly and they will slow down the process if they come in at this stage.

Best,

Will

---

**From:** Davis, Gregg
**Sent:** Wed 2/2/2005 6:01 AM
**To:** Mesdag, Will; 'dvoyticky@yahoo.com'
**Subject:** Potential Additional DAVIS PETROLEUM CORP. Investor

Will, I was at a charity dinner last night and sat with Gary Peterson, principle of Encap Investments, an energy equity firm here in Houston. They are a true player that has made extensive investment in E and P. Their website is "Encap Investments". We have talked to them before. Dad met them about 3 years ago. Gary has always expressed interest in doing something with Davis. Problem was they were more Acquisition/Exploitation focused....risk adverse. He asked what was going on last night and again said if you want to do something, they were taking on more risk type E and P. I gave him a high level overview of what we are doing and is wanting to meet to see if they could get in line for consideration. I told him we have a short time fuse, that others are already down the raod with due diligence. He asked if he could come and meet today with his guys.

What's your thoughts? My sense is they are real players and now that there is a true "Alignment Investment Opportunity with a Major Name Company and Team" they would be good. My suggestion is to have a meeting, no onÉ else but me, maybe George and David too, no geologists. If they are interested, only givÉ them the basic presentation and high level points to see if its even doable for them. Let me know your thoughts, Gregg

--------------------------
Sent from my BlackBerry Wireless Handheld

CONFIDENTIAL

RM00069482

# EXHIBIT 19

**ANNEXED TO THE DECLARATION OF HOWARD J. STEINBERG IN
SUPPORT OF OPPOSITION OF PLAINTIFF THE NANCY SUE
DAVIS TRUST TO MOTIONS OF NEW DAVIS DEFENDANTS AND
ALBERT S. CONLY, LIQUIDATING TRUSTEE, FOR SUMMARY
JUDGMENT**

From: Mesdag, Will
Sent: 2/23/2005 4:44:46 AM
To: Davis, Gregg
CC: Voyticky, David
Subject: Re: Riverstone

David raises the good point that if we distribute the letters now, John will give them to Jeffries and Jeffries will want to participate in the process on behalf of the family. We will not want that to happen until we have a deal worked out with your preferred partner.
--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Mesdag, Will
To: Davis, Gregg
CC: Voyticky, David
Sent: Tue Feb 22 20:28:55 2005
Subject: Re: Riverstone

Let's discuss tomorrow.

Advantages in showing the letters to John are that you now have all of them in hand, they are very complimentary, they all reference your management deal in a constructive way, and they demonstrate that you have significant interest and momentum. And, importantly, that they are not specific offers and expectations should be managed.

Disadvantages are that the deal is far from negotiated, there is no view on valuation, and John may develop a premature view on the appropriateness of each equity partner. The letters also don't accurately reflect the leverage Sankaty has as a result of the mezz debt.

Will
--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Davis, Gregg
To: Mesdag, Will
Sent: Tue Feb 22 19:59:02 2005
Subject: Re: Riverstone

John has hired Jefferies. We can send the letters to him but I thought we wanted to make sure the management deal was in place or at least where we want it roughly. Gregg
--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Mesdag, Will
To: Davis, Gregg
CC: Voyticky, David
Sent: Tue Feb 22 21:47:42 2005
Subject: Riverstone

Gregg,

NEWD00371071

I reviewed David's letter and think you characterized it perfectly -- late but well dressed.

He doesn't commit to much, but I think that he is sincere. If the management incentives of 7-10% are in addition to anything you buy and any overrides you exchange for equity, it's in the range. What is most interesting is that Mariner will be gone. That was an opportunity but also a complication (it still makes me crazy that we didn't pursue it). The biggest challenge with David will be getting a commitment from him that he is not going to try to merge you with another Riverstone portfolio company.

Have you given the indication of interest letters to John to review? If not, it might make sense to do so at this point with the structure outline that Michael prepared. It will stimulate him to hire an advisor.

We may want to use Bob Denham to work on the bridge facility with us if you decide to proceed with documentation, so it would also be helpful to know if he is working for DPC and/or the family.

See you tomorrow.

Will
-------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Leuschen, David
To: gdavis@davocs.com ; Mesdag, Will
Sent: Tue Feb 22 13:11:02 2005
Subject: FW: Attached Image

<<2201_001.pdf>>


From: curly@riverstonellc.com [mailto:curly@riverstonellc.com ]
Sent: Tuesday, February 22, 2005 4:01 PM
To: Leuschen, David
Subject: Attached Image
Importance: High

<<2201_001.pdf>>

NEWD00371072

# EXHIBIT 20

**ANNEXED TO THE DECLARATION OF HOWARD J. STEINBERG IN
SUPPORT OF OPPOSITION OF PLAINTIFF THE NANCY SUE
DAVIS TRUST TO MOTIONS OF NEW DAVIS DEFENDANTS AND
ALBERT S. CONLY, LIQUIDATING TRUSTEE, FOR SUMMARY
JUDGMENT**

**From:** Davis, Gregg
**Sent:** 5/28/2005 4:30:51 PM
**To:** Mesdag, Will
**CC:**
**Subject:** Re: Dan Armel

Good point. He may be in a pickle. We should make sure we communicate this to him when we meet. Gregg
---------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Mesdag, Will
To: Davis, Gregg
Sent: Sat May 28 11:29:07 2005
Subject: RE: Dan Armel

Gregg,

The proposed term sheet requires a 90 day period of exclusivity (which implies an agreement to the proposed terms subject to due diligence and definitive documentation) and agreed expense reimbursement in order to begin papering the deal. If Dan accepts this, he is welcome to hire Jeffries to render a fairness opinion, but the exclusivity requirement would block him from shopping the deal. Importantly, Evercore will not be prepared to paper the deal in the absence of exclusivity. I wouldn't worry about the time it will take to get a fairness opinion from Jefferies. If Evercore has exclusivity and is able to put a deal on the table that is consistent with the proposed term in six weeks, Jefferies will be under tremendous pressure to deliver its opinion. I would question, however, why Dan would expose himself to a Jefferies opinion after he agreed to begin papering a deal.


Will


From: Davis, Gregg
Sent: Sat 5/28/2005 8:55 AM
To: Mesdag, Will
Subject: Dan Armel

Will, I haven't heard from Dan Armel yet. I believe he is out of town. We should wait to hear from him directly his plans for going forward. I believe he is going to suggest we paper the deal (he mentioned this to Grace last week) while he has Jefferies engaged and do a firness opinion. My opinion is we still put the pressure on by saying 1. They cannot shop the deal and if they intend to have another auction process, we balk and say the offer is off the table. 2. If the Jefferies engagement is only a fairness opinion, we know that will take several months. We should say that the offer goes away after say 1 month so to put fire under them and limit Jefferies time. In the end, we must start papering the deal now. When I speak to him, I wil push for a face to face next week. Gregg

---------------------------
Sent from my BlackBerry Wireless Handheld

Confidential

NEWD00372703

# EXHIBIT 21

**ANNEXED TO THE DECLARATION OF HOWARD J. STEINBERG IN SUPPORT OF OPPOSITION OF PLAINTIFF THE NANCY SUE DAVIS TRUST TO MOTIONS OF NEW DAVIS DEFENDANTS AND ALBERT S. CONLY, LIQUIDATING TRUSTEE, FOR SUMMARY JUDGMENT**

**From:** Mesdag, Will
**Sent:** 6/2/2005 5:48:24 AM
**To:** Davis, Gregg
**CC:** Voyticky, David
**Subject:** RE: Davis Petroleum "Spoke to Bryan/Evercore

I think that all is well.  Get the bridge closed, let Dan return from vacation, and then start turning up the heat.

———

From: Davis, Gregg
Sent: Wed 6/1/2005 8:01 PM
To: Mesdag, Will
Subject: Davis Petroleum "Spoke to Bryan/Evercore

Will, hope alll is well. Again I'll be in thursday afternoon if you need me. Be there all weekend, available on cell 713 494 0070 or email.

I spoke to Bryan Jensen today who called to check in on the deal. I told him I felt all is progressing as expected, albeit a little slower than I'd like. I told him about Dan Armel's work. Told him the Bridge was getting signed Friday/Monday and why its still not finished...covenant review, lawyers weighing-in etc. I know you/David V. have given him some detail. I think he is cool

I did tell him that we (Davis Management and Evercore/Sankaty) may, if it appears there is a lull in the action, "stimulate things a bit, based on what Dan's tells us "when" we meet to get an updated plan. I told him there was still a chance he may want Jefferies to render a "fairness opinion". We agreed that "we" will weigh in on that and make sure it is very limited and that if there is any possibilty of an expanded Jefferies role, "we" would have to react. I feel it was apropriate to let him know "we" are aligned in our interests, that management is "partnered" with Evercore (and Sankaty and Red Mountain) and will share the same concerns if the deal veers of course. In that regard, I told I believe all is well, but "we" need a response. He was pleased and seemed ok.

Regarding Dan Armel, he is on a scheduled vacation this week and has not responded to my emails last friday. I did hear from Jack Hardy that he would make sure Dan deals with this. Let me know if you have any thoughts. Gregg

--------------------------
Sent from my BlackBerry Wireless Handheld

NEWD00371608

# EXHIBIT 22

**ANNEXED TO THE DECLARATION OF HOWARD J. STEINBERG IN
SUPPORT OF OPPOSITION OF PLAINTIFF THE NANCY SUE
DAVIS TRUST TO MOTIONS OF NEW DAVIS DEFENDANTS AND
ALBERT S. CONLY, LIQUIDATING TRUSTEE, FOR SUMMARY
JUDGMENT**

**From:** Jensen, Bryan
**Sent:** 6/8/2005 9:45:01 PM
**To:** Beutner, Austin
**CC:** Hiltz, William; Burnham, Ciara; Bick, Mayer
**Subject:** Davis Update

Will, Ciara and I caught up with Dan Armel (the independent director at Davis overseeing the process) yesterday and received the latest information on where our deal stands with the family.

-The good news is that everyone but Patty Davis (the sister in New York) generally supports our deal and would like to proceed on an exclusive basis with Evercore.
-Dan also thinks the right option for the company is to proceed with the Evercore offer.

-Unfortunately, Patty is making things difficult and arguing about the need for a market check or fairness opinion to ensure the best value is being offered.
-While Dan doesn't need her consent to proceed, he's concerned about being sued by Patty if she doesn't get her way and is inclined to get a third party opinion.
-Dan is planning on engaging Jeffries for a fairness opinion. Jeffries' mandate would be limited to an opinion to avoid the risk of them trying to drum up another offer.

-Dan told us he'd like to move forward on our deal anyway so the process would not drag out too much longer.
-We told Dan we felt bad the family had but him in a tough spot, but explained we couldn't begin working towards definitive documentation on our offer until the Jeffries process was complete and the company was ready to proceed with us on a formal, exclusive basis.
-We also indicated that our offer would go away if we didn't receive exclusivity and begin to move the deal forward relatively soon.

All in all, I think the deal is still ours and the tone of the conversation was generally positive. I think Dan sees the situation with Patty as a complicating factor which can be disposed of with proper procedure. He's trying to do that as quickly as possible so we can get on to finalizing our deal.

We agreed to speak again in a few days and get the update on where Jeffries in on their opinion.

Email with questions or comments.

------------------------------------------------------------
Bryan A Jensen
Senior Managing Director
Evercore Partners
11111 Santa Monica Blvd, Suite 1500
Los Angeles, CA 90025

310 689 0820 (ph)
310 689 0822 (fax)
jensen@evercore.com

NEWD00145341

# EXHIBIT 23

**INTENTIONALLY REMOVED AS HIGHLY CONFIDENTIAL.**

**TO BE FILED UNDER SEAL**