# EXHIBIT 60

**ANNEXED TO THE DECLARATION OF HOWARD J. STEINBERG IN SUPPORT OF OPPOSITION OF PLAINTIFF THE NANCY SUE DAVIS TRUST TO MOTIONS OF NEW DAVIS DEFENDANTS AND ALBERT S. CONLY, LIQUIDATING TRUSTEE, FOR SUMMARY JUDGMENT**

COPY

1

```
 1          IN THE UNITED STATES BANKRUPTCY COURT
                 SOUTHERN DISTRICT OF TEXAS
 2                  CORPUS CHRISTI DIVISION

 3
     IN RE:                        *    BANKRUPTCY
 4                                 *
     DAVIS OFFSHORE, L.P.,         *    NO. 06-20152
 5                                 *
          DEBTOR.                  *    CORPUS CHRISTI, TEXAS
 6                                 *    MARCH 9, 2006
                                   *    2:59 P.M.
 7    * * * * * * * * * * * * * * * *

 8
                     TRANSCRIPT OF MOTION HEARING
 9
              BEFORE THE HONORABLE RICHARD S. SCHMIDT
10                 UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   FOR THE DEBTORS:          MR. RHETT G. CAMPBELL
                               MS. DIANA M. WOODMAN
13                             MR. MATTHEW R. REED
                               MR. MITCHELL E. AYER
14                             THOMPSON & KNIGHT
                               333 CLAY STREET, SUITE 3300
15                             HOUSTON, TEXAS 77002-4499

16                             MR. SHELBY A. JORDAN
                               MR. NATHANIEL PETER HOLZER
17                             MR. HARLIN C. WOMBLE
                               JORDAN, HYDEN, WOMBLE & CULBRETH
18                             500 NORTH SHORELINE, SUITE 900
                               CORPUS CHRISTI, TEXAS 78471
19

20              (APPEARANCES CONTINUED ON PAGE 2)

21

22   COURT RECORDER:          MS. DANA PEREZ

23
            PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
24            TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
                      MOLLY CARTER, P. O. BOX 270203
25             CORPUS CHRISTI, TEXAS 78427 (361) 994-7596
```

United States District Court
Southern District of Texas
FILED

JUL 06 2006

Michael N. Milby, Clerk

1  standard metrics to what we would expect to receive if we

2  auctioned them off and actually sold them in a fair market

3  value auction today, and did a calculation of what we would pay

4  if we paid in the right priority, paying secured creditors and

5  so forth, and it looks like in the best case, we would pay

6  approximately $500,000 to our unsecured creditors.  And in that

7  example, the unsecured creditor class would be around

8  $21 million.

9          So our best case in a liquidation is we would pay

10  about a half million dollars on $21 million of creditor debt.

11  In the worst case, the second lien creditor, Sanctity, doesn't

12  get paid in full.  They only get paid, well, less than they're

13  owed.

14          So the problem the company has is it's short of cash.

15  It needs quite a bit of liquidity at the present time, and

16  liquidation or sale of the assets in the normal course is

17  really not an option, or a very undesirable option.

18          The shorthand version of where we are today with our

19  liquidity crunch is to get from today through about August 1st,

20  and there's a budget that supports this, we need about

21  $50 million.  And the company currently is operating in that

22  range of negative working capital.  We have cash in the bank,

23  but technically, it's not really the company's money.  So we're

24  basically out of cash at this point.

25          And consequently, in order to true up our accounts

1   and get to where we need to be, the company requires

2   approximately $50 million between now and August 1st.  There

3   really is no source of obtaining that $50 million.  So without

4   the deal, the Evercore deal that is the basis for the prepack

5   plan, the company really is faced with --

6           THE COURT:  And who is Evercore?

7           MR. CAMPBELL:  Evercore --

8           THE COURT:  I mean, I know they're sitting there,

9   but --

10          MR. CAMPBELL:  Right.  Evercore is an investment

11  fund.  Perhaps it's a hedge fund.  It's an investment group.

12          THE COURT:  What is their relationship, if any, to

13  Davis Petroleum or any of the Davis family?

14          MR. CAMPBELL:  My understanding is that there is no

15  relationship.  There are certain -- there are proposed to be

16  certain post effective date contracts --

17          THE COURT:  There are employment contracts.

18          MR. CAMPBELL:  -- employment contracts.

19          THE COURT:  And stock options.

20          MR. CAMPBELL:  Yes.

21          THE COURT:  Things of that sort, but --

22          MR. CAMPBELL:  Those have all been disclosed.

23          THE COURT:  But prior to all of that --

24          MR. CAMPBELL:  None.

25          THE COURT:  Forgetting Davis Acquisition, are there

19

1   any, is the -- it's a hedge fund?  Does anyone in control of

2   the hedge fund have anything, any relationship with any of the

3   Davis people?

4           MR. ENGMAN:  Your Honor, I hope you don't mind,

5   Richard Engman again from Jones Day.  I'd be happy to represent

6   on behalf of Evercore that --

7           THE COURT:  All right.  Go ahead.

8           MR. ENGMAN:  Pure investment relationship.  They

9   don't have, there is no current ties or other relationship with

10  the company, other than pursuing it as an investment.  As Your

11  Honor noted after the acquisition, in the acquisition vehicle,

12  key employees are being offered certain stock options and other

13  incentives to incentivize the business going forward.

14          THE COURT:  All right.  So the negotiation for the

15  first deal and now the second deal have all been an arm's

16  length transaction.

17          MR. CAMPBELL:  That is our understanding, and that's

18  what the evidence will show, yes, Your Honor.

19          THE COURT:  And is that also your understanding?

20          MR. ENGMAN:  It is, Your Honor.

21          THE COURT:  Okay.  Go ahead.

22          MR. CAMPBELL:  The original Evercore deal, and in

23  order to really understand why we are here today on this short

24  of a time line, you have to understand a little bit about the

25  timing of the original Evercore deal and what has happened.

20

1   The original Evercore -- well, I should put that in context.

2   Management of Davis, the Davis companies, understood that by

3   going into the offshore arena, the company was going to require

4   additional capital.  And for some period of time, I think going

5   back as long as a year, management has been trying to

6   recapitalize the company with additional capital.

7        During that period of time, they sought different

8   investor partners, equity partners to come in and participate.

9   Evercore became the party that they chose to participate with.

10  My understanding is that was an arm's length process as well.

11  Evercore was identified.  This is what originated in the

12  original Evercore deal.

13       That original Evercore transaction would have

14  recapitalized the company very substantially and would have

15  netted approximately, on a pro forma basis, now these are all

16  pro forma numbers, approximately $76.8 million to the equity

17  owners.  That deal almost closed.  It was negotiated very hard.

18  It was worked very extensively by Counsel for the equity class

19  and for Evercore and for the company, for a long time.  And as

20  a result of factors that really had nothing to do with the

21  business transaction and had nothing to do with the price, the

22  deal blew up on February the 6th, just about a month ago.

23       THE COURT:  Okay.  Now, are all those factors, are

24  those common knowledge, or is that -- I mean, I read your

25  position that they, that that deal fell apart.  Why did that

21

1   deal fall apart?

2           MR. CAMPBELL:  Well, there were -- one of the equity

3   owners declined to sign at the last minute.  I will tell the

4   Court that I thought I knew the answer to that question, but

5   yesterday, in yet another -- well, I guess it was two days

6   ago -- another conference call with all of the equity owners, I

7   heard differing stories as to why the deal fell apart.  And I

8   guess in truth, I think different equity owners would tell you

9   different reasons.  But the bottom line is that after an

10  all-night negotiating -- let me say, I was not there.  So I'm

11  just telling you what my understanding is.

12          THE COURT:  Okay.

13          MR. CAMPBELL:  After an all-night negotiating

14  session, it ended around 5:00 or 6:00 a.m. on February the 6th,

15  one of the family members, Patricia Davis Raynes, declined to

16  sign the last document.  There were various reasons.  I think

17  they were litigation based.  I guess I should tell you about

18  the lawsuit.  But they were litigation based.  And she declined

19  to sign the documents, and unless certain things were done,

20  people would decline to do it, refuse to do it.  And as a

21  consequence, the deal couldn't close.

22          The basis for that is this.  Patty Davis Raynes is a

23  Plaintiff in a derivative, well, I guess it's more than that,

24  but in a lawsuit against other members of her family.  It's

25  against the officers, directors of -- some of the officers and

1   directors of Davis Petroleum.  And it complains about a lot of

2   actions over a long period of time.  Part of the lawsuit

3   certainly is a derivative case, where it's for the benefit of

4   Davis Petroleum.  Part of it, as I understand it, is for her

5   own benefit.

6         Whatever else you want to say, she claims that the

7   Defendants in that lawsuit owe her and Davis Petroleum a great

8   deal of money.  Many of the Defendants that she has sued are,

9   as I said, officers and directors of the company, and they have

10   indemnity rights back against the company.  Those indemnity

11   claims, therefore, are both a defense, you know, costs of

12   defense, and also indemnity claims if they were to be found

13   liable.

14         As I appreciate it, Evercore's position was that if

15   they bought the equity in the company, in the original deal,

16   they wanted to be certain that they did not buy something that

17   was subject to those indemnity claims.  They wanted to be shed

18   of the Davis litigation.  And consequently, the way that that

19   was designed to be achieved was for the parties that had the

20   indemnity rights, the officers and directors, to give releases.

21   Well, those parties were asked to give releases, and they

22   insisted upon being released from Patty Davis Raynes, the

23   Plaintiff.  And she, in turn, had conditions that she insisted

24   upon in order to give those releases.  And those conditions

25   could not be satisfied.

23

```
 1          THE COURT:  Okay.  Now, Mr. Norton --
 2          MR. NORTON:  Yes, Your Honor.
 3          THE COURT:  -- are you her lawyer?
 4          MR. NORTON:  Yes, I am, Your Honor.
 5          THE COURT:  Is what Mr. Campbell said your
 6  understanding also?
 7          MR. NORTON:  There is a great more detail, but what
 8  Mr. Campbell related is accurate, yes, Your Honor.
 9          THE COURT:  Okay.  Now, I noticed -- I only point
10  this out so that I can -- rarely do I get the opportunity to
11  point out that I actually read the disclosure statement.  But
12  you turn to Page 11, it says that the principal terms of the
13  original Evercore deal are dramatically different from the
14  current transaction.  Then on Page 12, it says, because it's
15  substantially the same as the original Evercore deal, most of
16  them know what they are.  So which is it?
17          MR. CAMPBELL:  Other than price and timing.
18          THE COURT:  Okay.
19          MR. CAMPBELL:  It is the same transaction, except for
20  the price and the timing.
21          THE COURT:  Okay.
22          MR. CAMPBELL:  Other than that, it is basically the
23  same.  I thought I had changed that all the way --
24          THE COURT:  Okay.  That's the dramatic difference is
25  the price?
```

24

```
 1          MR. CAMPBELL:  Is the price.

 2          THE COURT:  Okay.

 3          MR. CAMPBELL:  And the timing.

 4          THE COURT:  And the price is dramatic.  Okay.

 5          MR. CAMPBELL:  It is.  And it's a big difference in

 6  the price.  On a pro forma basis, the original deal would have

 7  netted approximately 76.8 million to the equity owners, and our

 8  pro forma analysis shows that today this deal would net about

 9  31 million.

10          THE COURT:  Okay.

11          MR. CAMPBELL:  Now, these are all pro forma numbers

12  and they're all subject to adjustments, post-closing

13  adjustments.  But apples to apples, it's about 76 to 30.

14          THE COURT:  All right.  So now, have all the equity

15  owners signed the current term sheet deal?

16          MR. CAMPBELL:  No.  The company signed it.  They are

17  not required to sign it.

18          THE COURT:  Company has signed it and not the

19  equity --

20          MR. CAMPBELL:  Not the equity owners.

21          THE COURT:  Okay.

22          MR. CAMPBELL:  That's correct.

23          THE COURT:  Go ahead.

24          MR. LEICHTER:  Your Honor, this is Kevin Leichter.

25  Pardon me.
```

25

1        THE COURT:  Go ahead.  This is who?

2        MR. LEICHTER:  This is Kevin Leichter, representing

3   Barbara Davis.

4        THE COURT:  Okay.  Go ahead.

5        MR. LEICHTER:  I just would like to pipe in because I

6   want the record to be clear in one regard.  Mr. Campbell's

7   recitation is generally correct, but I should point out that

8   the estate of Marvin Davis, which is one of the -- it was --

9   that estate was sued in the lawsuit by his daughter, Patty

10  Raynes.  He, under the original, or his estate, under the

11  original Evercore deal, had agreed to provide the release to

12  the Debtors that had been requested by Evercore and had agreed

13  that the estate would not require a release from Patty Davis.

14  So I wanted that to be clear, Your Honor.

15       THE COURT:  Okay.

16       MS. MARSELA:  And Your Honor, this is Susan Marsela.

17  The same holds true for Mr. Gregg Davis.

18       THE COURT:  All right.

19       MS. MARSELA:  He had agreed to waive the indemnity

20  rights.

21       THE COURT:  All right.  Thank you.  Go ahead,

22  Mr. Campbell.

23       MR. CAMPBELL:  So going through this from a timing

24  point of view, I would like to go through some dates and tell

25  the Court some things about what has happened over the last

1   month, things that I participated in, and explain why it is

2   we're here this afternoon asking to go forward on an expedited

3   basis.

4            The original deal went bust on February the 6th.  Our

5   firm was retained -- well, and right after that happened, Bank

6   of America and Sanctity accelerated their debt, which was

7   30 million and 43 million.  Bank of America immediately

8   retained Alvarez & Marsel to determine what to do about their

9   cash and their collateral.  There was a meeting between A&M and

10  the company on February the 10th of 2006, to go over the cash

11  collateral issues, the cash and collateral issues.

12           Our firm was retained for the February 10th meeting

13  only, but not generally, just for that one day.  So I

14  participated in that meeting.

15           On Monday the 13th, we were retained generally, to

16  try to help the company with their problems.  And what we did

17  then was meet with and retain Bert Conly, who is a financial

18  analyst and consultant at FTI.  We retained the FTI Consulting

19  Company to help us get a handle on the numbers.

20           What we believe we needed to know was what is the

21  financial condition of the company, how much cash does it have,

22  how much cash does it need, what is the ultimate answer, what

23  are our options.  So we started working on that on the 14th.

24           On the 17th, we met with Richardson & Barr, an

25  investment banker specializing in oil and gas properties, to

1   get a feel for what we could do if we could try to auction the

2   properties off.

3          Later that day, on the 17th, Evercore, after having

4   been entreated to come back and do the deal, all this time,

5   under all of this, over these periods, these days, the

6   shareholders -- the equity owners were trying to get Evercore

7   back and try and put the deal back together.  I mean, this has

8   been a constant effort that, needless to say, people would

9   prefer to go back to that original deal, even at this date, if

10  they could.

11         And one of the pitches that the company and the

12  equity owners made to Evercore was, can we do a prepack and

13  eliminate the need for the equity owners to sign, because in a

14  prepack bankruptcy, if you satisfy the legal test, then it's

15  not necessary for the equity owners to sign off on a deal and

16  approve it.

17         Well, that afternoon, on February the 17th, Evercore

18  said, okay, we'll consider doing a prepack, but it has to be

19  repriced, and the price is probably going to be much reduced.

20  The equity owners said fine, do your due diligence, see what

21  you need to do, and we'll consider going forward.

22         On Monday the 20th, we went, we, the company and our

23  firm, went and met with Petrie Parkman, again, the investment

24  banking firm that works in oil and gas properties, talked to

25  them about the assets and what we thought we could get from

28

1    them.

2         On the 21st, significantly to me, Petrie called and

3    said they were not interested in marketing the properties and

4    recited the negative facts that we've talked about in the

5    disclosure statement.  These are nonproducing, offshore,

6    nonproducing properties, nonoperated.  They're in the Gulf of

7    Mexico.  And this is just, it's just not worth doing, in their

8    view.

9         On Wednesday, the 22nd, Evercore sent their man to

10   Houston, who performed additional due diligence.  On Friday the

11   24th, we were beginning to get better numbers and a handle on

12   the situation from FTI.  On Monday the 27th, we received the

13   revised draft term sheet from Evercore for the prepack, and

14   that was -- the 24th now of February, and that was when the

15   equity owners realized that the new price was going to be

16   dramatically lower than the prior price.  The equity owners,

17   frankly, have been trying to come to grips with that ever

18   since.

19        FTI's pro forma calculations on that date showed that

20   it would generate less than $31 million to the equity owners,

21   and even that is subject to a $10 million hold back.  And they

22   were quite upset over the fact of loss of value, from their

23   perspective, going from 76 million to 31 million.

24        In addition, the term sheet from Evercore had some

25   pretty onerous provisions, from the company's point of view,

29

1   including paying $1.5 million for expenses that had previously

2   been incurred, paying a breakup fee of 5 percent of the

3   ultimate purchase price, and having to be, having a

4   confirmation order in the prepack plan entered by March 15th.

5           Now, this is on Monday, February 27th, we've got to

6   do this and get a confirmation order by the 15th and close the

7   deal by March 30th.  That was pretty ambitious.  But on the

8   28th, we started working on it and trying to get that done.

9           On Tuesday, February 28th, we began to consider

10  serious alternatives for the equity owners and had a series of

11  conference calls with all of the equity owners participating.

12  I'm sorry.  At that point, it would have been all but Patty, to

13  be fair, to discuss a free fall bankruptcy, and whether we had

14  time to do it, because at that point, the free fall was going

15  to involve approximately four months to try and either market

16  the properties or to do a recapitalization, where equity would

17  be seriously diluted.

18          Significantly, we recognized that the offshore

19  properties could be very valuable, really very, very valuable,

20  but they are not operated, nonproducing, Gulf of Mexico, which

21  is adverse weather events, and they require a lot of money to

22  bring them on line.  Now we know the number is, I believe we

23  said $12½ million.

24          Going out four months, again, going to that

25  August 1st date, is going to take about $50 million if we true

  
30

1   up our various accounts and get the company on an even keel.

2   Even if we don't true up the numbers, certainly a minimum of 20

3   to $30 million, and that would require not only going into a

4   Chapter 11 but doing a very healthy DIP loan.  So we actually

5   considered whether that should be considered as an alternative.

6          And in looking at that, we looked at these facts.

7   The PV10 of the reserves on July of '05 was $113 million.  The

8   liquidation value, according to FTI, using standard metrics,

9   was about 70 to $90 million.  So if we do the auction, the

10   four-month process, we get 70 to 90 million, with existing

11   liabilities of 125.  So borrowing another 20 to $30 million did

12   not seem to be very prudent, and certainly not 50.

13          We did recognize that there might be a way to do an

14   equity deal in which an equity partner could come in, dilute

15   existing equity and much lower the percentage, get a much lower

16   percentage but of a bigger pie, somewhere down the road.  The

17   problem with that is there's no certainty of value.  The equity

18   owners have no way of knowing precisely what they're going to

19   get, and there's no time, no timing, because you don't know

20   when they're going to get a number that is very uncertain.

21          Plus, we didn't have time really to pursue that

22   option, because Evercore was sitting there with their deal

23   saying we've got to have a confirmation order by March 15th,

24   and they want an exclusive.  Once we signed up with them, we

25   couldn't negotiate or solicit other deals.  So thus, the board

31

1   of directors approximately that date, around March 1st,

2   concluded that it had to go for the Evercore deal.  That was

3   the only prudent thing to do, and so we began doing that.

4          On Thursday, March the 2nd, which is a week ago, we

5   solicited for the prepack, and we sent out all the solicitation

6   materials that evening by Federal Express to all of the equity

7   owners who, of course, are the only impaired classes.

8          The plan structure that's being solicited is

9   basically this.  It's a $150 million purchase price.  Evercore

10  went up 4 million from the original term sheet they came back

11  with.  The company has to pay all invoices and all claims from

12  the 150 million, plus the cash that's on hand.  And there will

13  be closing adjustments, and we true up the cash.

14         For 150 million, they get all the assets squeaky

15  clean, but no cash, no current assets.  So we're entitled to

16  use the current assets to pay bills.

17         They want to assume all executory contracts, other

18  than certain contracts that are regarded, that regard

19  overrides, as specified in one of the exhibits.  And the

20  company, out of the 150 million, has to pay the cost of a cure

21  of assuming executory contracts.

22         The residue of the purchase price goes to a

23  liquidating trust.  Bert Conly of FTI will be the Trustee.  We

24  will pay all allowed claims, either at closing or from the

25  trust, 100 percent.  All unsecured creditors will be

32

1   unimpaired.  We have to reserve at least $10 million for a

2   specified period of time to make good on reps and warranties

3   and potential indemnities that are required by Evercore.  It's

4   subject to other hold backs and reserves because we just have

5   to take care of all the claims, so we may have to establish

6   hold backs and reserves for other claims.

7          And existing management, including Gregg Davis, do

8   get employment contracts or consulting agreements.  Mr. Davis

9   gets an opportunity to invest in the Evercore deal.  It's

10   not -- it's completely above board, in this sense.  He gets to

11   participate with his actual after-tax dollars.  He gets treated

12   the same as every other equity owner, but he has an opportunity

13   to invest in Evercore.

14          It is my understanding that other equity owners do

15   not get that option in this plan.  After all, Evercore is not

16   required to give it to them if they don't want to.  And it is

17   not on account of his equity that he's getting out, because

18   he's been treating -- being treated the same as all equity

19   owners.

20          In the solicitation package, we told the equity

21   owners that the vote was Tuesday, two days ago, at 2:00 p.m.,

22   that the confirmation hearing would be sought to be held this

23   Thursday, today, at 3:00 p.m., and we're here.  And we sent all

24   that materials to them.

25          What we then did -- that went out on Thursday.  On

33

1   Friday, we called all the shareholders to make sure they had

2   received their material and started a series of lengthy

3   conference calls with each of the equity owners.  And I'll

4   assure the Court, all of them participated, along with their

5   attorneys.  And we had a series of calls on Friday and Saturday

6   and Sunday going over the solicitation materials, explaining

7   the financial statements to them, the financial information.  I

8   explained it to them.  Mr. Conly was on the call and explained

9   it to them.  And we went through different alternatives.  The

10  different things that I have explained just now was gone into

11  at great length with the equity owners in those calls.

12          And finally then, on Monday, we had a last few calls.

13  There's some additional, some changes were made in some of the

14  plan documents at the request of the equity owners to

15  strengthen some provisions they were concerned about.  And then

16  on Tuesday, we received the vote.  And as I said, or is in the

17  material, we got the vote.  It was 91 percent for, from Davis

18  Petroleum and Pipeline, and 100 percent in favor on Davis

19  Offshore.

20          We had 8.8 percent vote no in Davis Petroleum, and

21  8.8 percent vote no in pipeline.  And by the way, all equity

22  owners voted.  So it was --

23          THE COURT:  Okay.  And that was Nancy Davis.

24          MR. CAMPBELL:  That's correct.

25          THE COURT:  That voted her 8.8 percent, her trust

34

1   voted against the plan.

2          Mr. Diamond, are they still voting against the plan?

3          MR. DIAMOND:  Yes, Your Honor.

4          THE COURT:  Okay.

5          MR. CAMPBELL:  So management believes strongly that,

6   while this is a distasteful deal in the sense that the price is

7   dramatically lower than what equity owners thought they could

8   get, management believes that this is, by far and away, the

9   most prudent course, and indeed the only prudent thing for the

10  company to do at this time.

11         The alternatives are this.  If we go into a free fall

12  Chapter 11 and do either a four-month auction, data room

13  process, or just a straight liquidation through the bankruptcy

14  system, chances are very good, according to FTI's analysis,

15  that the unsecured creditors will not get paid at all, or very

16  little.

17         This way, all unsecured creditors get paid.  The

18  equity owners have a good chance of receiving up to

19  $31 million.  And I want to emphasize there's no assurance

20  they'll get 31 million, but the pro formas indicate that it

21  will be 31, less some deductions and hold backs.  So we're

22  hopeful they will get as close to 31 million as possible.

23         I think it is fairly certain they will receive a

24  payday.  It's just a question of how much.  But we can find no

25  other alternative that provides for payment of the creditors in

35

1    full and an opportunity for equity owners to receive a

2    substantial distribution.  And that's why management believes

3    this is important.

4         The timing, of course, is March 15th.  Evercore's

5    condition of the deal is we have to have a confirmation order

6    by March 15th, and we have to close the transaction by

7    March 30th.  And that's the reason for the need for expedited

8    consideration.

9         THE COURT:  Okay.  Were all of the equity holders

10   involved in the negotiations or at least apprised of the

11   negotiations with Evercore, both in the first and the second

12   contract?

13        MR. CAMPBELL:  They --

14        THE COURT:  Contemporaneously with the reaching

15   agreements?

16        MR. CAMPBELL:  In the first one, yes.  In the second

17   one, no.  Patty Raynes Davis was not, until we solicited.

18        THE COURT:  But Patty Davis has --

19        MR. CAMPBELL:  Patty Davis Raynes.

20        THE COURT:  -- voted in favor of the plan.

21        MR. CAMPBELL:  And she's voted in favor.  All of the

22   other equity owners were aware of the second round of

23   negotiations with Evercore, from beginning to end.

24        THE COURT:  All right.  So now, does anyone on the

25   phone have anything they want to say at this point?

1              All right.  Continue, Mr. --

2              MR. CAMPBELL:  All right.  Well, I think that

3    explains why we're here, Your Honor.

4              THE COURT:  So let's go ahead with our first day

5    orders.

6              MR. CAMPBELL:  Thank you.

7              THE COURT:  Does anyone in the courtroom have

8    anything that they wanted to say about this preliminary

9    statement, or preliminarily before we continue on?

10             All right.  Go ahead.

11             MS. WOODMAN:  Your Honor, Docket Number 3 is the

12   emergency motion for joint administration.  As the Court knows,

13   these are separate entities that operate closely together.

14   They do have centralized accounting, and their assets are

15   cross-collateralized to the secured --

16             THE COURT:  All right.  Is anyone opposed to the

17   emergency motion for joint administration?  First on the phone?

18             MS. MARCH:  Your Honor, this is Christine March with

19   the U.S. Trustee's Office.  We don't oppose the motion for

20   joint administration, but for some limited requests.

21             THE COURT:  What is that?

22             MS. MARCH:  Currently, the order currently

23   contemplates that there will be no monthly operating reports

24   filed.  We would ask that monthly operating reports, at least

25   in a, we're willing to accept a shortened version, but we would

62

1          MR. ROBERTS:  Thank you.

2          MR. CAMPBELL:  Your Honor, at this time we would call

3   Mr. Gregg Davis as our first witness.

4          THE COURT:  All right.  And his proffer is --

5          MR. CAMPBELL:  I'm not sure what number it is.

6          THE COURT:  Oh, it's in this.

7          MR. CAMPBELL:  14.  Yes, go ahead.

8      (Witness sworn.)

9          THE COURT:  That is Number 14.  Is that correct?

10  Okay.  We'll take a moment and I'll -- to be provided at

11  confirmation.

12         MR. CAMPBELL:  Yes, Exhibit 14.

13         MR. HOLZER:  That's --

14         THE COURT:  I don't have Exhibit 14.

15         MR. HOLZER:  That's 14 to the disclosure statement,

16  Your Honor.  I think you're looking at the wrong 14.

17         THE COURT:  Oh.  Sorry about that.  Exhibit 14.

18         MR. HOLZER:  Your Honor, if I could suggest, we're

19  getting a lot of noise on the conference call.  For those

20  people on the call, if they could mute their telephones, the

21  speakers on their phones, that might help that.

22         THE COURT:  Okay.  And then you can unmute them to

23  talk when you need to, if you can do that.  But there's some

24  people that are breathing into the phone, for instance.  I'm

25  not -- I'm not sure how that's happening.  It might be you're

63

1   on a cell phone or something.  I don't know.

2           All right.  You are -- you want to state your full

3   name for the record?

4           THE WITNESS:  Gregg James Davis.

5           THE COURT:  And I have what's been called The Proffer

6   of Gregg Davis in Support of Confirmation of the Plan, under 11

7   USC, Section 1229.  And it's not signed, but is this in fact

8   your testimony?

9           THE WITNESS:  That is correct.

10          THE COURT:  And everything in there is true and

11  correct, to the best of your knowledge?

12          THE WITNESS:  Yes, it is.

13          THE COURT:  All right.  Do you have any other

14  questions?

15          MR. CAMPBELL:  Two, Your Honor.  Some additional

16  things have come up.

17          GREGG JAMES DAVIS, DEBTOR'S WITNESS NO. 1, SWORN

18                       DIRECT EXAMINATION

19  BY MR. CAMPBELL:

20  Q.   Mr. Davis, you heard the Judge's question about the Davis

21  family relationships with Evercore.  Prior to the negotiation

22  of the, or consummation, really, of the current Evercore deal,

23  does any member of the Davis family have any relationships with

24  Evercore that you're aware of?

25  A.   No.

Davis - Direct                                    64

1    Q.    And in your judgment, were the family members well

2    represented with competent Counsel during the negotiations of

3    all of these Evercore transactions?

4    A.    Yes.

5              MR. CAMPBELL:  Thank you.

6              THE COURT:  And you don't have to lean forward.  You

7    can just talk.

8              MR. CAMPBELL:  I have no further questions, and we

9    tender the witness for cross-examination.

10             THE COURT:  All right.  Do we have anyone on the

11   phone that wants to ask any questions of the witness?

12             All right.  Anyone in the courtroom that wants to ask

13   any questions of the witness?  One more time on the phone?

14   Well, then you don't get any redirect.

15             All right.  You can step down.

16             THE WITNESS:  Thank you.

17             MR. CAMPBELL:  Call Bert Conly.

18             THE COURT:  And that would be Exhibit Number --

19             MR. CAMPBELL:  The next one, I believe.

20             MS. WOODMAN:  It's 13.

21             THE COURT:  Number 13.  Okay.

22        (Witness sworn.)

23             THE COURT:  All right.  Mr. Conly, I have two

24   documents here.  One is called The Proffer of Albert Conly in

25   Support of Confirmation Plan, under 11 USC 1129.  Is that, in

1   value was significant.  As unhappy as it was, as explained by

2   Mr. Campbell quite eloquently, that eroded value was

3   nonetheless the best opportunity to capture some value for

4   equity and to take care of the creditors and to preserve an

5   enterprise that was built with love and care over many decades

6   by the Davis family.

7            The ability to do so is directly tied to the timing

8   that Evercore required, and I would not want to see anything

9   that held up the confirmation of this case cause the punitive

10  provisions in the term sheet to be triggered with respect to

11  the timing of the transaction, and I would request that there

12  not be any delay, Your Honor, in confirmation.

13           THE COURT:  All right.  Anyone else on the phone have

14  a question -- have a comment or anything else that they want to

15  present?  All right.  Now in the courtroom?  Mr. Campbell, you

16  wanted to say --

17           MR. CAMPBELL:  There is one other point with regard

18  to the statements of affairs and schedules, and that is that

19  all litigation in favor of the company and the Chapter 5

20  avoidance actions and (inaudible) company, and all that sort of

21  stuff, go into the liquidating trust anyway.  So if we disclose

22  all of those kinds of transactions for the hope of benefitting

23  the creditors, those come into the liquidating trust for the

24  benefit of the creditors and ultimately the equity owners

25  anyway.

75

1          THE COURT:  Okay.  Anyone else in the courtroom with

2    anything they wanted to say?  Yes, sir.

3          MR. ENGMAN:  Your Honor, thank you.

4          THE COURT:  Okay.  You don't really have a mike over

5    there.  That table is there, but it's sort of the bastard

6    stepchild table unfortunately.  I'm sorry.

7          MR. ENGMAN:  Just happy that you're referring to the

8    table.

9          THE COURT:  Yeah, just the table.

10          MR. ENGMAN:  Thank you, Your Honor.  I'll be very

11    brief.  I just wanted to actually second the comments that were

12    just made over the telephone.  Time is of the essence here.

13    Value has eroded.  It has eroded significantly since January.

14    The March lease sale is coming up.

15          I did want to make the point to Your Honor that the

16    timing here, the March 15th date to March 30th closing are not

17    arbitrary provisions.  Evercore was, had negotiated for a long

18    time in the, what the Debtors refer to as the original deal,

19    and was looking forward to a closing there.  That didn't

20    happen.

21          Unfortunately, since then, value continues to erode

22    in the company.  The Debtor has laid out for Your Honor the

23    difficulties in raising enough capital to continue operating.

24    Unless it quickly gets the new capital that this deal will

25    provide, concerns again about the March lease sale, employees,

76

1   we just don't believe that the company that we, that Evercore
2   thinks it's buying today will be there after March 15th or
3   after March 30th.  And that's why Evercore has insisted on
4   those provisions, because they want to be -- if they're going
5   to pay the $150 million to buy the assets, they want to make
6   sure that the assets that they think that they're buying will
7   still be there.
8                THE COURT:  All right.
9                MR. ENGMAN:  Thank you, Your Honor.
10               THE COURT:  Yes, sir, Mr. Campbell.
11               MR. CAMPBELL:  Does the Court have a copy of our
12   confirmation order or form of confirmation order?
13               THE COURT:  I think you did supply me with one.  I
14   don't know whether it --
15               MR. CAMPBELL:  This is one that has had some
16   provisions added, based upon Bank of America and Evercore's
17   suggestions.  Can I pass this up?
18               THE COURT:  You may.  But what about the Reliant
19   issue?
20               MR. CAMPBELL:  That has not been addressed.  And --
21               THE COURT:  So --
22               MR. CAMPBELL:  As part of my argument, what I would
23   say is I really believe that the plan and this order adequately
24   addresses Mr. Roberts' concerns.  And I assure him and the
25   Court that the economic -- economically, his concerns have been

84

1    effectuate the concern that Mr. Roberts had expressed.

2              MR. JORDAN:  Your Honor, if we reach an agreement

3    with Mr. Roberts, then --

4              THE COURT:  Then we don't need a phone call.  You can

5    either submit this order or you can submit the new order.  All

6    right?

7              Thank you very much.  I appreciate the work that all

8    of you have done.

9         (Proceedings concluded at 4:43 p.m.)

10

11

12

13

14   I, court approved transcriber, certify that the foregoing is a
     correct transcript from the official electronic sound recording
15   of the proceedings in the above-entitled matter.

16

17   _Molly Carter_                    _July 5, 2006_____
     Molly Carter                      Date

18

19

20

21

22

23

24

25