# EXHIBIT 69

**ANNEXED TO THE DECLARATION OF HOWARD J. STEINBERG IN SUPPORT OF OPPOSITION OF PLAINTIFF THE NANCY SUE DAVIS TRUST TO MOTIONS OF NEW DAVIS DEFENDANTS AND ALBERT S. CONLY, LIQUIDATING TRUSTEE, FOR SUMMARY JUDGMENT**

# Exhibit 5

### EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") is dated February 6th, 2006, by and between Davis Petroleum Corp., a Delaware corporation (the "Company"), Davis Offshore, L.P., a Texas limited partnership ("Davis Offshore") and Gregg Davis ("Executive").

A.    The Company, Davis Offshore and Executive previously entered into an Executive Employment Agreement dated as of December 24, 2002 (the "Prior Agreement").

B.    The Company desires to encourage the continued employment of Executive in the service of the Company, and Executive desires to accept and continue such employment, on the terms and conditions of this Agreement from and after the date of this Agreement.

C.    The Company, Davis Offshore and Executive desire to amend and restate and supersede the Prior Agreement in its entirety and to enter into an agreement embodying the terms of such continued employment as set forth herein.

In consideration of the premises and mutual covenants herein and for other good and valuable consideration, the parties agree as follows:

1.    <u>Term of Employment</u>.  Subject to the provisions of Section 7 of this Agreement, Executive shall be employed by the Company for a period commencing on [_____], 2006, and ending on [_____], 2007 (the "Employment Term"), on the terms and subject to the conditions set forth in this Agreement; <u>provided</u>, <u>however</u>, that commencing with [_____,] 2007, and on each [_____] thereafter (each an "Extension Date"), the Employment Term shall be automatically extended for an additional one-year period, unless the Company or Executive provides the other party hereto 90 days' prior written notice before the next Extension Date that the Employment Term shall not be so extended.

2.    <u>Position</u>.

a.    During the Employment Term, Executive shall serve as the Company's President and Chief Executive Officer.  In such position, Executive shall have such duties and authority as shall be determined from time to time by the Board of Directors of the Company (the "Board"), provided that such duties are at all times consistent with the duties of such position.  Executive shall report directly to the Board.  Executive shall also serve as a member of the Board without additional compensation.

b.    During the Employment Term, Executive will devote Executive's full business time and best efforts to the performance of Executive's duties hereunder and will not engage in any other business, profession or occupation for compensation or otherwise which would conflict or interfere with the rendition of such services either directly or indirectly, without the prior written consent of the Board; <u>provided</u> that nothing herein shall preclude Executive from (i) accepting appointment to or continuing to serve on any board of directors, trustees or committees of any civic or charitable organization or (ii) managing his personal

DLI-5963132v8

investments; provided in each case, and in the aggregate, that such activities do not conflict or interfere with the performance of Executive's duties hereunder or conflict with Section 8.

        3.      Base Salary. During the Employment Term, the Company shall pay Executive a base salary at the annual rate of $600,000, less all applicable withholdings and deductions and payable in regular installments in accordance with the Company's usual payment practices. Executive shall be entitled to such increases in Executive's base salary, if any, as may be determined from time to time in the sole discretion of the Board. Executive's base salary shall be reviewed by the Board at least annually, with the first such review to be made no later than the one-year anniversary of this Agreement. Executive's base salary shall not be reduced except in connection with a broad-based cost reduction program instituted by the Company. Executive's annual base salary, as in effect from time to time, is hereinafter referred to as the "Base Salary."

        4.      Incentive Compensation.

        a.      Annual Bonus. With respect to each fiscal year ending during the Employment Term, Executive shall be eligible to earn an annual bonus award (an "Annual Bonus") based on a target bonus amount of $200,000 (with such target amount to be pro-rated for the first fiscal year ending during the Employment Term) upon the achievement during the period of Executive's employment with the Company of various organizational and individual goals established by the Board (in consultation with Executive) within the first three months of each fiscal year during the Employment Term and specified in writing to Executive; provided that any such bonus shall be pro-rated for the fiscal year containing the date of Executive's termination of employment with the Company. As soon as practicable after the conclusion of each fiscal year, the Board shall determine the amount of the Annual Bonus, if any, payable to Executive hereunder and shall provide Executive with a written description thereof in reasonable detail. The Annual Bonus, if any, shall be paid to Executive within two and one-half months after the end of the applicable fiscal year.

        b.      Equity Awards. The Company and Executive are simultaneously entering into a Restricted Stock Agreement and Stock Option Agreement, the terms and conditions of which will be set forth in such separate agreements and which will provide, among other things, for the forfeiture of certain awards to Executive in the event that he breaches the provisions of this Agreement.

        5.      Employee Benefits and Overrides.

        a.      Benefit Plans and Vacation. During the Employment Term, Executive shall be entitled to participate in the Company's employee benefit plans (other than bonus and incentive plans) as in effect from time to time (collectively "Employee Benefits"), on the same basis as those benefits are generally made available to other senior executives of the Company. Executive shall be entitled to five weeks of vacation per year, in accordance with the Company's vacation policy applicable to senior executives of the Company. Vacation shall be taken at times when reasonably appropriate given the Executive's responsibilities and consistent with the needs of the Company.

DLI-5963132v8

      b.     <u>Life Insurance</u>. During the Employment Term, the Company shall purchase or maintain term life insurance on the life of Executive, payable to the estate of Executive, equal to the amount of insurance that can be purchased by the Company by the payment of monthly premiums of $11,000.

      c.     <u>Royalty Interests</u>.

      (i)     During the Employment Term, Executive shall receive an assignment of overriding royalty interest ("ORRI") in any and all drilling prospects ("Prospects") in which the Company or Davis Offshore (or any of their respective affiliates) owns, or is entitled to, an interest and in any and all wells (including, without limitation, all exploratory and developmental wells) ("Well") in which the Company or Davis Offshore (or any of their respective affiliates) owns, or is entitled to, an interest and which is drilled after the date hereof, subject to and upon the following terms:

      (A)     the ORRI will be equal to (1) with respect to [onshore properties], 1.0% of 8/8ths and (2) with respect to [offshore properties], 0.75% of 8/8ths of all oil, gas and casinghead gas, condensate, natural gas liquids, and all other minerals and substances produced and saved under the terms of oil and gas leases acquired (whether by purchase, farm-in or in any other manner) prior to or after the date hereof by the Company or Davis Offshore (or any of their respective affiliates) ("Subject Leases"); provided, however, that the percentages described in the foregoing clauses (1) and (2) shall be reduced to the extent Executive has granted or transferred any such interests to any other person or persons and provided, further, that the percentage with respect to offshore properties shall be reduced by the 0.40% interest granted or transferred to Douglas Wilson pursuant to any employment agreement between the Company or Davis Offshore and Douglas Wilson;

      (B)     the assignment will be made to Executive as soon as possible after a Prospect has been sold to outside program participants but in any event before the testing and evaluation of the initial test well of the Prospect drilled by the Company or Davis Offshore (or any of their respective affiliates);

      (C)     the ORRI will be free of drilling, development and operating expenses, but will bear its proportionate share of severance and production taxes unless provided otherwise in the Subject Leases, and the ORRI will be calculated and paid or delivered to Executive in the same manner as provided in the Subject Leases affected thereby for the calculation and payment or delivery of royalties therein reserved to the lessors and will be, only to the same extent provided for royalties reserved to the lessors under the applicable Subject Leases, without deduction for the costs of gathering, storing, separating, treating, dehydrating, compressing, transporting, and otherwise making the oil, gas and other products produced and saved from the land covered by the Subject Leases ready for the sale or use;

(D)    the assignment will be made subject to all the terms and conditions of the exploration agreements and operating agreements between the Company or Davis Offshore (or any of their respective affiliates) and their respective outside program participants; and

(E)    Davis Offshore joins in the execution of this Agreement to evidence its agreement to the terms of this Section 5(c).

(ii)    After the Employment Term, Executive shall be entitled to receive an assignment of the ORRI with respect to any Prospect which, during the Employment Term (A) was determined by the Company to be prospective for oil and other hydrocarbons and (B) was not sold to outside program participants, if such Prospect is thereafter sold to outside program participants on or before the 18-month anniversary of the expiration of the Employment Term; provided that Executive shall not be entitled to any assignment pursuant to this Section 5(c)(ii) if Executive's employment is terminated for Cause (as defined in Section 7(a)) or due to Executive's resignation without Good Reason (as defined in Section 7(c)). Any assignment pursuant to this Section 5(c)(ii) shall be determined and made on the terms and conditions described in subsections 5(c)(i)(B) through (E) above.

6.    Business Expenses. During the Employment Term, reasonable business expenses that are consistent with Company policies and that are incurred by Executive in the performance of Executive's duties hereunder shall be promptly reimbursed by the Company.

7.    Termination. The Employment Term and Executive's employment hereunder may be terminated by either party at any time and for any reason; provided that Executive will be required to give the Company at least 90 days' advance written notice of any resignation of Executive's employment. Notwithstanding any other provision of this Agreement, the provisions of this Section 7 shall exclusively govern Executive's rights upon termination of employment with the Company and its affiliates.

a.    By the Company For Cause or By Executive Resignation Without Good Reason.

(i)    The Employment Term and Executive's employment hereunder may be terminated by the Company for Cause (as defined below) and shall terminate automatically upon Executive's resignation without Good Reason (as defined in Section 7(c)); provided that Executive will be required to give the Company at least 90 days' advance written notice of his resignation without Good Reason.

(ii)    For purposes of this Agreement, "Cause" shall mean (A) Executive's intentional and continuing failure to substantially perform Executive's duties hereunder (other than as a result of total or partial incapacity due to physical or mental illness) (B) Executive's act of misappropriation, embezzlement, intentional fraud or any similar conduct involving the Company or any of its subsidiaries or affiliates, (C) Executive's indictment or conviction of, or plea of guilty or nolo contendre to, a crime constituting (x) a felony under the laws of the United States or any state thereof or (y) a misdemeanor involving moral turpitude, or (z) an act of fraud, or any other offense that materially adversely affects the Company's

prospects or reputation or Executive's ability to perform his obligations or duties, (D) Executive's willful or repeated misconduct or gross negligence in the performance of Executive's duties hereunder, (E) Executive's breach of that certain Release of Claims entered into as of February [____], 2006, between Executive and various parties relating to Patricia Davis Raynes v. Marvin Davis, et. al.; Case No. CV05-6740 ABC (Ctx) in the United States District Court, Central District of California (the "Release"), or (F) Executive's breach of the provisions of Sections 8 or 9 of this Agreement; provided, that the events described in clauses (A), (D) (E) and (F) of this Section 7(a)(ii) shall constitute Cause only if Executive fails to cure such event within 20 days after receipt from the Company of written notice detailing the failure, misconduct or breach which the Board believes constitutes Cause.

        (iii)    If Executive's employment is terminated by the Company for Cause, or if Executive resigns without Good Reason, Executive shall be entitled to receive:

        (A)    the Base Salary through the date of termination;

        (B)    any accrued but unused vacation as of the date of termination;

        (C)    any Annual Bonus earned but unpaid as of the date of termination for the immediately preceding fiscal year, paid in accordance with Section 4;

        (D)    any ORRI earned by Executive pursuant to Section 5(c)(i) but not theretofore assigned by the Company, Davis Offshore or their affiliates;

        (E)    reimbursement, within 60 days following submission by Executive to the Company of appropriate supporting documentation) for any unreimbursed business expenses properly incurred by Executive in accordance with Company policy prior to the date of Executive's termination; provided claims for such reimbursement (accompanied by appropriate supporting documentation) are submitted to the Company within 45 days following the date of Executive's termination of employment; and

        (F)    such Employee Benefits, if any, as to which Executive may be entitled under the employee benefit plans of the Company (the amounts described in clauses (A) through (E) hereof being referred to as the "Accrued Rights").

    Following such termination of Executive's employment by the Company for Cause or resignation by Executive without Good Reason, except as set forth in this Section 7(a)(iii), Executive shall have no further rights to any compensation or any other benefits under this Agreement.

        b.    Disability or Death.

        (i)     The Employment Term and Executive's employment hereunder shall terminate upon Executive's death and may be terminated by the Company if Executive becomes physically or mentally incapacitated and is therefore unable, for a period of six consecutive months or for an aggregate of nine months in any 24 consecutive month period, to perform Executive's duties (such incapacity is hereinafter referred to as "Disability"). Any question as to the existence of the Disability of Executive as to which Executive and the Company cannot agree shall be determined in writing by a qualified independent physician mutually acceptable to Executive and the Company. If Executive and the Company cannot agree as to a qualified independent physician, each shall appoint such a physician and those two physicians shall select a third who shall make such determination in writing. The determination of Disability made in writing to the Company and Executive shall be final and conclusive for all purposes of the Agreement.

        (ii)    Upon termination of Executive's employment hereunder due to Disability or death:

        (A)    Executive or Executive's estate (as the case may be) shall be entitled to receive the Accrued Rights and a pro-rated portion of the Annual Bonus, if any, earned for the fiscal year containing the date of Executive's Disability or death, paid in accordance with Section 4;

        (B)    Executive or Executive's estate (as the case may be) shall be entitled to receive any ORRI earned by Executive pursuant to Section 5(c)(ii); and

        (C)    to the extent permitted by the Company's benefit plans and insurers providing benefits thereunder, the Company shall continue to make available medical and dental coverage to Executive or Executive's dependents (as the case may be), at the same cost basis to Executive (or Executive's dependents) as if Executive were still an employee of the Company, until the end of the calendar year containing the second anniversary of Executive's Disability or death, plus applicable COBRA continuation coverage thereafter; provided, however, that if the Company's benefit plans or insurers preclude such continued coverage, the Company shall reimburse Executive (or Executive's estate) for the premium cost to Executive (or Executive's estate) for continuation coverage for Executive and/or his dependents under COBRA, less any amounts Executive would have been required to pay as an employee for such coverage, for the same time period described above.

    Following Executive's termination of employment due to death or Disability, except as set forth in this Section 7(b)(ii), Executive and Executive's estate shall have no further rights to any compensation or any other benefits under this Agreement.

        c.    <u>By the Company Without Cause or Resignation by Executive for Good Reason.</u>

DLI-5963132v8

(i)    The Employment Term and Executive's employment hereunder may be terminated by the Company without Cause or by Executive's resignation for Good Reason.

(ii)    For purposes of this Agreement, "Good Reason" shall mean (A) the failure of the Company to pay or cause to be paid Executive's Base Salary or Annual Bonus when due hereunder or, except as agreed to by Executive, a reduction in Executive's Base Salary, (B) the failure of the Company to provide the Employee Benefits, (C) any substantial and adverse change in Executive's duties or reporting responsibilities from those described in Section 2 hereof , (D) the relocation of Executive's principal place of employment by more than 30 miles from the Company's current location, except for reasonable amounts of travel required on the Company's business, (E) a material breach by the Company of any other agreement to which the Company and Executive are parties or (F) a breach by the Company of the obligation to cause the election of Executive to the Board pursuant to Section 3.1(b) of that certain Stockholders' Agreement dated as of _____, 2006, by and among Davis Petroleum Acquisition Corp., a Delaware corporation ("DPAC"), and certain of DPAC's stockholders, as amended and in effect from time to time; provided that the events described in clauses (A), (B), (C), (E) and (F) of this Section 7(c)(ii) shall not constitute Good Reason if such event occurs in connection with Executive's termination of employment for Cause, due to Disability or as otherwise set forth in this Agreement, and shall constitute Good Reason only if the Company fails to cure such event within 10 days after receipt from Executive of written notice of the event that constitutes Good Reason; provided, further, that "Good Reason" shall cease to exist for an event on the 60th day following the later of its occurrence or Executive's knowledge thereof, unless Executive has given the Company written notice thereof prior to such date.

(iii)    If Executive's employment is terminated by the Company without Cause (other than by reason of death or Disability) or if Executive resigns for Good Reason:

(A)    Executive shall be entitled to receive the Accrued Rights and a pro-rated portion of the Annual Bonus earned for the fiscal year containing the date of Executive's termination of employment, paid in accordance with Section 4;

(B)    subject to Executive's continued compliance with the provisions of Sections 8 and 9, Executive shall be entitled to receive a single lump sum payment equal to 200% of the sum of (1) Executive's Base Salary as in effect on the date of termination of Executive's employment, plus (2) the average of the Annual Bonus amounts paid to Executive pursuant to this Agreement for the two completed fiscal years preceding the date of Executive's termination of employment (or, if the Executive's termination of employment occurs prior to December 31, 2007, the Annual Bonus amount paid to Executive hereunder for the fiscal year ending December 31, 2006, if any), less all applicable withholdings and deductions, payable within 45 days following the date of Executive's termination of employment; provided that the aggregate amount described in this clause (B) shall be reduced by the present value of any other cash severance or

DLI-5963132v8

termination benefits payable to Executive under any other severance plans, programs or arrangements of the Company or its affiliates. In no event shall any payment under this Section 7(c)(iii)(B) be paid later than two and a half months after the end of the calendar year containing the date of Executive's termination of employment;

(C)     Executive shall be entitled to receive any ORRI earned by Executive pursuant to Section 5(c)(ii) but not theretofore assigned by the Company, Davis Offshore or their affiliates;

(D)     to the extent permitted by the Company's benefit plans and insurers providing benefits thereunder, the Company shall continue to make available medical and dental coverage to Executive, at the same cost basis to Executive (or Executive's dependents) as if Executive were still an employee of the Company, until the end of the calendar year containing the second anniversary of Executive's termination of employment; provided, however, that if the Company's benefit plans or insurers preclude such continued coverage, the Company shall reimburse Executive for the premium cost to Executive for continuation coverage for Executive and his dependents under COBRA, less any amounts Executive would have been required to pay as an employee for such coverage, for the same time period described above.

Following Executive's termination of employment by the Company without Cause (other than by reason of Executive's death or Disability) or by Executive's resignation for Good Reason, except as set forth in this Section 7(c)(iii), Executive shall have no further rights to any compensation or any other benefits under this Agreement.

d.     Expiration of Employment Term.

(i)     Election Not to Extend the Employment Term. In the event either party elects not to extend the Employment Term pursuant to Section 1, unless Executive's employment is earlier terminated pursuant to paragraphs (a), (b) or (c) of this Section 7, Executive's termination of employment hereunder (whether or not Executive continues as an employee of the Company thereafter) shall be deemed to occur on the close of business on the day immediately preceding the next scheduled Extension Date and Executive shall be entitled to receive the Accrued Rights. If the Company elects not to extend the Employment Term and Executive terminates employment with the Company, Executive shall be deemed to have been terminated without Cause and the terms of Section 7(c)(iii) shall be applicable in all respects.

Following such termination of Executive's employment hereunder as a result of either party's election not to extend the Employment Term, except as set forth in this Section 7(d)(i), Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(ii)     Continued Employment Beyond the Expiration of the Employment Term. Unless the parties otherwise agree in writing, continuation of Executive's employment with the Company beyond the expiration of the Employment Term shall be deemed

DLI-5963132v8

an employment at-will and shall not be deemed to extend any of the provisions of this Agreement and Executive's employment may thereafter be terminated at will by either Executive or the Company; provided that the provisions of Sections 8, 9 and 10 of this Agreement shall survive any termination of this Agreement or Executive's termination of employment hereunder.

   e. Notice of Termination. Any purported termination of employment by the Company or by Executive (other than due to Executive's death) shall be communicated by written Notice of Termination to the other party hereto in accordance with Section 11(k) hereof. For purposes of this Agreement, a "Notice of Termination" shall mean a notice which shall indicate the specific termination provision in this Agreement relied upon and shall set forth the basic reasons for termination of employment under the provision so indicated.

   f. Board/Committee Resignation. Upon termination of Executive's employment for any reason, Executive agrees to resign, as of the date of such termination and to the extent applicable, from the Board (and any committees thereof) and the Board of Directors (and any committees thereof) of any of the Company's affiliates.

   8. Non-Competition.

   a. Executive acknowledges and recognizes the highly competitive nature of the businesses of the Company and its affiliates, and that by the nature of the business of exploration for and production of hydrocarbons, highly confidential and proprietary information of the Company and its affiliates will be made available to Executive upon execution of this Agreement and from time to time during his employment with the Company hereunder as an essential element of the conduct of his duties. This information, by its nature, would if disclosed or utilized outside of the conduct of the business of the Company and its affiliates cause substantial harm to the business and prospects, financial and otherwise, of the Company and its affiliates. Accordingly, the Executive agrees as follows:

   (i) During the Employment Term and, for a period of two years following the date Executive ceases to be employed by the Company (the "Restricted Period"), Executive will not, whether on Executive's own behalf or on behalf of or in conjunction with any person, firm, partnership, joint venture, association, corporation or other business organization, entity or enterprise whatsoever ("Person"), directly or indirectly solicit or assist in soliciting in competition with the Company, the business of any client or prospective client:

   (A) with whom Executive had personal contact or dealings on behalf of the Company during the one-year period preceding Executive's termination of employment;

   (B) with whom employees reporting to Executive have had personal contact or dealings on behalf of the Company during the one-year immediately preceding the Executive's termination of employment; or

   (C) for whom Executive had direct or indirect responsibility during the one-year immediately preceding Executive's termination of employment.

DLI-5963132v8

(ii)      During the Restricted Period, Executive will not directly or indirectly:

(A)      engage in any business that competes with any business of the Company or its affiliates in the geographical area underlying a Subject Prospect (as defined below) equal to the greater of (x) all lands or waters underlying the boundaries of such Subject Prospect, as established by the Board in good faith in accordance with generally accepted industry practices, plus a five-mile area outside of and contiguous to such boundaries (and the boundaries of any unit in which any Subject Prospect is contained), or (y) the area of mutual interest established by the Company with any third parties owning interests in such Subject Prospect (a "Competitive Business");

(B)      enter the employ of, or render any services to, any Person (or any division or controlled or controlling affiliate of any Person) who or which engages in a Competitive Business;

(C)      acquire a financial interest in, or otherwise become actively involved with, any Competitive Business, directly or indirectly, as an individual, partner, shareholder, officer, director, principal, agent, trustee or consultant;

(D)      interfere with, or attempt to interfere with, business relationships (whether formed before, on or after the date of this Agreement) between the Company or any of its affiliates and customers, clients, suppliers partners, members or investors of the Company or its affiliates; or

(E)      defame or disparage the business, products, services, directors, officers, employees or other representatives of the Company or any of its affiliates or otherwise do anything to detract from or reflect adversely upon their reputation, nor will Executive engage in any unfair trade practices with respect to the Company or its affiliates.

"Subject Prospect" shall mean (i) the leasehold interests, working interests, overriding royalty interests, production payments and net profits interests, reversionary rights, fee mineral interests, fee royalty interests and all other interests in oil, gas and other minerals of the Company and its affiliates, and (ii) a reasonably defined geographic area that the internal records of the Company evidence was, during the Employment Term, evaluated for acquisition and exploitation which the Company either (x) designated as a Prospect during the Employment Term or (y) did not during the Employment Term designate as a Prospect, but did so designate within the one-year period immediately following the expiration of the Employment Term and  determined to expend or commit to expend any material amounts for seismic or other geophysical data or lease acquisitions.

(iii)      Notwithstanding anything to the contrary in this Agreement, Executive may, directly or indirectly own, solely as an investment, securities of any Person engaged in the business of the Company or its affiliates which are publicly traded on a

national or regional stock exchange or on the over-the-counter market if Executive (i) is not a controlling person of, or a member of a group which controls, such person and (ii) does not, directly or indirectly, own 5% or more of any class of securities of such Person.

        (iv)    During the Restricted Period, Executive will not, whether on Executive's own behalf or on behalf of or in conjunction with any Person, directly or indirectly:

        (A)    solicit or encourage any employee of the Company or its affiliates to leave the employment of the Company or its affiliates; or

        (B)    hire any such employee who was employed by the Company or its affiliates as of the date of Executive's termination of employment with the Company or who left the employment of the Company or its affiliates coincident with, or within one-year prior to or after, the termination of Executive's employment with the Company.

        (v)    During the Restricted Period, Executive will not, directly or indirectly, solicit or encourage to cease to work with the Company or its affiliates any consultant then under contract with the Company or its affiliates.

        b.    It is expressly understood and agreed that although Executive and the Company consider the restrictions contained in this Section 8 to be reasonable, if a final judicial determination is made by a court of competent jurisdiction that the time or territory or any other restriction contained in this Agreement is an unenforceable restriction against Executive, the provisions of this Agreement shall not be rendered void but shall be deemed amended to apply as to such maximum time and territory and to such maximum extent as such court may judicially determine or indicate to be enforceable. Alternatively, if any court of competent jurisdiction finds that any restriction contained in this Agreement is unenforceable, and such restriction cannot be amended so as to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

9.    Confidentiality; Intellectual Property.

a.    Confidentiality.

(i)    Executive will not at any time (whether during or after Executive's employment with the Company) (x) retain or use for the benefit, purposes or account of Executive or any other Person; or (y) disclose, divulge, reveal, communicate, share, transfer or provide access to any Person outside the Company (other than its professional advisers who are bound by confidentiality obligations), any non-public, proprietary or confidential information -- including without limitation geotechnical or geophysical data, production data, exploration or development programs, trade secrets, know-how, research and development, software, databases, inventions, processes, formulae, technology, designs and other intellectual property, information concerning finances, investments, profits, pricing, costs, products, services, vendors, customers, clients, partners, investors, personnel, compensation, recruiting, training, advertising, sales, marketing, promotions, government and regulatory activities and approvals -- concerning the past, current or future business, activities and operations of the Company, its subsidiaries or affiliates and/or any third party that has disclosed or provided any of same to the Company on a confidential basis ("Confidential Information") without the prior written authorization of the Board.

(ii)    "Confidential Information" shall not include any information that is (a) known broadly to the public other than as a result of Executive's breach of this covenant or any breach of other confidentiality obligations by third parties; (b) made legitimately available to Executive by a third party without breach of any confidentiality obligation; or (c) required by law to be disclosed; provided that Executive shall give prompt written notice to the Company of such requirement, disclose no more information than is so required, and cooperate with any attempts by the Company to obtain a protective order or similar treatment.

(iii)    Except as required by law, Executive will not disclose to anyone, other than Executive's immediate family and legal or financial advisors, the existence or contents of this Agreement; provided that Executive may disclose to any prospective future employer the provisions of Sections 9 and 10 of this Agreement provided they agree to maintain the confidentiality of such terms.

(iv)    Upon termination of Executive's employment with the Company for any reason, Executive shall (x) cease and not thereafter commence use of any Confidential Information or intellectual property (including without limitation, any patent, invention, copyright, trade secret, trademark, trade name, logo, domain name or other source indicator) owned or used by the Company, its subsidiaries or affiliates; (y) immediately destroy, delete, or return to the Company in good condition, at the Company's option, (1) all property of the Company, including without limitation, computers, laptops, software, passkeys and passwords, and (2) all originals and copies in any form or medium (including memoranda, books, papers, plans, computer files, letters and other data) in Executive's possession or control (including any of the foregoing stored or located in Executive's office, home, laptop or other computer, whether or not Company property) that contain Confidential Information or otherwise relate to the business of the Company, its affiliates and subsidiaries, except that Executive may

retain only those portions of any personal notes, notebooks and diaries that do not contain any Confidential Information; and (z) notify and fully cooperate with the Company regarding the delivery or destruction of any other Confidential Information of which Executive is or becomes aware.

b.    <u>Intellectual Property.</u>

(i)    If Executive has created, invented, designed, developed, contributed to or improved any works of authorship, inventions, intellectual property, materials, documents or other work product (including without limitation, research, reports, software, databases, systems, applications, presentations, textual works, content, or audiovisual materials) ("Works"), either alone or with third parties, prior to Executive's employment by the Company, that are relevant to or implicated by such employment ("Prior Works"), Executive hereby grants the Company a perpetual, non-exclusive, royalty-free, worldwide, assignable, sublicensable license under all rights and intellectual property rights (including rights under patent, industrial property, copyright, trademark, trade secret, unfair competition and related laws) therein for all purposes in connection with the Company's current and future business.

(ii)    If Executive creates, invents, designs, develops, contributes to or improves any Works, either alone or with third parties, at any time during Executive's employment by the Company and within the scope of such employment and/or with the use of any the Company resources ("Company Works"), Executive shall promptly and fully disclose same to the Company and hereby irrevocably assigns, transfers and conveys, to the maximum extent permitted by applicable law, all rights and intellectual property rights therein (including rights under patent, industrial property, copyright, trademark, trade secret, unfair competition and related laws) to the Company to the extent ownership of any such rights does not vest originally in the Company.

(iii)    Executive agrees to keep and maintain adequate and current written records (in the form of notes, sketches, drawings, and any other form or media requested by the Company) of all Company Works. The records will be available to and remain the sole property and intellectual property of the Company at all times.

(iv)    Executive shall take all requested actions and execute all requested documents (including any licenses or assignments required by a government contract) at the Company's expense (but without further remuneration) to assist the Company in validating, maintaining, protecting, enforcing, perfecting, recording, patenting or registering any of the Company's rights in the Prior Works and Company Works. If the Company is unable for any other reason to secure Executive's signature on any document for this purpose, then Executive hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Executive's agent and attorney in fact, to act for and in Executive's behalf and stead to execute any documents and to do all other lawfully permitted acts in connection with the foregoing.

(v)    Executive shall not improperly use for the benefit of, bring to any premises of, divulge, disclose, communicate, reveal, transfer or provide access to, or share with the Company any confidential, proprietary or non-public information or intellectual

DLI-5963132v8

property relating to a former employer or other third party without the prior written permission of such third party. Executive hereby indemnifies, holds harmless and agrees to defend the Company and its officers, directors, partners, employees, agents and representatives from any breach of the foregoing covenant. Executive shall comply with all relevant policies and guidelines of the Company, including regarding the protection of confidential information and intellectual property and potential conflicts of interest. Executive acknowledges that the Company may amend any such policies and guidelines from time to time, and that Executive remains at all times bound by their most current version.

                   (vi)    The provisions of Section 9 shall survive the termination of Executive's employment for any reason.

          10.    <u>Specific Performance</u>.  Executive acknowledges and agrees that the Company's remedies at law for a breach or threatened breach of any of the provisions of Section 8 or Section 9 would be inadequate and the Company would suffer irreparable damages as a result of such breach or threatened breach.  In recognition of this fact, Executive agrees that, in the event of such a breach or threatened breach, in addition to any remedies at law, the Company, without posting any bond, shall be entitled to cease making any payments or providing any benefit otherwise required by this Agreement and obtain equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction or any other equitable remedy which may then be available.

          11.    <u>Miscellaneous</u>.

             a.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without regard to conflicts of laws principles thereof.

             b.    <u>Entire Agreement/Amendments</u>.  This Agreement contains the entire understanding of the parties with respect to the employment of Executive by the Company. There are no restrictions, agreements, promises, warranties, covenants or undertakings between the parties with respect to the subject matter herein other than those expressly set forth herein. This Agreement may not be altered, modified, or amended except by written instrument signed by the parties hereto.

             c.    <u>No Waiver</u>.  The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver of such party's rights or deprive such party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

             d.    <u>Severability</u>.  In the event that any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

             e.    <u>Dispute Resolution</u>.  Any and all claims, demands, cause of action, disputes, controversies and other matters in question arising out of or relating to this Agreement, any provision hereof, the alleged breach thereof, or in any way relating to the subject matter of

DLI-5963132v8

this Agreement, involving the Company, its subsidiaries and affiliates and Executive (all of which are referred to herein as "Claims"), even though some or all of such Claims allegedly are extra-contractual in nature, whether such Claims sound in contract, tort or otherwise, at law or in equity, under state or federal law, whether provided by statute or the common law, for damages or any other relief, including equitable relief and specific performance, shall be resolved and decided solely by binding arbitration pursuant to the Federal Arbitration Act in accordance with the Commercial Arbitration Rules then in effect with the American Arbitration Association; provided, however, that if a party makes a good faith determination that a breach (or potential breach) of any of the confidentiality or non-competition provisions of this Agreement by another party may result in consequences that will be immediate, severe, and incapable of adequate redress after the fact, that party may seek a temporary restraining order or other immediate injunctive relief without first seeking relief through arbitration. After the court has ruled on the request for a temporary relief, the Parties will thereafter proceed with arbitration of the dispute and stay the litigation pending arbitration. In the arbitration proceeding Executive shall select one arbitrator, the Company shall select one arbitrator and the arbitrators so selected shall select a third arbitrator. Should one party fail to select an arbitrator within five days after notice of the appointment of an arbitrator by the other party or should the two arbitrators selected by Executive and the Company fail to select an arbitrator within 10 days after the date of the appointment of the last of such two arbitrators, any person sitting as a Judge of the United States District Court of any District in Texas, upon application of Executive or the Company, shall appoint an arbitrator to fill such space with the same force and effect as though such arbitrator had been appointed in accordance with the immediately preceding sentence of this Section 11(e). The decision of a majority of the arbitrators shall be binding on Executive, the Company and its subsidiaries and affiliates. The arbitration proceeding shall be conducted in [Houston, Texas]. Judgment upon any award rendered in any such arbitration proceeding may be entered by any federal or state court having jurisdiction. This agreement to arbitrate shall be enforceable in either federal or state court. The enforcement of this agreement to arbitrate and all procedural aspects of this agreement to arbitrate, including but not limited to, the construction and interpretation of this agreement to arbitrate, the scope of the arbitrable issues, allegations of waiver, delay or defenses to arbitrability, and the rules governing the conduct of the arbitration, shall be governed by and construed pursuant to the Federal Arbitration Act.

In deciding the substance of any such Claim, the arbitrators shall apply the substantive laws of the State of Texas; provided, however, that the arbitrators shall have no authority to award treble, exemplary or punitive type damages under any circumstances regardless of whether such damages may be available under Texas law, the parties hereby waiving their right, if any, to recover treble, exemplary or punitive type damages in connection with any such Claims.

    f. <u>Assignment</u>. This Agreement, and all of Executive's rights and duties hereunder, shall not be assignable or delegable by Executive. Any purported assignment or delegation by Executive in violation of the foregoing shall be null and void *ab initio* and of no force and effect. This Agreement may be assigned by the Company to any third party who becomes a successor to all or any substantial portion of the business operations of the Company by operation of law, contract or otherwise. Upon such assignment, the rights and obligations of the Company hereunder shall become the rights and obligations of such affiliate or successor person or entity.

DLI-5963132v8

     g.     <u>Set Off; Mitigation</u>.  The Company's obligation to pay Executive the amounts provided and to make the arrangements provided hereunder shall be subject to set-off, counterclaim, recoupment or deduction of amounts owed by Executive to the Company or its affiliates. including, without limitation, any amounts payable by Executive pursuant to the Release.  Executive shall not be required to mitigate the amount of any payment or benefit provided for pursuant to this Agreement by seeking other employment or otherwise; <u>provided, however</u>, that Executive's coverage under the Company's welfare benefit plans will be reduced to the extent that Executive becomes covered under any comparable employee benefit plan made available by another employer and covering the same type of benefits.  Executive shall report to the Company any such benefits actually received by him.

     h.     <u>Compliance with Code Section 409A</u>.  Notwithstanding anything herein to the contrary, (i) if at the time of Executive's termination of employment with the Company, Executive is a "specified employee" within the meaning of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), and the deferral of the commencement of any payments or benefits otherwise payable hereunder as a result of such termination of employment is necessary in order to prevent any accelerated or additional tax under Section 409A of the Code, then the Company will defer the commencement of the payment of any such payments or benefits hereunder (without any reduction in such payments or benefits ultimately paid or provided to Executive) until the date that is six months following Executive's termination of employment with the Company (or the earliest date as is permitted under Section 409A of the Code) and (ii) if any other payments of money or other benefits due to Executive hereunder could cause the application of an accelerated or additional tax under Section 409A of the Code, such payments or other benefits shall be deferred if deferral will make such payment or other benefits compliant under Section 409A of the Code, or otherwise such payment or other benefits shall be restructured, to the extent possible, in a manner, determined by the Board, that does not cause such an accelerated or additional tax.  The Company shall consult with Executive in good faith regarding the application of this Section 11(h), provided that neither the Company nor any of its employees or representatives shall have any liability to Executive with respect thereto.

     i.     <u>Tax Gross-Up of Parachute Payments</u>.

     (i)     In the event that any payments or benefits made or provided to or for the benefit of Executive in connection with this Agreement, or Executive's employment with the Company or the termination thereof (the "Payments"), are determined to be subject to the excise tax imposed by Section 4999 of the Code or any interest or penalties with respect to such excise tax (such excise tax, together with any such interest and penalties, are collectively referred to as the "Excise Tax"), then the Executive shall be entitled to receive an additional payment (a "Gross-Up Payment") from the Company in an amount such that, after payment by Executive of the Excise Tax and any income tax or employment tax imposed upon the Gross-Up Payment or any excise tax imposed by Section 4999 of the Code on the Gross-Up Payment, the Executive will retain the portion of the Gross-Up Payment equal to the Excise Tax on the Payments.  The determination of whether the Payments are subject to the Excise Tax and, if so, the amount of the Gross-Up Payment, shall be made by a nationally recognized United States public accounting firm that has not, during the two years preceding the date of its selection, acted in any way on behalf of the Company or any of its affiliates; <u>provided, however</u>,

To the most recent address of Executive set forth in the personnel records of the Company.

       l.     <u>Executive Representation</u>.  Executive hereby represents to the Company that the execution and delivery of this Agreement by Executive and the Company and the performance by Executive of Executive's duties hereunder shall not constitute a breach of, or otherwise contravene, the terms of any employment agreement or other agreement or policy to which Executive is a party or otherwise bound.

       m.    <u>Prior Agreements</u>  This Agreement supercedes all prior agreements and understandings (including verbal agreements) between Executive and the Company and/or its affiliates regarding the terms and conditions of Executive's employment with the Company and/or its affiliates including, without limitation, the Prior Agreement.  The Prior Agreement shall, without further action, be terminated as of the date first set forth above.

       n.     <u>Cooperation</u>.  Executive shall provide Executive's reasonable cooperation in connection with any action or proceeding (or any appeal from any action or proceeding) which relates to events occurring during Executive's employment hereunder.  This provision shall survive any termination of this Agreement.

       o.     <u>Withholding</u>.  The Company may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation and any deductions authorized by Executive.

       p.     <u>Other Benefits</u>.  During the Employment Term, the Company shall maintain in full force and effect a directors and officers insurance policy on terms no less favorable to Executive than the terms applicable to other officers and directors of the Company.

       q.     <u>Counterparts</u>.  This Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

       r.     <u>Tax Penalty Avoidance</u>.  The provisions of this Agreement are not intended and should not be construed to be legal, business or tax advice.  To ensure compliance with requirements imposed by the Internal Revenue Service, the parties hereto are informed that the U.S. federal tax advice contained in this document, if any, is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the Code or promoting, marketing or recommending to any party any transaction or matter addressed herein.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

DAVIS PETROLEUM CORP.                    GREGG DAVIS

By: _____            _____
        Grace Drulias
        Authorized Officer

DAVIS OFFSHORE, L.P.

By: Davis Offshore Management LLC
        its General Partner

 By: Davis Oil Company, its Managing
Member

  By: The Marvin and Barbara Davis
Revocable Trust under Trust Agreement dated
February 3, 2004, its Managing Partner

      By:_____
            Barbara Davis
            Trustee

DL1-5963132v8

that if the accounting firm has determined that Section 4999 does not apply, and the Internal Revenue Service claims that Section 4999 applies to the Payments (or any portion thereof), then subsection (ii) below shall apply.

(ii)    Executive shall notify the Company in writing of any claim by the Internal Revenue Service that, if successful, would require the payment by the Company of a Gross-Up Payment. Such notification shall be given as soon as practicable but no later than ten (10) business days after Executive is informed in writing of such claim and shall apprise the Company of the nature of such claim and the date on which such claim is requested to be paid. Executive shall not pay such claim prior to the expiration of the thirty (30) day period following the date on which he gives such notice to the Company (or such shorter period ending on the date that any payment of taxes with respect to such claim is due). If the Company notifies Executive in writing prior to the expiration of such period that it desires to contest such claim, Executive shall:

(A)    provide the Company any information and written records or documents in his possession and reasonably requested by the Company relating to such claim;

(B)    take such action in connection with contesting such claim as the Company shall reasonably request in writing from time to time, including, without limitation, accepting legal representation with respect to such claim by an attorney reasonably selected by the Company;

(C)    cooperate with the Company in good faith in order effectively to contest such claim; and

(D)    permit the Company to participate in any proceedings relating to such claim;

provided, however, that the Company shall bear and pay directly all costs and expenses (including additional interest and penalties) incurred in connection with such contest and shall indemnify and hold Executive harmless, on an after-tax basis, for any Excise Tax or income tax (including interest and penalties with respect thereto) imposed as a result of such representation and payment of costs and expenses. Without limiting the foregoing provisions of this subsection, the Company shall control all proceedings taken in connection with any such contest and, at its sole option, may pursue or forgo any and all administrative appeals, proceedings, hearings and conferences with the taxing authority in respect of such claim and may, at its sole option, either direct Executive to pay the tax claimed and commence a proceeding to obtain a refund or contest the claim in any permissible manner, and Executive agrees to prosecute such contest to a determination before any administrative tribunal, in a court of initial jurisdiction and in one or more appellate courts, as the Company shall determine; provided, however, that if the Company directs Executive to pay such claim and seek a refund, the Company shall advance the amount of such payment to Executive, on an interest-free basis, and shall indemnify and hold Executive harmless, on an after-tax basis, from any Excise Tax or income tax (including interest or penalties with respect thereto) imposed with respect to such advance or with respect to any imputed income with respect to such advance; further provided that any extension of the statute

DLI-5963132v8

of limitations relating to payment of taxes for the taxable year of Executive with respect to which such contested amount is claimed to be due is limited solely to such contested amount. Furthermore, the Company's control of any such contest shall be limited to issues with respect to which a Gross-Up Payment would be payable hereunder, and Executive shall be entitled to settle or contest, as the case may be, any other issue raised by the Internal Revenue Service or any other taxing authority.

(iii)     If, after the receipt by Executive of an amount advanced by the Company pursuant to the foregoing subsection (ii), Executive becomes entitled to receive any refund with respect to such claim, Executive shall (subject to the Company's complying with the requirements of subsection (ii)) promptly pay to the Company the amount of such refund (together with any interest paid or credited thereon after taxes applicable thereto). If, after the receipt by Executive of an amount advanced by the Company pursuant to subsection (ii), a determination is made that Executive shall not be entitled to any refund with respect to such claim and the Company does not notify Executive in writing of its intent to contest such denial of refund prior to the expiration of thirty (30) days after such determination, then such advance shall be forgiven and shall not be required to be repaid and the amount of such advance shall offset, to the extent thereof, the amount of Gross-Up Payment required to be paid.

j.     Successors; Binding Agreement.  This Agreement shall inure to the benefit of and be binding upon personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.  The Company will use commercially reasonable efforts to cause any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and assets the Company (a "Successor") or any corporation which becomes the ultimate parent corporation of the Company or any such Successor to expressly assume to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place; provided; however, that express assumption shall not be required where this Agreement is assumed by operation of law.

k.     Notice.  For the purpose of this Agreement, notices and all other communications provided for in the Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective addresses set forth below in this Agreement, or to such other address as either party may have furnished to the other in writing in accordance herewith, except that notice of change of address shall be effective only upon receipt.

If to the Company:

Davis Petroleum Corp.
1360 Post Oak Boulevard, Suite 2400
Houston, Texas 77056
Attention:

If to Executive:

DLI-5963132v8