

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

ENTERED
04/11/2008

| | | |
|---|---|---|
| IN RE: | § | |
| DAVIS PETROLEUM CORP., *et al* | § | CASE NO: 06-20152 |
| Debtor(s) | § | |
| | § | CHAPTER 11 |
| | § | |
| THE NANCY SUE DAVIS TRUST | § | |
| Plaintiff(s) | § | |
| | § | |
| VS. | § | ADVERSARY NO. 06-2062 |
| | § | |
| DAVIS PETROLEUM CORPORATION, | § | |
| *et al* | § | |
| Defendant(s) | § | |

## MEMORANDUM OPINION AND ORDER ON
## MOTION FOR SUMMARY JUDGMENT

On this day came on for consideration the Motion for Summary Judgment filed by the Defendants Davis Petroleum Acquisition Corp., Davis Offshore Partners, LLC, Davis Petroleum Investment, LLC (collectively, the "Acquisition Companies"), Davis Petroleum Corp. ("DPC"), Davis Offshore, L.P., Davis Petroleum Pipeline, LLC (collectively "Davis Petroleum" or the "Company"), together with the Acquisition Companies and Davis Petroleum "New Davis", together with defendant Albert S. Conly, Liquidating Trustee Under Liquidating Trust Agreement of Davis Petroleum Corporation, Davis Offshore, L.P. and Davis Petroleum Pipeline, LLC (the "Trustee") (collectively with New Davis, "Defendants"). The Court, having heard the arguments of counsel, and having reviewed the pleadings, briefs and summary judgment evidence, finds that there are no genuine issues of material fact and the Motion for Summary Judgment should be granted.

## I.  UNCONTROVERTED FACTS

1.      Following CEO Marvin Davis's death in September 2004, the Davis

family members, which included Barbara Davis, Patricia Davis Raynes, John Davis,

Dana Davis, Nancy Davis, and Gregg Davis (exclusive of Gregg Davis, the "Davis

Family," and with Gregg Davis, the "Interest Holders"), each engaged counsel to

represents their interests in connection with matters relating to distributing the Marvin

Davis estate and handling its major assets, including the Company.  Nancy Davis retained

Michael Diamond of Milbank, Tweed, Hadley & McCoy LLP, to represent her interests.

2.      By January 2005, Davis Petroleum needed additional capital investment

and certain members of the Davis Family expressed an interest in selling some or all of

their equity interests in the Company.

3.      Gregg Davis, President of Davis Petroleum, informed members of the

Davis Family that he and Willem Mesdag ("Mesdag") planned to explore potential

solutions, including additional financing, an equity investor, a partial sale of the

Company's assets, or a sale of the entirety of Davis Petroleum.

**Gregg Davis Entered Into an Agreement With Red Mountain and Retained Mesdag As An Advisor To Assist Him In Proposing A Management Led Buyout**

4.      By an agreement dated January 31, 2005, Gregg Davis entered into the

Red Mountain Advisory Agreement ("Red Mountain Agreement") with Red Mountain

Capital Partners LLC ("Red Mountain"), an entity owned by Mesdag, to retain Red

Mountain as Gregg Davis' investment advisor for a potential management-led buyout of

DPC, and to provide advisory services to DPC in negotiating bridge financing from

Sankaty, or another lender.  The Red Mountain Agreement provided that DPC would guarantee Red Mountain's fees in connection with the anticipated transactions.

5.      Gregg Davis informed John Davis of Red Mountain's retention and Gregg Davis understood that John Davis approved of Mesdag acting as a Gregg Davis advisor.

6.      Gregg Davis also informed the Davis Family of the possibility that Mesdag would invest in the Company through a future investment proposal.

**Gregg Davis Solicited Proposals from Potential Equity Investors**

7.      Gregg Davis and Mesdag approached Evercore and other potential equity investors and asked them to consider an investment in the Company, with the possibility of acquiring a controlling share of the business.

8.      In response, Evercore, Sankaty, and Riverstone each submitted a proposal.

**The Interest Holders Retained Independent Counsel and Appointed an Independent Director to Protect their Interests**

9.      Gregg Davis informed the Davis Family of the proposals from these potential equity investors, all of which were management-proposed buyouts.

10.      At the time of the proposals, each Interest Holder was represented individually by separate legal counsel, as follows:  Barbara Davis by Edward Landry of Musick, Peeler & Garrett LLP; John Davis by Jonathan Koslow, Jerome Coben, and Richard Levin of Skadden, Arps, Slate Meagher & Flom LLP & Affiliates; Patricia Davis Raynes ("Raynes") by Edward Rosenfeld of Bryan Cave LLP: Gregg Davis by Susan Marcella of Gibson, Dunn & Crutcher, and Michael Pierce of Thompson & Knight LLP; and, as previously noted, Nancy Davis by Michael Diamond of Milbank Tweed Hadley & McCoy LLP (collectively, the "Davis Family Counsel").

11.     Because, as a participant in any management-proposed buyout, Gregg Davis had an inherent conflict of interest in pursuing any of the three proposals, on the advice of the Davis Family Counsel, the Interest holders retained independent counsel for Davis Petroleum to represent the interests of the Davis Family.

12.     On April 5, 2005, O'Melveny & Myers LLP ("O'Melveny"), with the approval of the Davis Family Counsel, was retained as independent counsel to Davis Petroleum in connection with inter alia, Davis Petroleum's search for capital or proposed financing.

13.     During April 2005, O'Melveny searched for an independent director to represent the Interest Holders, and chose to interview three candidates, including Daniel Armel.

14.     O'Melveny provided the candidates a generic summary of the Company situation, which described a family-owned company with a family shareholder as President, who sought to lead a "management buyout".

15.     Also in April 2005, Richardson & Barr, an investment banker specializing in oil and gas properties, conducted an independent valuation of the Company, which approximated DPC's value to be within a range of $120-$150 million.

16.     On or about May 1, 2005, O'Melveny recommended Dan Armel to the Interest Holders for appointment as independent director.

17.     The Davis Family Counsel, with the possible exception of Raynes' counsel, approved the selection of Dan Armel as Independent Director.

18.     After the Independent Director was retained, Raynes' new counsel, Boies Schiller, contacted the other Davis Family Counsel, as well as O'Melveny, to emphasize

that the chief role of the Independent Director should be to maximize shareholder return
because Gregg Davis was conflicted.

19.      On May 6, 2005, Dan Armel ("Armel" or the "Independent Director") was
elected to the position of Independent Director by 82.4% of total equity of Davis
Petroleum for the purpose of reviewing, evaluating, soliciting and taking any action that
could be taken by the board or similar governing entity with respect to any possible
equity transactions or financing transactions involving Davis Petroleum.

20.      Plaintiff's then-counsel, Michael Diamond, conveyed his client's approval
of the selection of Armel as Independent Director.

21.      The Independent Director and the Special Committee were represented by
O'Melveny.

22.      The Independent Director was appointed by the unanimous consent of the
DPC Board of Directors to serve as sole member of a Special Committee, which was
formed to:

> (i) Review and evaluate, and consider whether it is in the best interests of
> the Company [DPC] to enter into, potential equity recapitalization
> transactions, sale transactions, acquisition transactions, business
> combinations and other strategic transactions presented to or considered
> by the Company (each an "Equity Transaction"); (ii) directly or indirectly,
> solicit or receive proposals from persons or entities that propose to enter
> into any Equity transaction with the Company, and (iii) if the Committee
> determines an Equity Transaction is in the best interest of the Company, to
> take…all action which could be taken by the Board with respect to such
> transaction or to make a recommendation to the Board or the shareholders
> of the Company with respect to such transaction.

23.      The Independent Director was granted authority to review and take all
action that could be taken by the board with respect to "proposals for the financing of
[Davis Petroleum's] operations pending the consummation of any Equity

Transaction…including…proposals for the amendment of [Davis Petroleum's] existing senior or subordinate financing arrangements, or both, or for the provision of additional or bridge financing."

### The Independent Director Fully Understood the Operations Of DPC

24.    Upon his retention, the Independent Director obtained the Company's financial information.

25.    The Independent Director was informed of Mesdag's engagement by Gregg Davis and was provided with a copy of the Red Mountain Advisory Agreement.

26.    The Independent Director was also informed that Mesdag and Gregg Davis had solicited offers in an attempt to find an equity investor, and had obtained three proposals.  The Independent Director was given a summary and comparison of the three offers, in addition to the complete original proposals.

27.    The Independent Director knew that Mesdag, and his company, Red Mountain, were acting as the financial advisor to Gregg Davis and were proponents of a management-led recapitalization or buyout.

28.    The Independent Director communicated with DPC's counsel concerning discussion topics for a May 26, 2005 meeting, which included the Davis Entities' capital requirements, oil reserves, valuations, the "currently liquidity crisis," and equity purchase proposals.  The Independent Director also provided Plaintiff's counsel with cash flow projections, reserve estimates, and operations statements that outlined the Davis Entities' ongoing fees and expenses.

29.    The Independent Director viewed the Riverstone proposal, which was based on a $90 million Total Enterprise Value ("TEV") for 100% of the company's

equity and $110 million TEV for 50% of the equity, as the least attractive.  The Independent Director considered the Sankaty and Evercore proposals to be close in terms, but favored Evercore because the terms of the Evercore deal were better and because, if he had pursued the Sankaty offer, he was not sure he could bring Evercore "on board".

30.     The Independent Director was also informed that Raynes, daughter of Barbara and the late Marvin Davis, and an Interest Holder, had expressed interest in shopping the Davis Entities herself, outside of the management-led buyout by Gregg Davis.  The remainder of the Davis Family and their counsel opposed permitting individual shareholders like Raynes to shop the company outside of the process then being led by the Independent Director.

31.     The Independent Director was also informed that Raynes had threatened litigation against the company and other family members and that, in April 2005, Raynes made a demand for inspection of DPC's records.  In response to this demand, Raynes' counsel was provided with a number of Davis Entity documents.  The Red Mountain Advisory Agreement was among the documents that Raynes received.

32.     In June 2005, Raynes' counsel directly contacted the Independent Director, demanding that he investigate the actions of Gregg Davis and other board members and repeating the concern that Gregg Davis had conflicted interests.

**The Independent Director Obtained Financing and Retained an Independent Financial Advisor To Assist In Recommendation And Search For Equity Offers**

33.     The Independent Director authorized Davis Petroleum to enter into an "Amended and Restated Senior Subordinated Secured Note Purchase Agreement dated as of June 13, 2005, by and among [Davis Petroleum] and [the Sankaty Group]," pursuant to

which the terms of the Sankaty Notes were amended and new financing was extended

(the "Sankaty Bridge Loan") to finance the operations of Davis Petroleum on a short-

term basis, thus helping provide temporary liquidity to enable the Independent Director to

continue the process of identifying and negotiating an Equity Transaction.  The Sankaty

Bridge Loan as amended was listed among the "Material Agreements" on Schedule

5.9(a), appended as Exhibit 9 to the Disclosure Statement.

34.     The Sankaty Bridge Loan was necessary to provide capital, due to the

liquidity issue that had plagued DPC from before the time the Independent Director was

retained.

35.     O'Melveny, at the request of the Independent Director, forwarded to

counsel for the Interest Holders the report of the independent auditor, KMPG, and

combined financial statements for the Davis Entities for year end 2004 and 2003.

36.     In the 2004 KPMG Report, KPMG gave DPC a "going concern

qualification," indicating that "the Company ha[d] suffered recurring losses from

operations and ha[d] a working capital deficiency that [raised] substantial doubt about its

ability to continue as a going concern."

37.     DPC's senior lender, Bank of America, had placed first priority liens on

all of DPC's assets.  The Sankaty Notes were thus secured by liens subordinated to the

Bank of America liens on virtually all of DPC's assets.

38.     On June 16, 2005, the Independent Director, in his capacity as sole

member of the Special Committee, retained Jefferies & Company Inc. ("Jefferies") as an

investment banker "to act as (a) exclusive financial advisor to the Special Committee in

connection with any strategic transaction involving [the Davis Entities] or any of the

Company's assets through any structure or from of transaction and/or (b) exclusive financial advisor to the Special Committee in connection with the structuring, issuance, sale or placement of equity and/or debt financing [subject to carve outs for existing secured lenders]".

39.     A copy of the June 16, 2005 Jefferies engagement letter was sent to Davis Family Counsel.

40.     In addition to authorizing Jefferies to act as financial advisor to the Special Committee, the engagement letter authorized Jefferies to obtain new offers to acquire equity.  If Jefferies obtained an offer that culminated in a deal from an equity investor other than the listed "excluded" parties, which included Evercore, then Jefferies would collect a substantially larger fee for this new-found buyer.

41.     On June 17, 2005, Evercore contacted Gregg Davis and the Independent Director to express Evercore's desire to enter into an exclusivity agreement.  Evercore recognized that DPC was prepared to hire a finance advisor to review Evercore's May 5, 2005, proposal and conditioned its willingness to enter into exclusivity and proceed with the transaction on the substantial completion of such a review, as well as any other review that the Interest Holders felt was necessary.

42.     On June 23, 2005, the Independent Director sent the Davis Family and the Davis Family Counsel a letter (the "June 23 Letter"), which informed them of the retention of Jefferies and the challenges facing Davis Petroleum:

> Several of you have asked when the company is likely to run short on cash now that the Sankaty financing has closed.  The answer depends in part on what happens with the Clipper project.  The company should know by the end of July whether the Clipper project can be developed commercially, and the company should have sufficient funds to get to that point.  If the drilling is successful and the company proceeds with the development, it

should probably draw the balance of the Sankaty loan ($10 million) in early August, and that borrowing will allow the company to get through August.  On the other hand, if Clipper turns out to not be worth pursuing, then further development expenditure with respect to Clipper will not be required and the company should have sufficient working capital for several months.  However if there is no agreement for an equity infusion and the well is dry, there will be substantial adverse consequences on the value of the company and the ability to attract new capital and retain certain key employees.

43.     In the June 23 Letter, the Independent Director recommended that DPC enter an exclusivity agreement with Evercore if Jefferies found the proposal fair and was unaware of other likely bidders.

44.     The Independent Director also advised Davis Family Counsel:

[U]nder any scenario, the company's continued viability will be contingent upon an equity infusion of the type proposed by Evercore or a sale of the company to an entity or group that can provide additional equity and the time in which we have to complete that transaction is not extensive.  It is very important that each of you as representatives of the company's shareholders, appreciate the need to act quickly and cooperatively if we are to maximize the value of the company for the benefit of all shareholders, without regard to how that benefit is ultimately allocated among the shareholders.

45.     On July 1, 2005, the Independent Director, O'Melveny, and Jeffries had a call with the Interest Holders and their counsel, during which Jefferies recommended that the Evercore proposal be pursued.  Jefferies concluded that the $135 million TEV payment for 50% of the preferred stock of the company offered by Evercore exceeded the value a "strategic" investor would pay, which typically would be based on the discounted value of the reserves.

46.     According to the Independent Director, the May Evercore proposal was at the midpoint of the value range that could be expected for this Company, exceeding the

value of the proved reserves alone, and included value for "intangibles," notably the Company's team of oil and gas explorationists.

47.     The Independent Director recommended, with the support of Davis Family Counsel, pursuit of the May Evercore proposal.

48.     The Independent Director encouraged Evercore to proceed with negotiation, while the Independent Director continued to respond to other equity investor inquiries.  The Independent Director remained in discussions with other possible investors, including Constellation Energy.

**The Davis Entities' Prospects and Family Needs Changed During the Summer Of 2005**

49.     By mid-August 2005, the Interest holders continued to support the Evercore proposal, but not under the then-current terms.  Due to Barbara Davis' desire to cash out her entire interest, the Evercore offer to acquire 50% interest in Davis Petroleum was not a basis on which the Independent Director could successfully negotiate a deal.

50.     The Independent Director thus began negotiations to have Evercore increase its offer, to acquire up to 100% of the equity interests (except the Gregg Davis interests).

51.     During the summer of 2005, the status of the Davis offshore wells was not improving.  The first well bore at Clipper was delayed, and the Schooner well had come in dry.  Production from the J. Bellis well was not as encouraging as expected.  Shortly before Labor Day 2005, Hurricane Katrina struck the Gulf of Mexico and damaged the J. Bellis well, taking it offline, and causing it to stop producing oil.  In late August 2005, a Netherland Sewell Association ("NSA") report ("NSA Report") stated figures as of July

2005, that were overall lower, in terms of volume of reserves, than in the December 2004 NSA report.

52.     On September 7, 2005, Constellation Energy submitted a proposal to acquire 100% of the Company's equity for $128 million.

53.     On September 13, 2005, Evercore submitted a revised proposal, which was premised on an increase of TEV from $135 million to $147 million.  The Evercore offer proposed to acquire 50% of the outstanding equity (excluding the Gregg Davis equity interest).  At that point, Evercore was not willing to increase its offer to acquire up to 100% of the shareholder interest (minus Gregg Davis' interest), and therefore the Independent Director turned to another possible investor, Constellation Energy.

54.     On September 14, 2005, counsel for David Petroleum informed the Davis Family  Counsel that Constellation Energy's proposal was "very conditional and [was] a long way from being a proposal upon which any action could be taken."

55.     Counsel for the Independent Director sent Davis Family Counsel a comparison of Evercore's May 5 and September 13, 2005 proposals.  This comparison showed the sources of value change between the two proposals and indicated that the proposed equity commitment would be split between Evercore, Sankaty and Red Mountain.

56.     In late September 2005, the Independent Director traveled to Houston, Texas to meet with representatives of Constellation Energy for further negotiations. David Lucke of Randall & Dewey, a Jefferies-related entity, attended this meeting.

57.     On October 4, 2005, Constellation Energy submitted a revised proposal, premised on a TEV of $135 million and based on acquiring 100% of the equity.  The

Independent Director informed Constellation Energy that this offer was lower than expected and was subject to too many contingencies and offsets to be considered competitive.   Constellation informed the Independent Director that it would submit a revised proposal, but did not indicate when such a revised offer would be made.

**The Raynes Litigation**

58.     On September 13, 2005, Patricia Davis Raynes filed a lawsuit in the United States District Court for the Central District of California in Los Angeles.

59.     Plaintiff's Complaint in this action alleges that, in the Raynes Litigation,"[o]ne member of the Davis Family, Patricia Davis Raynes, [was] embroiled in contentious litigation with other members of the Davis Family, contending, among other things, that she had been denied a portion of her inheritance."

60.     Raynes sued the Marvin Davis estate, the Marvin and Barbara Davis Trust, all the directors of DPC, as well as certain of its officers, including her brother, Gregg Davis, and her mother, Barbara Davis

61.     Each of the named officers and directors had the ability to assert indemnity rights against DPC for reimbursement of costs and expenses associated with defending the Rayne Litigation and, ultimately, for any liability that Raynes might establish (the "Indemnity Claims")

**Evercore and Constellation Submitted Higher Bids in October 2005
In Response to the Successful Clipper Discovery**

62.     In October 2005, the Independent Director met separately with Evercore and Constellation to update these potential investors on a positive discovery at the Clipper prospect.   The Independent Director, Jefferies, and the Davis Family, were all aware of the Clipper discovery and its effects on valuation of the DPC.   The Independent

Director attended five or six meetings with the Davis offshore geologists, and received a

"standard Davis offshore presentation" concerning the financial and technical

information in the major discoveries, which at that point were Lorien and J. Bellis and, by

October, Clipper.

63.    In October 2005, Evercore also submitted a revised proposal (the "October

Proposal"), which was incorporated into and annexed to a letter from Evercore to the

Independent Director, dated October 21, 2005.

64.    The October 26 Exclusivity Agreement stated that the terms of the

October Proposal were to be considered the "substantial terms of the agreement between

the parties".

65.    Based on "feedback about the shareholders' requirements for an

acceptable deal," the October Proposal committed "to increase the amount of stock held

by the Davis Family Trusts (other than the Gregg J. Davis Trust) that [Evercore was]

willing to purchase from 50% up to 100%.

66.    The October Proposal offered a purchase price based on a Total Enterprise

Valuation of Davis Petroleum of $147.9 million, which was to be adjusted as necessary at

closing for any changes in cash, working capital and debt balance.

67.    The October Proposal identified Red mountain and Sankaty as potential

co-investors in the transaction: "We [Evercore] intend to partner in this transaction with

Sankaty Advisors, LLC and Red Mountain Capital Partners, although our offer is not

contingent on their participation."

The October Proposal and attached Summary of Proposed Terms also stated that "[t]o the extent that certain Davis Family members would like to sell less than 100% of their holdings, we are willing to accommodate them in this transaction."

69.     The October Proposal requested exclusivity and a prompt closing:

> Rapid execution is critical to DPC, as the Company is facing substantial near term capital expenditures and is currently in breach of its senior and subordinated debt covenants.  We believe that the  Company has reached a point with its lenders where any further delay in consummating a transaction poses a significant risk to the value of the Company and its prospects.  For this reason, our offer will expire at 5:00 p.m. EST on October 26, 2005, unless we enter into an Exclusivity Agreement prior to that time.

70.     During an October 24, 2005, meeting with Davis Family Counsel, the Independent Director explained the choices confronting Davis Petroleum and discussed the positive and negative effects of the Clipper well discovery, as well as the Company's dire financial situation.  He also addressed an oral proposal by Constellation Energy, which had increased its offer to $156.5 million TEV (up from $135 million) based on the successful discovery at Clipper, although the offer was still subject to numerous offsets and contingencies, in addition to a 60 day due diligence period.  The Independent Director also addressed the then-current  Evercore offer of $147.9 million for 100% shareholder equity (excluding the Gregg Davis' interest) and recommended that the Company should enter into an exclusivity agreement with Evercore.

71.     The Interest holders knew that news concerning the Clipper well was significant.  Yet, the Independent Director was not instructed to slow things down or reopen the process based on Clipper, but was pressured to "get a deal done."

72.     On October 27, 2005, the Independent Director, acting within his authority to take "all action which could be taken by the Board or other comparable governing

entity with respect to such [equity] transaction" in the best interest of Davis Petroleum,
executed the Exclusivity Agreement with Evercore, dated October 26, 2005, to negotiate
exclusively with Evercore for a period of 70 days from the execution of the agreement.

73.     The Independent Director "absolutely" believed he had the Interest
Holders' support when he entered into exclusivity with Evercore.

**Jefferies Resigned Due to the Raynes Litigation and the Interest
Holders Declined to Seek a Fairness Opinion**

74.     On October 27, 2005, Jefferies formally resigned as financial advisor to
the Special Committee.  Jefferies personnel told the Independent Director that they were
not prepared to provide a fairness opinion in a transaction with pending shareholder
litigation.  The Independent Director confirmed that Jefferies' resignation had nothing to
do with Jefferies' view of the Evercore offer, which was regarded as highly advantageous
to the shareholders.  Jefferies' resignation enabled the Independent Director to negotiate
Jefferies' fees down.

75.     On October 28, 2005, O'Melveny contacted the Davis Family Counsel, on
behalf of the Independent Director, and inquired, as discussed at the October 24, 2005
meeting: (1) whether the Interest Holders wanted to proceed with the Evercore
transaction or whether they objected to it, (2) whether the Interest Holders required a
fairness opinion, since Jefferies had resigned, and (3) whether any Interest Holder wished
to "roll over" his or her equity rather than cash out.

76.     On November 16, 2005, O'Melveny confirmed that Plaintiff had informed
the Independent Director that Plaintiff supported the Evercore deal and that Plaintiff saw
no need for a fairness opinion.

77.     On November 23, 2005, counsel for Barbara Davis informed O'Melveny that Barbara Davis wished to sell 100% of her equity interest to Evercore, that she believed a fairness opinion was unnecessary, and that she wanted the Independent Director to proceed to consummate the Evercore deal.

### The Independent Director and Evercore Documented the Original Evercore Deal

78.     After the formal exclusivity agreement with Evercore was executed, Bank of America and Sankaty entered into forbearance agreements with the Davis Entities based on the anticipated closing of an equity-infusing transaction.

79.     In January 2006, the Interest Holders and their counsel were asked again whether any Interest holders, other than Gregg Davis, wished to retain their equity interest and "roll" it over into the New Davis that would be formed after closing the transaction.  No Interest Holder, other than Gregg Davis, advised the Independent Director that they were committed to retain their equity as part of the transaction.

80.     On January 14, 2006, O'Melveny informed Davis Family Counsel that the Independent Director was ready to complete a sale of Davis Petroleum to Evercore. Davis Family Counsel was also informed of some open issues, including the determination of who would pay Red Mountain's fees.

81.     On or about January 31, 2006, the Schedules for the Original Evercore Deal were provided to Davis Family Counsel.  The Complaint in this action references an email, dated January 31, 2006, from Jack Hardy of O'Melveny & Myers LLP, counsel for the Special Committee, to Davis Family Counsel, attaching Schedules for the Original Evercore Deal.

82.     The Schedules to the Original Evercore Deal (later appended as exhibits to the Disclosure Statement) specifically identified the Red Mountain Agreement on a schedule of "Material Agreements" and also identified Red Mountain's claim to fees.  In addition, in section "5.25 Finders Fees" of the Draft Contribution and  Sales Agreement ("CSA"), which was later also appended to the Disclosure Statement as Exhibit C, Red Mountain and Jefferies were identified as the only "investment banker, broker, finder or other intermediary…who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement."  The Red Mountain Advisory Agreement was identified as one of the "Material Agreements" on Schedule 5.9(a) (later attached as Exhibit 9 to the Disclosure Statement.)

83.     The Independent Director was aware of the Red Mountain Agreement from the earliest stages of his retention, and negotiated the allocation between "buyers" and "sellers" of Red Mountain's fees, which was set forth on the "flow of funds" schedule 2.2(c).

84.     In negotiating the capital adjustments to the purchase price that affected equity value, the Independent Director took the position that all expenses associated with the Company became the buyer's liability.  Thus, the Independent Director put a "stake in the ground" and treated all working capital adjustments and business expenses, whether ordinary or not, as though the deal had closed in October 2005, when the exclusivity agreement was executed.

85.     The Independent Director's negotiation strategy held the "net to equity" for Interest Holders in the Original Evercore Deal at a high level despite the fact that the Davis Petroleum financial position had significantly deteriorated after October 2005.  For

example, the J. Bellis well, damaged in hurricane Katrina, remained offline, and large sums were expended in attempting to fix that well.  Upon being advised that the purchase price Evercore agreed to pay in the prepackaged plan was $150 million, the Independent Director was "sure" the drop in the amount flowing to equity from the deal he negotiated to the recovery under the Plan "reflected the deterioration of the Company's financials from that October date." See Armel Dep. 253:12-19.  "If you start off with something as close to the same enterprise value that we were talking about before, if it is going to be a lower number to the shareholders then it was either going to be more money retained in the company or it was going to be an account of deterioration of financials."  Id. 254:3-9.

### The Davis Family Failed to Close the Original Evercore Deal

86.     From the outset, the Original Evercore Deal was conditioned on obtaining satisfactory releases of any claims from Raynes, and of any Indemnity Claims, to ensure that Davis Petroleum would be free of claims after closing.

87.     Counsel for the Interest Holders actively participated in negotiations with the Independent Director and Evercore to resolve the release and indemnity issue.

88.     Due to difficulties with internal Davis Family negotiations, the closing date for the Original Evercore Deal was extended from January 31, 2006 to February 3, 2006, and then again extended to February 6, 2006.  During this period, the Independent Director  had a meeting with counsel for the Interest Holders to advise them of the negative  consequences of failing to complete the transaction on time, including Bank of America's notification that it would accelerate repayment of its loans if the transaction failed to close before February 7, 2006.

89.     On February 5, 2006, O'Melveny forwarded a revised purchase price adjustment schedule, which consolidated the $85 million pre-money equity valuation and the purchase price, to Davis Family Counsel.

90.     On February 6, 2006, Evercore and the Independent Director stood ready and willing to close the Original Evercore Deal, subject to receipt of executed final documents from all Interests holders.

91.     The transaction failed to close and the Independent Director resigned when Raynes refused to execute the final documents.  Raynes and the other members of the Davis Family were unable to reach agreement on how to escrow or fund holdbacks pertaining to the contemplated proceeds from the Original Evercore Deal among the Interest holders in light of the Raynes Litigation.

92     The Complaint in this Action concedes that Raynes was "[t]he lone holdout of the Davis Family to the [Original Evercore Deal]."  Plaintiff's former counsel, Diamond, when asked: "Is there any doubt in your mind that the reason that the original deal died was because Patty Davis Raynes and her counsel were unreasonable?" Responded:  "That's certainly my view that if they had been rational we would have gotten a deal closed."

**Bank of America and Sankaty Default Notices**

93.     On February 7, 2006, the day after the Original Evercore Deal failed to close, Davis Petroleum's senior lender, Bank of America – which refrained from taking adverse action against Davis Petroleum prior to the closing of the Original Evercore Deal –declared default and accelerated the outstanding indebtedness of approximately $30 million.

94.     The next day, February 8, 2006, Sankaty, Davis Petroleum's junior lender, declared defaults with respect to its junior loans of over $43 million.

95.     In the days immediately after the Original Evercore Deal failed to close, in a final attempt to resurrect the failed transaction, Evercore offered to make an additional payment to Raynes of $5 million; however, other Davis family members refused to agree to a deal that would provide  Raynes with additional funds to pursue litigation against them.

96.     As of February 2006, Evercore indicated that it would initiate no more deals, and that any new deal would have to be done on very different terms.

**The Interest Holders Approached Evercore to Enter Into an Equity Transaction in the Context of a Prepackaged Plan**

97.     Faced with "a severe liquidity crisis, "Davis Petroleum formally retained Rhett Campbell of Thompson & Knight as bankruptcy counsel on February 13, 2006, and FTI Consulting Company (FTI") as its financial advisory, on February 14, 2006.  Mr. Campbell provided an overview of the costs and risks of the chapter 11 process by e-mail to Gregg Davis, which was distributed to the shareholders and their counsel.

98.     These retained professionals assessed the financial condition of Davis Petroleum, met with Richardson & Barr, an investment banker specializing in oil and gas properties, and evaluated the remaining options for Davis Petroleum.

99.     Due to unpaid obligations to drilling partners, Davis Petroleum was at risk of being placed in "non-consent status" on all its major offshore and onshore wells.

100.     During the period from mid-February to early March, 2006, FTI received two emails from Pioneer Energy, the owner operator of the Clipper well.  The first email indicated that the Company was delinquent on its payments dating back to November

2005, and was in danger of being put in non-consent status.  The second email indicated that Pioneer would forward the matter to Pioneer's counsel, who would take appropriate action.

101.    If Davis had been put into non-consent status, the detriment to the value of DPC would have been substantial. Furthermore, the penalties are severe.  If the Company had been put into non-consent status it would not have an interest in the properties until the rest of the parties who consented recovered 3,500 or 1,000 percent of their investment.

102.    To pay for immediate capital investment obligations, the Company needed approximately $15 million by March 31, 2006, and a total of $50 million in additional cash before August 1, 2006 to fund all its obligations on its offshore interests.

103.    As of February 2005, the J. Bellis well was still offline. Pioneer, the owner-operator with a majority stake in the Clipper well, had divested itself of its offshore properties in production, but had decided to retain Clipper.

104.    Further, due to obligations to its senior and junior lenders, the Davis Entities owed $8.9 million and were in a negative $12.9 million cash position as of February 17, 2006.  FTI estimated that DPC would run out of cash by March 3, 2006. The Company's attractiveness to potential buyers was at risk because the geologist team could lose personnel, and did lose Michael McGuire, the head of the Rockies' division, who resigned when the original Evercore Deal failed to close.

105.    In early February 2006, the senior lender, Bank of America, hired a bankruptcy financial advisor, the firm of Alvarez & Marshal.

106.    The Interest Holders and Davis Petroleum requested that Evercore submit a new proposal for a transaction in the context of a prepackaged bankruptcy plan, while simultaneously exploring other alternatives to Davis Petroleum.

107.    On February 17, 2006, Evercore indicated that it would consider a prepackaged bankruptcy deal, but advised that the deal would have to be repriced and "much reduced."

108.    Evercore indicated that a price reduction was necessary due to the risk that the company's business reputation would be damaged, it would be unable to continue to develop and promote prospects, it would not be viewed as viable partner, and it might lose some of its properties or be subject to non-consent payments.

109.    Lawyers and advisors for Davis Petroleum met with another investment banker specializing in oil and gas properties, Petrie Parkman & Co. ("Petrie Parkman"), to discuss a potential sale of Davis Operating Entities assets.

110.    On February 21, 2006, Petrie Parkman advised that it was not interested in marketing Davis Petroleum's assets because they presented a "tough sell" for buyers, as they were short-lived and DPC was not the owner/operator on many of its prospects.

111.    On February 27, 2006, Evercore provided a term sheet for a new offer to Davis Petroleum, after conducting additional due diligence to assess Davis Petroleum's most current financial condition and prospects.

112.    Between February 27, 2006, and March 2, 2006, bankruptcy counsel at Thompson & Knight, bankruptcy advisors at FTI, and the Board of Directors of Davis Petroleum considered the various alternatives available to Davis Petroleum and the Interest Holders.

113.     DPC attempted to solicit bids for a DIP financing from Bank of America, Sankaty, Fortress, and Petrie Parkman.  However, none of these potential lenders offered to commit and submit a term sheet.

114.     With the advice of FTI and Thompson & Knight, the Board of Davis Petroleum, on or about March 1, 2006, concluded that "the [Evercore deal] was the only prudent thing to do."  Thus, the Board and its advisors negotiated the terms of a new offer solicited from Evercore to acquire the Davis Entities as part of a prepackaged bankruptcy plan, which were reflected in a final Term Sheet.

115.     The Term Sheet identified Evercore (through its majority-owned investment vehicle, DPI), Red Mountain (by Willem Mesdag) and Sankaty (by Stuart Davis), as the buyers, and was annexed to the Disclosure Statement as Exhibit B and incorporated by reference into the Plan.  The Term Sheet provided for a purchase price of $150 million, which was similar to the October Proposal's TEV of $147.9 million.  In this deal, however, the buyers were not responsible for the liabilities that resulted from the Davis Operating Companies' financial deterioration.

**The Interest Holders Approved the Revised Evercore Deal**

116.     On March 2, 2006, a solicitation package containing the Plan, the Disclosure Statement with exhibits, including the proposed Term Sheet, and voting ballots (the "Solicitation Package") was sent to the Interest holders.

117.     The Plan provided for Evercore and its co-investors to pay a purchase price of $150 million to fund a trust that would pay Davis Petroleum's creditors and return any remaining funds to the Interest Holders.  The ability to repay creditors in full was a major concern since the updated balance sheet FTI prepared, based on the

November 2005, financial statements, and the cash flow statements, showed the company insolvent on a balance sheet basis and unable to pay its debts as they became due.  Under the Plan, Evercore and its co-investors were obligated to fund up to an additional $40 million in new capital to pay for expected costs through the end of 2006.

118.    Due to the critical financial and business condition of Davis Petroleum, the terms of the transaction required return of ballots by March 7, 2006, confirmation of the Plan by March 15, 2006, and closing of the transaction by March 30, 2006.  The Term Sheet and proposed Plan also contained as an express condition broad release provisions and an injunction against claims against the buyers if the Plan was funded.

119.    The timing of the closing was driven by other matters than the petroleum reserve engineering report.  These matters included DPC's serious liquidity problems, Evercore's need to close promptly because the prior deal had fallen through, and the need to satisfy claims and avoid non-consent status.

120.    From Friday, March 3, 2006, until Monday, March 6, 2006, Thompson & Knight and FTI conducted lengthy conference calls with Davis Petroleum's management and Davis Family Counsel, to discuss the proposed prepackaged bankruptcy plan and the alternatives facing the Davis  Entities.

121.    The Debtor's professionals recommended the Evercore offer as a more favorable alternative to a Section 363 sale or a Chapter 11 liquidating plan.  If the Company had gone through a Section 363 sale, there was no reason to believe that DPC would achieve a higher value.  The liquidation analysis concluded that the Plan offered much greater value to the shareholders, who would receive nothing in a chapter 7 liquidation.   Further, FTI concluded that DPC did not have enough liquidity and could

not obtain the financing necessary to go through a Section 363 sale.  The desire for the equity holders to sell their position in the company, the need for capital, and]the concern about deterioration of the asset value, made the Evercore offer more attractive than a Section 363 sale or Chapter 11 liquidation.

122.    All the Interest Holders and their counsel participated in these conversations, along with the Davis Entities' bankruptcy counsel and financial advisors.

### FTI Performed a Reasonable Liquidation Analysis

123. Prior to the Confirmation Hearing, Davis Petroleum's financial advisor, FTI Consulting Company, conducted a liquidation analysis, a cash flow analysis and an update of the balance sheet for Davis Petroleum.

124.    When FTI performed the liquidation analysis, it knew that new NSA numbers were expected at the end of March 2006, but determined that these new numbers would not "change its advice to the board or to the equity holders."  Davis Petroleum informed Conly on February 17, 2006 that NSA expected "a first try roll up preliminary run in 2 weeks or approximately March 6" [Conly Dep.Ex 5] with respect to the December NSA Report.  As of the Confirmation hearing on March 9, 2006, Davis Petroleum had received from NSA only very preliminary estimates in connection with the December NSA Report, which did not reflect an increase in values compared to the July 2005 Report.

125.    The FTI Liquidation Analysis, attached as Exhibit 4 to the Disclosure Statement and discussed during the Confirmation Hearing, was sent to the Interest Holders as part of the Solicitation Package, and was the subject of "a series of calls" with

the Interest Holders conducted by the Debtors' counsel and FTI during March 3-5, 2006, to discuss the alternatives facing Davis Petroleum.

126.    The Liquidation Analysis performed by FTI was not based on a "fire sale" transaction.

127.    FTI used four different metrics as part of its Liquidation Analysis to establish a current market value for the Davis Petroleum oil reserves.

128.    For each of the four categories of reserves considered as part of the valuation metric utilizing the PV10 values of the Company's oil and gas reserves as reported in the most recent NSA report, the discount rates were:

1.    85% for Proved Developed Producing wells,

2.    50% for Proved Developed Non-Producing wells,

3.    25% for Proved Undeveloped Reserves,

4.    and 10% for Probable Reserves.

129.    Drilling wells in the Gulf of Mexico is not a "low risk" business.  Further, drilling the first well is not always a good indicator as to future economic value because it requires sometimes three, four, or five to determine that the reserves are sufficient to cover the cost of production.

130.    As of Confirmation, all of the Company's offshore wells were non-producing, since the J. Bellis well was still offline.  Many of the offshore reserves attributable to Davis Petroleum were in the proved/undeveloped category and were not producing.  Consequently, the value of these reserves was discounted to reflect the risk.

131.    The Liquidation Analysis presented at Confirmation reflected that in a liquidation scenario, the best case would have allowed the Debtors to pay $0.5 million of

the $21 million of debt owed to creditors, and the worst case would not have yielded enough proceeds to cover even the second lien creditor, Sankaty.

132.   Under both the "high case" and the "low case" scenarios in the FTI Liquidation Analysis, the Interest holders would receive nothing.

133.   FTI opined that the Evercore Proposal was the best possible option for Davis Petroleum given the liquidity crisis and other factors.

134.   Furthermore, FTI concluded that the March NSA report would have no material impact on the decision to accept the sales price offered by Evercore.

135.   The testimony of Albert Conly of FTI, regarding valuation was uncontroverted at the Confirmation Hearing.

136.   The only question posed to Conly by counsel for the Nancy Davis Trust was "whether in the evaluation you made of the assets of the Debtor, … did you speak to anyone else as a potential purchaser of the assets," to which Mr. Conly answered: "No."

137.   Nothing in FTI's proffer was challenged as to its accuracy or as to the validity of the liquidation scenarios presented, and no objection was made to Confirmation by any Interest holder, including for purported failure to explore alternatives to bankruptcy.

138.   After receiving the updated NSA oil reserve numbers as of March 31, 2006, prior to his deposition, Conly re-ran the Liquidation Analysis and confirmed that the updated NSA numbers would have had no material effect on FTI's conclusions.  The only change in recovery was on the high side for unsecured creditors, who would in that scenario have received 50 cents on the dollar, but still nothing would go to equity

holders.  The value of the Company still would "not have been in excess of what was paid."

139.    On further review, moreover, FTI found that the amount of claim/liabilities used in its original liquidation analysis was underestimated.  After re-running the numbers, Davis Petroleum ultimately ended up with more claims than FTI estimated.

140.    At his deposition, taken on October 30, 2007, Conly confirmed that his proffer at the Confirmation Hearing was true and correct (including all exhibits), except as he would revise them to reflect what he now knows about the March 31, 2006, NSA report which would not change FTI's advice to the board or to the equity holders.  Conly also confirmed that Conly Ex. 7 was a true and accurate copy of Exhibit 4 to the Disclosure Statement (the "Liquidation Analysis").

**The Interest Holders Voluntarily Chose to File For Bankruptcy and to Propose the Revised Evercore Deal as a Pre-Packaged Plan**

141.    On March 7, 2006, Davis Petroleum filed voluntary petitions to commence the chapter 11 cases, along with the Disclosure Statement and Plan, commencing "prepackaged" chapter 11 cases (the "Chapter 11 Cases") before the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division.

142.    On March 8, 2006, Davis Petroleum issued a press release in Houston and Los Angeles announcing that DPC had reached an agreement with Evercore, to be facilitated through a prepackaged bankruptcy filing, to allow the continued growth and success of Davis Petroleum.  The press release identified Evercore, Sankaty and Red Mountain as the entities purchasing the equity of Davis Petroleum and provided brief background information on DPC, Evercore, Sankaty, and Red Mountain.

**The Disclosure Statement and Plan**

143.     The Bankruptcy Plan, filed contemporaneously with commencement of the Chapter 11 Cases, was pre-approved by 91.2% of the equity interests of the Interest Holders as the only impaired class under the Plan.

144.     The Plan provided for sale of 100% of the equity interests in Davis Petroleum to the Acquisition Entities for a purchase price of $150 million, subject to adjustment (the "Purchase Price") pursuant to terms set forth in an attached Term Sheet.

145.     The Term Sheet was incorporated into the Plan in the first substantive provision of the Plan, Article IA, which provided that "capitalized terms not otherwise defined in this Plan shall have the meanings ascribed to them in this Article I, except to the extent they are defined terms in the Term Sheet attached to the Disclosure Statement as Exhibit B, or the Draft Contribution and Sale Agreement (the "Draft CSA') dated February 13, 2006 attached to the Disclosure Statement as  Exhibit C, and both incorporated herein."

146.     The Draft CSA, dated February 13, 2006, defined the term "Buyers" as the Acquisition Entities.  The Term Sheet identified the signatories for the Buyers as DPI by Evercore, Red Mountain by Willem Mesdag, and Sankaty by Stuart Davies.

147.     The Plan was identified as a reformulation of the deal that had been extensively negotiated prior to the filing of the Chapter 11 Cases:  "[E]ach Interest holder is quite familiar with the current Term Sheet and CSA proposed by Evercore because it is substantially the same as the Original Evercore Deal, with the most significant change being the substantial reduction in the price to be paid to the Interest holders."

148.    The only Interest Holder that did not vote to approve the Plan was the Plaintiff.  Plaintiff remains alone in her position in this lawsuit.

### This Court Held a Confirmation Hearing, Where All Interest Holders Were Represented By Sophisticated Counsel

149.    At the Confirmation Hearing on March 9, 2006, the Court conducted a full evidentiary hearing, including examination of proffered witnesses.  Debtors' Counsel informed the Court that the most current reserve report estimated the reserves as of July 2005.  George Cañar was offered as a witness if anyone wished to have him address the current status of the Company's reserves, but no one asked to have him testify.

150.    Plaintiff and the other Interest holders were each separately represented by counsel at the Confirmation Hearing.

151.    None of the Interest Holders, including Plaintiff, filed any objection to the Plan and Disclosure Statement, or objected to the Plan's confirmation at the Confirmation Hearing.

152.    Plaintiff's counsel also did not ask the Court to order discovery on valuation of Davis Petroleum, and did not object to the inability of the Interest Holders other than Gregg Davis to "roll" their equity interest.

153.    The Court specifically inquired whether all Interest Holders had been parties to the negotiations on the Original Evercore Deal and to the negotiations leading up to the prepackaged Plan.  Thompson & Knight, bankruptcy counsel for the Company, assured the Court that they had, with the exception that Raynes was not included in the negotiations of the prepackaged Plan "until we solicited," beginning on March 3, 2006. The Court noted: "But Patty Davis [Raynes] has voted in favor of the Plan," to which counsel responded, "And she's voted in favor."

154.    The Court then gave all Interest Holders an opportunity to speak: "All right.  So now, does anyone on the phone have anything they want to say on the point?" Hearing silence, the Court continued with the hearing.

155.    With the exception of counsel for Nancy Davis, Davis Family Counsel, including Barbara Davis, urged the Court to approve the Plan and issue a confirmation order to allow the family to salvage some value from the Davis Entities, after the family's failure to close the Original Evercore Deal placed the Company in the predicament that required a bankruptcy filing.

156.    During the confirmation hearing, Evercore did not make any representation to the Court, other than the Puneet Gulati Declaration, which accurately represented that Evercore and its co-investors were ready and able to fund $40 million for new equity and $150 million to fund the Plan.

157.    The Davis family members were represented by sophisticated counsel from predominately large law firms throughout the negotiation of the Original Evercore Deal, the formulation of the prepack plan and the Confirmation Hearing.

158.    The Confirmation Transcript identified counsel for the Nancy Davis Trust as Michael Diamond, Esq. (Milbank, Tweed, Hadley & McCoy LLP) and counsel for other Davis family members as follows:  Kevin Leichter (Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP) for Barbara Davis; Jerome Coben and Richard Levin (Skadden, Arps, Slate Meagher & Flom LLP & Affiliates) for John Davis, Fred Norton (Boies Schiller & Flexner LLP) for Patricia Davis Raynes; Susan Marcella (Gibson Dunn & Crutcher) and Bruce Ruzinsky (Jackson Walker LLP) for Gregg Davis.

159.    Beginning in late 2004, Michael Diamond represented the Nancy Davis Trust in connection with the Evercore transaction.

160.    Article I.C.(iv) of the Plan acknowledged that the Interest Holders and other affected parties were represented by counsel who participated in the formulation of, or had the opportunity to review and provide comments on, the Plan:

> This Plan is the product of extensive discussions and negotiations between and among, inter alia, the Debtors, the Interest Holders, the Bank, and the Buyer Parties.  Each of the foregoing was represented by counsel who either participated in the formulation and documentation of, or was afforded the opportunity to review and provide comments on, the Plan, the Disclosure Statement, and the documents ancillary thereto.  Accordingly, the general rule of contract construction known as "contra proferentum" shall not apply to the interpretation of any provision of this Plan, the Disclosure Statement, and any agreement or document generated in connection herewith.

**The Confirmation Order**

161.    As set forth in the Plan and Disclosure Statement, the Plan was conditioned on entry of a confirmation order by March 15, 2006, and closing on the sale by March 30, 2006.

162.    On March 10, 2006, the Court entered an Order Approving Disclosure Statement and Confirming Joint Plan of Reorganization of Davis Petroleum Corp., Davis Offshore, L.P., and Davis Petroleum Pipeline, LLC.

163.    The Confirmation Order contained findings of fact and conclusions of law, none of which were appealed by any Interest Holder, including Plaintiff.

164.    The Court approved the Disclosure Statement as containing adequate information contemplated by Bankruptcy Code § 1125.

165.    The Confirmation Order expressly confirmed that the discharge, release, exculpatory and injunctive provisions of the Plan were "fair, equitable, reasonable, and in

the best interests of the Debtors, the Reorganized Debtors, and their estates, creditors, and equity holders."

166.     These discharge and release provisions were "approved in their entirety and given full effect as of the Effective Date of the Plan."

**Plaintiff's Action to Revoke Confirmation**

167.     On September 6, 2006, 179 days after the Plan was confirmed and one day before the action would have become time-barred under 11 U.S.C. § 1144, the Nancy Davis Trust commenced this action alleging that the Confirmation Order was procured by fraud.

168.     At Plaintiff's October 19, 2007 deposition, she did not identify any representations made to her about the Original Evercore Deal or the Plan that she believed to be false, and was instructed not to answer further on grounds that her response would be privileged.

## II.  SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, the party moving for summary judgment "is entitled to judgment as a matter of law" when "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c).  Once a movant makes and supports a motion as provided by Rule 56, the non-movant must produce admissible evidence demonstrating the existence of "material" fact, meaning the non-movant cannot rest on unproved allegations to create a triable issue of fact.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (a non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment); *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. Of San Antonio*, 40  F.3d 698, 713

(5th Cir. 1994) (conclusory allegations unsupported by specific facts will not prevent an award of summary judgment).

Although the court must view the evidence in the light most favorable to the non-moving party, the evidence must evince a "genuine" issue of material fact; in other words, the evidence adduced by the non-movant must be such that a reasonable fact finder could return a verdict in its favor.  *See Coleman v. Houston Indep. Sch. Dist.* 113 F.3d 528, 533 (5th Cir. 1997); *Bodenheimer v. PPG Indus., Inc.,* 5 F.3d 955, 956 (5th Cir. 1993).  There can be no genuine issue as to any material fact when the non-moving party fails to adduce evidence concerning an essential element of its claim; such a failure renders all other facts immaterial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-32 (1986).

Here, the evidentiary record before the Court on New Davis' motion demonstrates that there is no genuine issue of material fact as to the elements necessary to support a claim under 11 U.S.C. § 1144.  Accordingly, this Court finds that summary judgment should be granted as a matter of law in favor of New Davis.

### III. DISCUSSION

This Court made the following findings of fact in support of the Confirmation Oder:

> THE ORDER:…. [T]he uncontroverted facts are that this is a company that needs help.  This is a company that, if it were liquidated, would be under water, would be insolvent, would not pay money, would not even pay out all its unsecured claims, that a deal has been done that has the potential of $31 million to its equity holders, that … 91.2 percent of its equity holders have signed off on the plan, and none of the equity holders have objected to the plan.  And that the plan does in fact provide for ways of paying adequately all of the claims and sets out all the appropriate … vehicles for doing all of that, that the notice that was given was short, but it was effective, that there [are] good, valid reasons for

moving forward on an expedited basis, as we are doing[,] that all of the
parties to this transaction that will be affected are sophisticated people
who at least are represented by competent counsel and having been
informed of everything that's being done, and that this plan meets the
provisions of 1129, and it should be confirmed.

- - Conf. Tr. 81-83.

In keeping the fundamental policy promoting the finality of chapter 11

proceedings, it is axiomatic that *res judicata* bars any and all actions seeking to

collaterally attack the Confirmation Order on grounds other than fraud in its procurement.

*See* 8  Collier on Bankruptcy ¶ 1141.02, at 11 ("in the absence of an allegation of fraud in

obtaining the judgment, the Supreme Court held that the doctrine of res judicata applie[s]

with respect to matters that are covered by a plan of reorganization confirmed by final

order of a bankruptcy court." (citing *Stoll v. Gottlieb*, 305 U.S. 165, 171-72 (1938).  To

sustain a claim under § 1144 seeking revocation of the Confirmation Order, Plaintiff must

establish each of the traditional elements of fraud: (1) that the debtor or proponent made a

materially false representation or omission; (2) that the representation was either known

to be false, or was made without belief in its truth, or was made with reckless disregard

for the truth (i.e., scienter); (3) that the representation was made to induce the court to

rely upon it; (4) the court did rely upon it; and (5) that as a consequence of such reliance,

the court entered the confirmation order.  *See In re Longardner & Assoc., Inc.*, 855 F.2d

455, 461 n.6 (7th Cir. 1988), cert. den. 489 U.S. 1015 (1989); *In re Zolner*, 249 B.R. 287,

293 (N.D. Ill. 2000); *In re Circle K Corp.*, 181 B.R. 457, 463 (Bankr. D. Ariz. 1995).

Plaintiff cannot seek to reopen evidence previously admitted as uncontroverted at

Confirmation except by demonstrating that specific misrepresentations or material

omissions were intentionally made to the Court, with the requisite level of scienter, in

order to procure the Confirmation Order.  Plaintiff failed to demonstrate admissible evidence exists sufficient to create a triable issue of material fact as to each element of Plaintiff's § 1144 claim in order to withstand summary judgment.

### A.  No Evidence of Undisclosed Conflicts Of Interest or Lack of Arm's Length Dealing

Plaintiff's allegations principally revolve around the claimed "nondisclosure" of alleged conflicts of interest on the part of Davis Petroleum's President, Gregg Davis, and his financial advisor, Willem Mesdag of Red Mountain, which Plaintiff asserts rendered false the representations made to the Court concerning the arm's length nature of the negotiations of the Original Evercore Deal and the Plan.   To support the argument that the alleged conflicts were not disclosed until after Confirmation, Plaintiff points to an allegedly "secret" Advisory Services Agreement, dated January 31, 2005 (the "Red Mountain Agreement"), which was attached to a proof of claim filed on April 20, 2006, by Willem Mesdag of Red Mountain for fees based on services provided to Gregg Davis and guaranteed by Davis Petroleum under the  Red Mountain Agreement.  However, the uncontroverted facts show that Evercore's negotiations with Davis Petroleum and its Interest Holders were completely arm's length, with all parties represented by counsel and financial advisors of their choosing, both during the Original Evercore Deal, as well as the Plan and Confirmation process.

### 1.)  The Original Evercore Deal Was The Product Of Extensive Arm's Length Negotiations  With Davis Petroleum's Independent Director, Represented By An Independent Financial Advisor, With The Alleged Conflicts Of Gregg Davis And Red Mountain Fully Disclosed

The Original Evercore Deal was an arm's length transaction in which all parties were presented by separate counsel and financial advisors and in which nothing

concerning Gregg Davis, Willem Mesdag, the Red Mountain Agreement, or the fees Red Mountain sought as part of the Original Evercore Deal, was "hidden."  The alleged "conflicts" of Gregg Davis and Red Mountain were disclosed as part of the documents and schedules previously part of the record at Confirmation.  Moreover, not only were these conflicts fully disclosed, but members of the Davis Family had actively put in place independent counsel and an independent director to address these potential conflicts by May 2005.

From the time of his appointment, the Independent Director actively ran the process to determine the appropriate steps for Davis Petroleum to address its capital needs and to allow some members of the Davis Family to "cash out" their interests in Davis Petroleum.  The Independent Director communicated frequently, both in writing and in meetings and/or teleconferences, with the Davis Family Counsel, and obtained their approval in June 2005 to retain Jefferies & Company, Inc. ("Jefferies") as the Independent Director's exclusive financial advisor.  The October 21, 2005, Evercore proposal (the "October Evercore proposal") was regarded by the Independent Director as a full and fair offer for Davis Petroleum, and when the Independent Director entered into the exclusivity agreement with Evercore dated as of October 26, 2005, to pursue a transaction on the terms set forth in the October Evercore proposal, it was with the express support of the Davis Family Counsel.

Jefferies resigned in October 2005.  The record establishes that the Independent Director and Davis Family Counsel consciously chose to have Davis Petroleum enter into exclusivity with Evercore in October 2005, knowing that a fairness opinion would not be forthcoming from Jefferies, and consciously chose not to retain a new investment bank to

provide a fairness opinion, concluding one was unnecessary.  Under the Original

Evercore Deal, any member of the Davis Family who wished to retain an equity stake in

David Petroleum was permitted to do so long after Evercore committed to acquire up to

100% of the equity (except for Gregg Davis' share) as part of the October Evercore

proposal.  This was another question put directly to the Davis Family Counsel as part of

the October 24, 2005 meeting – "need to know if anyone wants to stay in and to what

extent" – since it affected governance issues and drafting of the deal documents.  After

repeated follow-up, O'Melveny sent an e-mail to Davis Family Counsel on January 24,

2006 confirming that "We did not hear back from any of you on this point, so we are

going to assume that no one other than Gregg will roll over his or her interest into new

equity."  Red Mountain's proposed  fees were disclosed as part of original Evercore deal.

The uncontroverted evidence demonstrates that Red Mountain's claim to fees was

negotiated by the Independent Director as part of the Original Evercore Deal and was the

subject of multiple disclosures to Davis Family Counsel.  Red Mountain's need to file a

proof of claim shows that these fees were not paid as part of the Plan.  Therefore, whether

and to what extent Red Mountain can claim a fee in connection with the sale to Evercore

pursuant to the Plan will be determined as part of an entirely separate contested

proceeding.

      The record demonstrates that the Original Evercore Deal fell apart at closing

because of one Interest holder's last-minute refusal to sign documents out of concerns

about the impact of the deal on the Raynes litigation.  None of the Interest Holders

present at the Confirmation Hearing disputed any of the recitations concerning the

Original Evercore Deal or how it collapsed.  In fact, several Interest Holders' counsel

(including counsel for Patricia Davis Raynes) spoke to confirm that the deal fell apart in the manner described by Debtors' counsel. ("It was negotiated very hard [and] worked very extensively by Counsel for the equity class and for Evercore and for the Company, for a long time. And as a result of factors that really had nothing to do with the business transaction and had nothing to do with the price, the deal blew up on February the 6th.")

All parties, including Davis Family Counsel, knew the consequences of failing to close the original Evercore deal. When the Original Evercore Deal failed to close, Bank of America's acceleration of the senior debt was triggered. Going back to June 2005, the Independent Director had informed Davis Family Counsel that "the company's continued viability" was contingent on obtaining an equity infusion, and urged that "each of you, as representatives of the company's shareholders, appreciate the need to act quickly and cooperatively if we are to maximize the value of the company for the benefit of all shareholders, without regard to how that benefit is ultimately allocated among shareholders." In the weeks and days before the Original Evercore Deal failed to close over intra-family issues, the record makes clear that the urgency of getting the deal consummated was well known to all the parties, with O'Melveny and the Independent Director admonishing Davis Family Counsel to get the deal done, even if it meant putting the sales proceeds in escrow and Barbara Davis' counsel sending a letter to Ms. Raynes' counsel promising to hold her accountable if the deal collapsed over an issue that had been raised by Evercore as a condition to closing months earlier.

When the Original Evercore Deal failed to close on February 6, 2006, as a result of one shareholder's refusal to sign the deal, the Independent Director felt he could no longer "perform the services he had been retained to perform" and resigned. The

Independent Director believed that he had brought the shareholders a "full and fair price for the company."  However, the Independent Director needed the consent of 100% of the shareholders and he was not able to get the Davis Family Counsel to heed his advice, dating back to at least June, "to act quickly and cooperatively if we are to maximize the benefit of the company for the benefit of all shareholders, without regard to how that benefit is ultimately allocated among shareholders."  On February 7, 2006, Davis Petroleum's secured lenders, Bank of America and Sankaty, sent notices of acceleration.

The uncontroverted evidence proves that the Original Evercore Deal was the product of a year-long, arm's length process, with all parties represented by counsel and financial advisors of their choosing, exactly as was represented to the Court at confirmation.

### 2.) The Prepackaged Plan Was Likewise An Arm's Length, Voluntary Transaction With the Debtors Represented by Counsel Approved by Davis Family Counsel and an Independent Financial Advisor, Albert Conly of FTI

Plaintiff alleges that the Plan and Confirmation process was not an arm's length process, due to Willem Mesdag's involvement as one of Evercore's co-investors and the resignation of the Independent Director after the collapse of the Original Evercore Deal. Neither fact impacted the arm's length nature of the process, because all parties were represented by counsel.

Counsel for various family members are identified on the Confirmation Transcript, including Michael Diamond, Esq. of Milbank, Tweed, Hadley & McCoy LLP for the Nancy Davis Trust.  Each Interest Holder was separately represented not only at the hearing, but throughout the transaction, as reflected on a Davis Petroleum Contact List distributed by counsel for the Independent Director (the "DPC Contact List").  The

DPC Contact List confirms that Michael Diamond represented the Nancy Davis Trust in connection with the Evercore transaction dating back to at least June 2005.

As discussed above, Gregg Davis informed his family of Willem Mesdag's desire to invest alongside any proposed equity investor when the search for capital began in January 2005.  Mesdag's participation as a proposed co-investor (through Red Mountain) was disclosed in every version of the Evercore Proposal.  Willem Mesdag signed for Red Mountain as one of the three proposed "Buyers" on the Term Sheet that formed the basis for the prepackaged Plan, which was sent to Davis Family Counsel separate from the full solicitation package and was also attached as Exhibit B to the Disclosure Statement and expressly incorporated into the Plan.  Plaintiff was represented by sophisticated legal counsel and the assertion of lack of disclosure of Mesdag's participation as a co-investor under these circumstances is not credible.

While it is true that the Independent Director resigned on the night the Original Evercore Deal collapsed, Plaintiff's implication that the Plan was anything but a voluntary, arm's length deal does not survive summary judgment scrutiny.  The Plan was the product of extensive negotiations among the debtors, the banks, the interest holders, and Evercore, each represented by separate counsel.  Article I.C.(iv) of the Plan acknowledged that the Interest Holders and other affected parties were represented by counsel who participated in the formulation of or had the opportunity to review and provide comments on the Plan, which was expressly acknowledged to be a reformulation of the failed Original Evercore Deal:

> This Plan is the product of extensive discussions and negotiations between and among, *inter alia,* the Debtors, the Interest Holders, the Bank, and the Buyer Parties.  Each of the foregoing was represented by counsel who either participated in the formulation and documentation of, or was

> afforded the opportunity to review and provide comments on, the Plan, the
> Disclosure Statement, and the documents ancillary thereto.  Accordingly,
> the general rule of contract construction known as "contra proferentum"
> shall not apply to the interpretation of any provision of this Plan, the
> Disclosure Statement, and any agreement or document generated in
> connection herewith.

- - Bankr. Dkt. No. 18, Plan at 11.

The Evidence at Confirmation establishes that the Interest Holders' decision to

accept the Plan was the culmination of an intense process in which Davis Petroleum's

board of directors together with the Interest Holders, each guided by experienced

professionals, "entreated [Evercore] to come back" with a proposal after considering the

limited options facing Davis Petroleum in the wake of the failed Original Evercore Deal.

After several days of round the clock discussions every Interest Holder except Plaintiff

concluded that the Plan represented the most certain prospect for the Interest Holders to

receive a substantial recovery for their equity interests, and voted to accept the

prepackaged Plan.  The arm's length nature of this process is clear from the

uncontroverted evidence.

## B.  No Evidence of Misrepresentations Concerning Davis Petroleum's Value at Confirmation.

After completion of discovery, Plaintiff added a new allegation of "fraud" in the

procurement of the Confirmation Order based on alleged misrepresentations concerning

valuation.  The allegations are insufficient to state an actionable § 1144 claim as a matter

of law because: (i) statements concerning valuation are opinion, not fact, and cannot

serve as the basis for a fraud claim under Texas law, *See, Zar v. Omni Indus., Inc.*, 813

F.2d 689, 693 (5th Cir. 1987) ("The generally accepted rule in Texas jurisprudence is that

future predictions and opinions, especially those regarding the future profitability of a

business, cannot form a basis for fraud as a matter of law."); (ii) the representations concerning the Debtor's assets and value in liquidation were based on schedules prepared by the Debtor's independent financial advisor, Bert Conly of FTI, and the Amended Complaint nowhere states that FTI acted with intent to mislead the Court; (iii) any challenge to valuation is clearly barred by *res judicata* because Plaintiff's former counsel acknowledged that his client believed Davis Petroleum's valuation was understated at the time of Confirmation, yet Plaintiff did not seek to contest valuation or object to the Plan; (iv) the only valuation analysis relied on by the Court in approving the Plan was FTI's testimony that the impaired class would receive more under the Plan than in a liquidation, satisfying 11 U.S.C. § 1192(a)(7) – testimony that Mr. Conly confirmed was accurate at Confirmation and remains accurate today even if he were to take into account updated information that was not available until weeks after Confirmation concerning the estimated value of Davis Petroleum's reserves, and; (v) Plaintiff failed to establish that any representations concerning Davis Petroleum's potential value procured Confirmation because all Interest Holders except Plaintiff, advised by experienced bankruptcy professional, made a conscious decision to accept the Plan since it offered "the best opportunity to capture some value for the equity and to take care of the creditors and to preserve an enterprise" on their evaluation of the harsh financial realities immediately facing the Debtors, which threatened their survival.  Accordingly, the uncontroverted evidence fails to support the claimed "misrepresentations".

It is undisputed that Davis Petroleum's reserve reports from its outside engineering firm, Netherland, Sewell & Associates, Inc. ("NSA"), were on a biannual cycle, with one report issued as of July 1st, and a second report as of December 31st.

These independent reports take months to prepare subsequent to the period being audited. For both the December 31, 2004, period and the December 31, 2005, period, the final NSA report estimating Davis Petroleum's reserves as of year-end issued in the first week of April.  Relying on the fact that the Plan and Disclosure Statement utilized information from Davis Petroleum's then most current reserve report, which estimated the reserves as of July 2005, (the "Estimate of Reserves and Future Revenue to the Davis Petroleum Corporation Interests of Certain Oil and Gas Properties located in Louisiana, Texas, Wyoming, and the Gulf of Mexico as of July 1, 2005" (the "July NSA Report")), Plaintiff asserts that Davis Petroleum "had updated information about DPC's oil and gas reserves indicating that the value of those reserves substantially exceeded the value that was represented to the Court"  -- implying that Davis Petroleum either hid "updated" information that was available by NSA or failed to inform the parties that management believed its reserves had increased since the July 2005 Report.  Neither assertion is supported by the record.  Davis Petroleum was forthcoming about the dated nature of its NSA reserve estimates, and all parties were advised that management believed the reserves had increased since the July NSA Report but had no idea what the values would be in the forthcoming NSA report for the period ending December 31, 2005.

Plaintiff's allegation concerning the "understated" book value also fails.  The schedules to the Disclosure Statement identifying book values and liquidation analysis were prepared by FTI to demonstrate not market value, or going concern value, of Davis Petroleum, but to satisfy 11 U.S.C. § 1129(a)(7), which requires that any member of an impaired class who does not accept the Plan will be expected to receive more pursuant to the Plan than in a chapter 7 liquidation of the assets.  The proffer of the Debtor's financial

advisor, Albert Conly, explicitly stated the assumptions on which the valuation was based.  In fact, Mr. Conly testified that certain of the lien items in his opinion may have overstated values that could be achieved in a liquidation.

Moreover, all parties, with the advice of independent professionals, agreed to the Plan price.  The uncontroverted evidence confirms that the price in the Plan was negotiated and agreed to based on the decision of Davis Petroleum's board of directors and Interest holders to accept the Plan based on the severity of Davis Petroleum's liquidity crisis and the lack of other immediately viable alternatives that offered a better prospect for achieving greater value.  The timing of the release of an updated NSA reserve report ignores that all parties knew that the price negotiated by the Independent Director for the Original Evercore Deal had, in fact, taken into account the Clipper discovery, which occurred in October 2005, after the issuance of the July NSA Report. In the absence of the Clipper discovery, the record shows that there would not have been a deal for up to 100% of the equity at anything close to a TEV of $147 million.  The Independent Director confirmed that the financial condition of Davis Petroleum deteriorated from the time of the October exclusivity agreement, and Davis Petroleum's position only worsened after the Original Evercore deal fell through, therefore, it is non sequitur to argue that the Plan price, based on an implied TEV of $150 million, resulted from "misrepresentations" concerning Davis Petroleum's value.

Finally, Plaintiff alleges that Evercore "falsely represented to the Court at the confirmation hearing that there had been a significant decline in value from January to March."  The only testimony offered by Evercore at the Confirmation Hearing was from Puneet Gulati who confirmed that Evercore and its co-investors stood ready to fund the

Plan and capitalize the Reorganized Debtors with up to $40 million to satisfy the Reorganized Debtors' then-projected capital expenditures through the end of 2006. Plaintiff's Amended Complaint apparently refers not to these evidentiary statements proffered by Evercore at the hearing, but instead to the argument of Evercore's counsel in response to "second comments [by Barbara Davis' counsel]" concerning the need to act quickly because "if [Evercore's] going to pay the $150 million to buy the assets, they want to make sure that the assets they think they're buying will still be there." Counsel's argument is opinion and thus improper basis for a fraud claim. Moreover, the statement that "value has eroded" since January was unquestionably true, because Davis Petroleum's liabilities continued to escalate and its working capital position deteriorated significantly both before and after the Original Evercore Deal failed to close. Standing alone, the unwinding by Bank of America of Davis Petroleum's hedge position cost Davis Petroleum $8.97 million dollars.

The uncontroverted evidence does not support the Plaintiff's allegations of misrepresentation by the Debtors or Evercore in connection with the Plan.

### C.  No Evidence of Fraudulent Intent

Plaintiff's claim also fails as a matter of law because the specific intent to defraud required to maintain an action under § 1144 is absent from both the Amended Complaint and the record. Plaintiff fails to allege that any party had fraudulent intent, but even if Plaintiff had alleged these critical facts, the record contains no evidence to sustain them. No evidence supports the necessary assertions: (1) that the Mesdag-Red Mountain advisory relationship was purportedly concealed with intent to defraud the Davis Family or the Court; or (2) that the Debtors or Evercore knowingly concealed information

regarding Davis Petroleum's value with fraudulent intent to mislead the Court.  As such, there is no issue of material fact as to scienter, and the Reorganized Debtors are entitled to judgment as a matter of law on this ground.

"Although [§ 1144] does not define fraud, courts have construed the requirement to mean a showing of actual fraudulent intent."   *In re Zolner*, 249 B.R. 287, 293 (N.D. Ill. 2000); *see also Longardner & Assocs.*, 855 F.2d at 460 ("the courts required a showing of actual fraudulent intent").  "Without a specific showing of the requisite fraudulent intent, the bankruptcy court ha[s] no authority under section 1144 to revoke its confirmation order." *Longardner & Assocs.*, 855 F.2d at 461-62; *In re Graco, Inc.*, 267 F. Supp. 952, 954 (D. Conn. 1967) ("Fraud is not to be inferred."); *In re D.F.D. Inc.*, 43 B.R. 393, 395 (Bankr. E.D. Pa. 1984).  "A determination of the existence of fraud necessary for the revocation of an order of confirmation of Chapter 11 Plan must be made on the specific facts of each case with a view to whether, in each case, the requisite fraudulent intent has been demonstrated." *In re Doty*, 129 B.R. 571, 586 (Bankr. N.D. Ind. 1991).

In *In re Hertz, Inc.*, 38 B.R. 215, 220 (Bankr. S.D.N.Y. 1984), the court denied relief under § 1144 because the plaintiffs failed to make the required "showing of actual fraud."  Even though the court noted conduct that "raise[d] an appearance of impropriety," it held that "this standing alone is not sufficient evidence of actual fraudulent intent."  *Id.*  The court granted judgment as a matter of law for the defendants because the plaintiffs had failed to show that the debtor's acts were "based on anything other than economic self-interest."  *Id.*

Plaintiff's Amended Complaint – filed with the benefit of full discovery – fails to allege any sort of intent to defraud on the part of the Debtors, Evercore, or anyone else, with regard to the alleged misrepresentations regarding the value of Davis Petroleum. The closest the Amended Complaint comes is the allegation that certain parties allegedly "knew" that the value of the Company was greater than that represented at Confirmation. An allegation that a party had knowledge of a false statement is not the same as an allegation that such statements were made with the requisite "actual intent to defraud." *Longardner & Assocs.*, 855 F.2d at 461 (relief denied where pleadings "fail[ed] to cite clear, specific and demonstrable instances involving actual fraudulent intent"). Moreover, here, the Debtors' representations concerning valuation were all made by the Debtors' independent financial advisor, Albert Conly of FTI, who is currently serving as the Liquidating Trustee. The Debtor engaged FTI, an independent financial analyst, to perform the Liquidation Analysis and Plaintiff has made no allegation that FTI acted with any intent to defraud. Moreover, the Debtors submitted those results to the Court, fully informed the Court of the basis for its Liquidation Analysis, and offered additional testimony as to value. The Court also gave the parties time to object and pursue questioning on this topic. As in *Hertz* this case demonstrates only that the parties act in their own economic self-interest. Plaintiff nowhere purports to accuse Mr. Conly of intentionally deceiving the Court. As such, the Amended Complaint and Plaintiff's record is legally insufficient on this ground alone.

Even assuming, arguendo, that the allegations raise an "appearance of impropriety," as the court observed in *In re Hertz* 38 B.R. at 220, "this standing alone is not sufficient evidence of actual fraudulent intent." The record is devoid of the necessary

evidence to show an intent to conceal this Mesdag advisory relationship with Gregg Davis, with the purpose of defrauding the Court.  Furthermore, "[a] debtor's innocent misrepresentations of property value are not grounds for revocation."  *See Matter of Pence*, 905 F.2d 1107, 1110-11 (7th Cir. 1990); *In re Kouterick,* 161 B.R. 755, 759-60 (Bankr. D.N.J. 1993); *In re Edwards,* 67 B.R. 1008, 1011 (Bankr. D. Conn. 1986).

In sum, neither the Amended Complaint nor the record contain any support for fraudulent intent necessary to maintain an action under § 1144.  The uncontroverted evidence supports the opposite conclusion – that all parties acted at arm's length and in good faith, as this Court found at the Confirmation Hearing.  *See* 11 U.S.C. § 1129(a)(3). "[W]here, as in the present case, the creditor fails to show specific acts involving fraudulent intent, it is not entitled to have a confirmed plan of reorganization revoked under section 1144."  *Longardner & Assocs.*, 855 F.2d at 461.

### D.  Defendants Are Entitled To Judgment as a Matter Of Law Because the Order of Confirmation Was Not "Procured By Fraud."

Plaintiff's claim also fails because the challenged conduct did not "procure" the entry of the Confirmation Order.  The uncontroverted evidence fails to show that any of the alleged fraud substantially affected the confirmation process.

Section 1144 allows revocation "if and only if such [confirmation] order was procured by fraud."  "[P]rocured' is a requirement of substantial causation requiring a showing that the alleged fraud was instrumental in obtaining the confirmation order and made a difference in the process."  *In re V&M Management Inc.*, 215 B.R. 895, 903 (Bankr. D. Mass. 1997) (emphasis added).  "The burden is on the movants in the first instance to plead that the alleged fraud substantially affected the confirmation process and – more to the point—specify how."  *Id.*

In *In re Nyack Autopartstores Holding Co., Inc.,* 98 B.R. 659, 661 (S.D.N.Y. Bankr. 1989), the court refused relief under § 1144 because the order had not been procured by fraud.  *Id.*   The court noted that the outcome of the complained-of preference actions was uncertain, and would not determine the success or the failure of the plan.  *Id.*  Furthermore, the court held that "there was no allegation in the amended complaint that [unsecured creditors] would have received a greater distribution if the debtors successfully recovered" the allegedly missing property of the debtors.  *Id.*  "Nor was there any claim that consenting creditors would have withheld their affirmative votes had they been informed," and the fact that a creditor "succeeded the assets of the debtor for less than fair value," by itself, "does not mean that the distribution to creditors would be greater or that their ability to make an informed judgment about the plan would have been enhanced."  *Id.* Certainly, "the plaintiff was not deceived because he did not vote for the plan and appealed the order of confirmation."  *Id.* at 662-63.  As a result, the court held Plaintiff did not show that the  Confirmation Order was procured by fraud.

Plaintiff does not assert that the Plan would not have been confirmed but for these representations.  *See In re V&M Management, Inc.,* 215 B.R. at 903 (relief under § 1144 denied because "[t]he motion for revocation fail[ed] to state a basis on which the confirmation order [could] be revoked because, on the facts alleged, the omitted information, even if material to the confirmation process or to the confirmation order, is such that the order cannot be said to have been procured by the omission").  Instead the Amended Complaint represents an attempt by the sole Interest holder who voted against the Plan to circumvent the finality of the Confirmation Order.  This Court held on the record that the Confirmation was procured on the basis that the Plan was recommended

by professional advisors retained by the Debtors, was the product of arm's length

negotiations between sophisticated parties each represented by counsel, and was

overwhelmingly approved by the Interest Holders.   Moreover, Debtors' retained

financial advisors' testimony was that even taking into account the updated December

NSA Report on Davis Petroleum's estimated reserves which was not available at

Confirmation—in the absence of the Final NSA proposed by the Plan, creditors were not

expected to recover in full (or possibly recover at all), and certainly nothing would be left

for distribution to the Interest holders.  When asked why the Debtors did not push back

the Confirmation Hearing to wait for that report, Mr. Conly responded:

> The – the timing of the – of the filing the confirmation hearing, the closing
> was driven by other matters than the engineering report, including the
> company's very serious liquidity problems, the buyer's desire to close the
> deal and move on because they had already had one deal fail to close, the
> need to identify the claims and satisfy the parties that had been stayed, and
> to avoid any no consent provisions or default provisions in the operating
> agreements were very important matters that the company was facing.
> And moving forward to preserve the value that was there was very
> important regardless of what the timing of the engineering report would
> be.  And based upon the information that we had, we didn't believe that
> the engineering report was going to support a sales price substantially, that
> either equaled to or substantially exceeded the price that was being paid by
> Evercore.

- - Conly Dep. 76:16-77:9.

Under these circumstances, it is speculation to assert that the Confirmation Order was

affected, let alone procured, by the alleged non-disclosures.  Accordingly, Plaintiff's

Amended Complaint fails to state a viable claim for revocation of a Confirmation Order

under § 1144 of the Bankruptcy Code.

Further, the record contradicts any allegation that any alleged omissions or

misstatements regarding the Debtor's value substantially affected the confirmation

process.  Mr. Conly testified that even if, hypothetically, FTI's Liquidation Analysis had included the March 31, 2006, values, these values would not have changed the recommendations and representations FTI made to the board of directors and to this Court.  Even though the updated reserve estimates were not available until weeks after the Confirmation Order was entered, Mr. Conly, to test Plaintiff's theory, performed the same liquidation analysis using the March 31, 2006, NSA report and concluded that his recommendation would not change.  Even given the increased value of the assets reflected in the March NSA Report, Mr. Conly's liquidation analysis would have yielded no recovery to equity.  The choice confronting the Interest Holders and the Court would still have been exactly the same: accepting the Plan, which offered payment in full to all creditors, with a substantial recovery to the shareholders, versus facing the risk of a lengthy Chapter 11 process, which could not assure full payment to anyone.  The Court relied on the undisputed fact that the Plan would pay out more than liquidation, was the only deal available; and time was of the essence because of the acceleration and the threat of non-consent status on significant offshore wells.  *See In re J.E. Jennings, Inc.,* 46 B.R. 167, 172 (Bankr. E.D. Pa. 1985) (denying claim for revocation where "the disclosure [of certain proceedings] … would not have enhanced the ability of creditors to make an informed judgment about the plan in this case because of the uncertainties regarding the outcome of such proceedings; nor was this information material to the possible success or failure of the plan itself").

**E.  Permitting a Section 1144 Claim Premised on Plaintiff's Dissatisfaction With a Plan to Which She Did Not Object at Confirmation Contravenes Fundamental Bankruptcy Policy.**

To ensure that parties can rely on the finality of the bankruptcy process, one of the cardinal rules of bankruptcy law is that a confirmation order once entered is inviolable, and upon expiration of the time to appeal, principles of *res judicata* bar subsequent litigation of any issues that could have been raised as part of the confirmation proceedings.  *See* 8 Collier on Bankruptcy ¶ 1141.02, at 11 (15th ed. 2006) ("in the absence of an allegation of fraud in obtaining the judgment, the Supreme Court held that the doctrine of res judicata applie[s] with respect to matters that are covered by a plan of reorganization confirmed by final order of a bankruptcy court") (citing *Stoll v. Gottlieb*, 305 U.S. 165, 171-72 (1938)); *see also Republic Supply Co. v.  Shoaf*, 815 F.2d 1046 (5th Cir. 1987) (*res judicata* barred action to enforce guaranty when guarantors were released in confirmed plan to which no objection was filed).

"While there is a strong bankruptcy policy against allowing a chapter 11 plan procured by fraud to be effective, there is an equally strong policy in favor of the finality of a confirmation order."  *In re California Litfunding*, 360 B.R. 310, 324 (Bankr. C.D. Cal. 2007) (citing 8 Collier on Bankruptcy § 1144.04[02]); *see also Matter of  Chung King, Inc.*, 753 F.2d 547, 549-50 (7th Cir. 1985) (because the policy of finality in confirmed judicial sales should be protected unless "compelling equities" outweigh it, a "bankruptcy court may vacate a prior order confirming a sale … only in very limited circumstances in the exercise of its powers as a court of equity").   Courts have recognized that, "while it would be ideal for the court to reach back now and correct any irregularity or eradicate any suggestion of possible wrongdoing, absent a showing of

actual fraud this cannot be done at the expense of a confirmed plan." *In re Hertz, Inc.*, 38 B.R. at 220.  The court in *In re Hertz* thus found that "it ha[d] no authority" to revoke the confirmation order "in the absence of competent evidence that would justify prescription of such harsh medicine." *Id.*  In denying relief, the court explained that the exigencies of the circumstances at the time of confirmation, not 20/20 hindsight, must be regarded: "[I]n a less than ideal world the debtors have come up with a realistic plan of reorganization that will provide for nearly full payment of all claims against the estate. The Plan also provides creditors with more than they would receive in liquidation.  The Debtor's Plan was the only plan proposed in this case, and not surprisingly all unsecured creditors [the impaired class], with the exception of [the plaintiffs], voted in its favor." *Id.*

To sustain an action under §1144 the Plaintiff must make a clear showing of fraud by intentional misstatements or concealment.  *See e.g., In re Ogden Modulars, Inc.* 180 B.R. 544, 547-48 (Bankr. E.D. Mo. 1995) (granting § 1144 relief where debtor failed to disclose that debtor's president was collecting a monthly consulting fee; that the debtor's president was using employees' and debtor's property for his own personal uses, and that monthly rentals were diverted from the debtor's accounts to that of the debtor's president).  Courts also demand that any frauds be material, with cognizable effects on confirmation.  *See e.g.,  First Union Nat'l Bank of Fla. v. Perdido Motel Group,* 142 B.R. 460, 464-65 (Bankr. N.D. Ala. 1992) (granting revocation where plaintiff showed that necessary votes for confirmation would not have been obtained had debtor disclosed certain ancillary deals made with certain creditors, and judge's findings and conclusions clearly relied on the debtor's misrepresentations in issuing the confirmation order).

In an attempt to circumvent the finality of the Confirmation Order, to avoid a Plan that was considered unacceptable from the outset, Plaintiff has made unsubstantiated allegations that the confirmation order was "procured" by "fraud." However, as discussed above, Plaintiff has not shown that an actual fraud substantially caused entry of the Confirmation Order, which is required by § 1144. Here, there is no intent to defraud at any point in the parties' dealings, and all alleged omissions with regard to value and Red Mountain were unquestionably disclosed. Plaintiff's action here is particularly problematic because Plaintiff seeks to reopen issues of valuation that Plaintiff's former counsel did not controvert despite the opportunity to do so at Confirmation. Nor is there a discernible effect on the issuance of the Confirmation Order. At most, Plaintiff has alleged that less-than-perfect representations of value were made, in good faith. As one bankruptcy court has observed, "criticism" about opinions as to value, "is legitimate only for cross examination of an expert so opining …. It falls far short of establishing fraud." *In re Robbins*, 178 B.R. 299, 304 (Bankr. D. Mass. 1995). Here, Plaintiff had ample opportunity at the Confirmation Hearing to raise any of her concerns regarding valuation on cross-examination of Mr. Conly, or through discovery. However, Plaintiff chose to ask only one question of FTI, as to whether additional offers were solicited. Plaintiff cannot now utilize the vehicle of an action under § 1144 to raise an objection that could have – and should have – been raised at the Confirmation Hearing.

The record makes clear that this case does not involve any actual fraud, much less fraud in the procurement of the Confirmation Order. This case falls well outside the range of cases that warrant the "harsh medicine" of §1144. *See In re Hertz. Inc.*, 38 B.R. at 220. As in *In re Hertz*, the Debtors proposed a plan "in a less than perfect world" that

would provide full payment to creditors and a substantial amount to equity. *Id.* Absent any evidence of fraud, Plaintiff's allegations constitute an attempt by a dissatisfied Interest Holder to reopen a final judgment in hopes of some possible additional recovery or unwarranted settlement. Such a claim finds no basis in the bankruptcy code or policy. Absent any fraudulent conduct, the Confirmation Order is entitled to the benefits of *res judicata.*

## IV. CONCLUSION

For the reasons stated above, the Reorganized Debtor's Motion for Summary Judgment on the Amended Complaint should be granted and judgment as a matter of law in favor of the Reorganized Debtor should be entered. Counsel for the Reorganized Debtors shall submit a proposed judgment to the court.

Dated: 04/10/2008

_____
RICHARD S. SCHMIDT
United States Bankruptcy Judge